PD-0832-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/2/2015 1:05:05 PM
Accepted 11/2/2015 2:26:45 PM
ABEL ACOSTA
CLERK

CASE NO. PD-0832-15

_____

IN THE COURT OF CRIMINAL APPEALS
OF THE STATE OF TEXAS

_____

THE STATE OF TEXAS,

Appellant,

v.

JAMES ALAN JENKINS,

Appellee.

_____

On Appeal From the 14th District Court of Appeals,
Cause Number No. 14-13-00662-CR

_____

## STATE'S BRIEF

_____

KEN PAXTON
Attorney General of Texas

JONATHAN WHITE
Assistant Attorney General

*Lead Appellate Counsel

ADRIENNE MCFARLAND
Chief, Criminal
Prosecutions Division

*JON R. MEADOR
Assistant Attorney General
State Bar No. 24039051

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

_____

ATTORNEYS FOR THE STATE

ORAL ARGUMENT REQUESTED

# IDENTITY OF JUDGE, PARTIES, AND COUNSEL

JUDGE:
    Honorable John Stevens
    359th District Court
    Montgomery County, Texas

PROSECUTORS:
    Jonathan White & David Glickler
    Office of the Attorney General
    Assistant Attorneys General
    P.O.12548
    Austin, Texas 78711

DEFENSE ATTORNEY:
    Audley Heath
    609 Colquitt Street
    Houston, Texas 77006

APPELLATE ATTORNEYS:
    George McCall Secrest, Jr. (Appellee)
    Bennett & Secrest, PLLC
    808 Travis Street, 24th Floor
    Houston, Texas 77002

    Jon R. Meador
    Office of the Attorney General
    (Appellant)
    Assistant Attorney General
    P.O.12548
    Austin, Texas 78711

# TABLE OF CONTENTS

IDENTITY OF JUDGE, PARTIES, AND COUNSEL.............................i

INDEX OF AUTHORITIES.................................................iv

STATEMENT OF THE CASE ...............................................1

STATEMENT REGARDING ORAL ARGUMENT .................................1

ISSUES PRESENTED.....................................................2

STATEMENT OF THE FACTS .............................................2

    I.  Overview of the RUD.............................................2

    II. The State's Case for Conspiracy to "Take Over" the RUD..............2

    III. The Genesis of the Plan....................................5

    IV. The Plan to "Make Up" Reasons for Returning to The Residence
    Inn...................................................... 11

    V. Statement of Facts Regarding Appellee's Understanding of
    Relevant Election-Law Authorities .............................14

    VI. The Mistake of Law Instruction.............................21

SUMMARY OF THE ARGUMENT ..........................................22

ARGUMENT...........................................................23

    I.  The Trial Court Did Not Err in Failing to Provide the Section 8.03
    Instruction. .................................................23

A. Standard of Review. .................................................................. 23

B. Affirmative Defenses Are Subject to Confession and Avoidance. ...................................................................................25

C. Section 8.03 Mistake of Law Is In The Nature of Confession and Avoidance. ................................................................. 34

D. Appellee's Reliance Was Unreasonable as a Matter of Law....... 50

E. A Mistake-Related Defense That Tended To Negate The Culpability Necessary for the Commission of the Offense Would Not Apply To Illegal Voting. ................................................................. 53

II. The Court of Appeals Erred in Finding that Appellee Was Harmed by the Trial Court's Failure to Provide a Section 8.03 Mistake of Law Instruction. ................................................................. 57

PRAYER FOR RELIEF ................................................................. 62

TEXAS RULE OF APPELLATE PROCEDURE 9.4 ............................ 63

CERTIFICATE OF SERVICE .......................................................... 64

# INDEX OF AUTHORITIES

Page

CASES

*Alford v. State*, 808 S.W.2d 581 (Tex. App. – Dallas 1991), *aff'd by,* 866 S.W.2d 619 (Tex. Crim. App. 1993);................................................................33,35

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App.1984)...............24, 65

*Austin v. State*, 541 S.W.2d 162 (Tex. Crim. App. 1976) .......................47

*Bailey v. United States*, 524 U.S. 184 (1998) ..........................................33

*Barnette v. State*, 709 S.W.2d 650 (Tex. Crim. App. 1986)....................28

*Boykin v. State*, 818 S.W.2d 72 (Tex. Crim. App. 1991).........................42

*Bruno v. State*, 845 S.W.2d 910 (Tex. Crim. App. 1993) ........................28

*Bryan v. United States*, 524 U.S. 184 (1998)...........................................56

*Casey v. State*, 215 S.W.3d 870 (Tex. Crim. App. 2007) .......................25

*Commonwealth v. Bobino*, 18 A.2d 458 (N.Y. 1941)...............................49

*Commonwealth v. Cosentino*, 850 A.2d 58 (N.Y. 2004)....................49, 50

*Commonwealth v. Kratas*, 564 Pa. 36, 764 A.2d 26 (Pa. 2001)..............37

*Cornet v. State*, 359 S.W.3d 217 (Tex. Crim. App. 2012) ......................41

*Cornet v. State*, 417 S.W.3d 446 (Tex. Crim. App. 2013) ......................57

*Cox v. Louisiana*, 379 U.S. 559 (1965) ...................................................38

*Davis v. United States*, 690 F.3d 330 (5th Cir. 2012)............................52

*DeHam v. State*, 389 S.W.2d 955 (Tex. Crim. App. 1965) .....................28

*Dixon v. United States*, 548 U.S. 1 (2006) ..............................................33

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007).......................65

*Durden v. State*, 290 S.W.3d 413 (Tex. App. – Texarkana 2009, no pet.) ..................................................................................................................58

*Ex parte Canady*, 140 S.W.3d 845, 849 (Tex. Crim. App. 2004) ...........39

*Ex parte Nailor*, 149 S.W.3d 125 (Tex. Crim. App. 2004) .....................38

*Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998)...................32

*Granger v. State*, 3 S.W.3d, 36 (Tex. Crim. App. 1999) .........................31

*Green v. State,* 829 S.W.2d 222 (Tex. Crim. App. 1992) .................. 47, 53

*Hefner v. State*, 735 S.W.2d 608 (Tex. App. – Dallas 1987, pet. ref'd) ..48

*Hicks v. Feiock*, 485 U.S. 624 (1988) .....................................................33

*In re Winship*, 397 U.S. 358, 364 (1970) ................................................34

*Jackson v. State*, 646 S.W.2d 225 (Tex. Crim. App. 1983) .....................31

*Jenkins v. State*, No. 14-13-00662-CR, 2015 Tex. App. LEXIS 5667 (Tex. App. – Houston [14th Dist.] 2015) ........................................... *passim*

*Juarez v. State*, 308 S.W.3d 398 (Tex. Crim. App. 2007) ..... 27, 29, 31, 35

*Kimbro v. State*, 157 Tex. Crim. 440, 249 S.W.2d 919 (Tex. Crim. App. 1952) ........................................................................................... 28, 35

*Love v. State*, 199 S.W.3d 447 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).................................................................................................24

*Lowry v. State*, 692 S.W.2d 86, 87 (Tex. Crim. App. 1985) .............. 34, 40

*Martin v. Ohio*, 480 U.S. 228 (1987) ..................................... 41, 42, 58, 59

*McDuffee v. Miller*, 327 S.W.3d 808 (Tex. App. – Beaumont 2010, no pet.) .................................................................................................3

*Medrano v. State*, 421 S.W. 3d 869 (Tex. App.—Dallas 2014, no pet.)..54

*Miller v. State*, 660 S.W.2d 95 (Tex. Crim. App. 1983) .........................28

*Mills v. Bartlett,* 377 s.w.2D 636 (1964) .............................. 14, 51, 52, 60

*Mullaney v. Wilbur*, 421 U.S. 684 (1975)..............................................34

*Okonkwo v. State*, 398 S.W.3d 689 (Tex. Crim. App. 2013).............. 44, 61

*Ostrosky v. State*, 725 P.2d 1087 (Alaska Ct. App. 1986) ......................53

*People v. Marrero*, 507 N.E.2d 1068 (N.Y. 1987)............................. 48, 51

*People v. Studifin*, 504 N.Y.S.2d 608 (Sup. Ct. 1986)...........................38

*Plummer v. State*, 426 S.W.3d 122 (Tex. App. – Houston [1st Dist.] 2012, pet. ref'd) .................................................................................47

*Posey v. State*, 966 S.W.2d. 57 (Tex. Crim. App. 1998)................... 23, 24

*Reyes v. State*, 422 S.W. 3d 18 (Tex. App. – Waco 2013, pet. ref'd).......58

*Rodriguez v. State*, 368 S.W.3d 821 (Tex. App. 2012, pet. ref'd)............44

*Romero v. State*, 800 S.W.2d 539 (Tex. Crim. App. 1990)......................25

*Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2009) .......................44

*Sanchez v. State*, 376 S.W.3d 767 (Tex. Crim. App. 2012).....................57

*Sanders v. State*, 707 S.W.2d 78 (Tex. Crim. App. 1986).................. 29, 30

*Sands v. State*, 64 S.W.3d 488 (Tex. App. – Texarkana 2001, no pet.)..58

*Shaw v. State*, 243 S.W.3d 647 (Tex. Crim. App. 2007) ...................24, 38

*Smith v. United States*, 133 S. Ct. 714 (2013).........................................41

*State v. DeRoach*, 458 S.W.3d 696 (Tex. App. – San Antonio 2015 pet. ref'd) ..............................................................................................47

*State v. Pruser*, 21 A.2d 641 (N.Y. 1941) ...............................................56

*State v. Sheedy*, 125 N.H. 108, 480 A.2d 887 (1984) ..............................48

*Taylor v. Taintor*, 83 U.S. (16 Wall.) (1873) ..........................................47

*Texas v. Florida*, 306 U.S. 398  (1939) ...................................................52

*Thompson v. State*, 236 S.W.3d 787 (Tex. Crim. App. 2007) ........... 39, 40

*Thompson v. State*, 26 Tex. Ct. App. 94, 9 S.W. 486 (1888)...................54

*United States v. Aquino-Chacon*, 109 F.3d 936 (4th Cir. 1997).............51

*United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558 (1971) ....56

*Westbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000) ...........25

*Willis v. State*, 707 S.W.2d 78 (Tex. Crim. App.1986)...........................29

*Young v. State*, 991 S.W.2d 835 (Tex. Crim. App. 1999).........................39

## STATUTES

Texas Election Code § 1.015 (West 2010) ...................................... *passim*

Texas Election Code § 11.001 (West 2010)…………………..….....………62, 63

Texas Election Code § 64.012 (West 2010)……………..……………*passim*

Tex. Penal Code Ann. § 8.02 (West 2010) ...................................... *passim*

Tex. Penal Code Ann. § 8.03 (West 2010) ...................................... *passim*

Tex. Penal Code art. 40 (1948) ........................................................ 39, 40

Tex. Penal Code art. 45 (1879) ........................................................ 39, 40

## OTHER AUTHORITIES

Texas Criminal Pattern Jury Charges, State Bar of Texas 2010);
§ B12.2, at 164-167 (2010)......................................................... *passim*

*Texas Criminal Practice Guide* § 122.01 ............................................. 33

*The Doctrine of Affirmative Defenses in Civil Cases – Between Common Law and Jewish Law,* 34 N.C.J. Int'l & Comm. Reg. 111, 117-18 (2008) ....................................................................................... 35

Wayne R. LaFave, *Substantive Criminal Law* § 5.6(a), at 394-397 (2d ed. 2003)); ...................................................................... 36, 37, 51

## STATEMENT OF THE CASE

Appellee, James Alan Jenkins, was charged with illegal voting; that is, voting in an election in which he knew he was not eligible to vote. CR at 11[1] (indictment); Appendix A. Appellee asked for an instruction at the charge conference on "Mistake of Law," based on section 8.03 of the Penal Code (Section 8.03 Mistake of Law). CR at 318-322; Appendix B. The Honorable John Stevens denied the requested instruction finding that Appellee had failed to admit to the conduct charged. IX RR 167-170; Appendix C. Appellee was subsequently found guilty and sentenced to three years' incarceration. CR at 353-355; Appendix D. On appeal, a majority of the court found that Judge Stevens erred in failing to provide the instruction and that the error harmed the Appellee, while the dissent found no error or harm. *See Jenkins v. State,* No. 14-13-00662-CR, 2015 Tex. App. LEXIS 5667 (Tex. App. – Houston [14th Dist.] 2015); Appendix E.

## STATEMENT REGARDING ORAL ARGUMENT

Because this Court would be addressing an issue of first impression, namely, whether Section 8.03 Mistake of Law is subject to the doctrine of confession, the State respectfully requests oral argument.

---

[1] "CR" refers to the Clerk's Record—the transcript of pleadings and documents filed with the clerk during trial and is followed by page number. "RR" refers to the Reporter's Record of the transcribed trial proceedings and is preceded by volume number and followed by page number. "SX" will refer to the numbered exhibits offered by the State and admitted into evidence at trial, and "DX" will refer to the defendant's exhibits.

1. The court of appeals erred in failing to affirm the trial court's ruling denying Appellee's Request for a Section 8.03 Mistake of Law instruction.

2. The court of appeals erred in finding that Appellee was harmed by the trial court's failure to provide a Section 8.03 Mistake of Law instruction.

## STATEMENT OF THE FACTS

### I. Overview of the RUD.

The Woodlands Road Utility District (RUD) was created to do road projects in and around The Woodlands, Texas, and is financed by taxes on commercial properties within the RUD. VII RR 33-41 The RUD is bounded primarily by the major roadways and commercial properties in The Woodlands and is governed by an elected board of five directors, none of whom by law had to reside within the RUD. VII RR 33-41; SX 1 (boundary map). Three of the five board seats expired in 2010, and an election was scheduled for May 8, 2010. VII RR 43.

### II. The State's Case for Conspiracy to "Take Over" the RUD.

The candidates included three incumbents, Bill Neill, Gene Miller, and Winton Davenport, and three challengers Bill Berntsen, Peter Goeddertz, and Richard McDuffee. VII RR 37, 40-43. There were two

votes cast for each of the incumbents in early voting. VII RR 43-44; SX 3 (election records). There were ten votes cast each of the challengers on election day. VII RR 44-45; SX 4 (election records). The ten voters included Appellee, Goeddertz, Roberta Cook, Sybil Doyle, Berntsen, Adrian Heath, Robert Allison, Benjamin Allison, Thomas Curry, and McDuffee. VII RR 45-46. Each of the ten, election-day voters listed The Marriott Residence Inn, 9333 Six Pines Drive, The Woodlands (hereinafter, "The Residence Inn"), as his or her residency. VII RR 44-48. Appellee signed a voter's registration application on April 5, 2010 listing The Residence Inn as his residence. VII RR 54-55. But Appellee also listed his mailing address as 16 Pastoral Pond Circle, The Woodlands (hereinafter, "Pastoral Pond"), which he and his wife had purchased on or about January 17, 1992, and which had been designated as his "homestead" since June 29, 2004. VII RR 54-55; SX 7, 9.

James Stillwell, an attorney who had represented the three incumbent directors in a lawsuit[2] challenging the election results filed on May 14, 2010, testified that he obtained records from The Residence Inn, and those records indicated that none of the election-day voters had

---

[2] *McDuffee v. Miller*, 327 S.W.3d 808 (Tex. App. – Beaumont 2010, no pet.).

rented a room at The Residence Inn prior to the date on which he or she executed his or her voter registration card. VII RR 49-61; SX 6 (guest records for The Residence Inn), 7 (voter registration applications). Arguing that the ten, election-day voters had conspired to "take over the RUD," the State was permitted to introduce, over Appellee's objection, deed records of the election-day voters tying each of them to properties outside the RUD. VII RR 67-77; SX 8-16 (deed records), 17 (aerial map). The State also introduced photographs of the properties, inside and out, and the homestead exemptions applicable to each property all indicating that the voters lived outside the RUD. VII RR 77-85, 94; SX 18, 20-28.

Dara Bowlin, a sergeant in the special investigations unit at the Attorney General's office, obtained certified copies of Department of Public Safety records for all ten voters. VII RR 157-165; SX 39-48. Appellee changed his address listed on his driver's license to The Residence Inn on May 24, 2010. VII RR 168-169; SX 40. Curry had also changed his address to The Residence Inn. VII RR 159; SX 41. No one else listed The Residence Inn as his or her address. VII RR 157-165. Bowlin also obtained certified copies of Texas Department of Motor Vehicle registration records for the election-day voters. VII RR 165; SX

49. None listed The Residence Inn as an address and all matched up with the deed records in state's exhibits 8-17, which indicated that each voter had ties to physical property outside the RUD. VII RR 165-168.

## III.   The Genesis of the Plan.

Heath, who had lived in Montgomery County for nearly twenty years and considered himself to be "very political," began investigating the formation and workings of the RUD and discovered that it was $65 million in debt and, in his opinion, benefited the developers and not the residents. VIII RR 138-139, 153-154. After learning that three of the five board seats would expire in 2010, Heath began speaking with state and local election officials about the residency requirements for voting. VIII RR 140-143, 154-157. He subsequently decided he wanted to establish his residency within the RUD so he could vote in the upcoming May 8, 2010 election. VIII RR 160. He changed his residency on March 5, 2010 to The Residence Inn. VIII RR 163-164; SX 7. He also began looking for people to run for the board. VIII RR 160. He talked to several people about running and McDuffee, Goeddertz, and Berntsen eventually agreed to run. VIII RR 160-161. While the addresses McDuffee, Goeddertz, and Berntsen used in their applications to run for the open positions on the

5

RUD board were outside the RUD, all listed The Residence Inn as their addresses when they registered to vote in the RUD election. VII RR 40-42, 46, 57-59; SX 2 (candidacy applications).[3] Heath called Appellee in late February or early March and asked if he could get a group together for a public meeting in the RUD. IX RR 71. At the meeting, Heath discussed residency for voting purposes, referring to opinions from the Secretary of State and the Office of the Attorney General[4] and a copy of the RUD map. VIII RR 175-176.

At trial, McDuffee testified that he first heard about The Woodlands RUD when he received a call around March of 2010 inviting him to a meeting at Appellee's place of business. VII RR 171-172. Appellee, who McDuffee characterized the "leader" of the voting group because "everything flowed out of Jim's office," expressed a desire for McDuffee to vote in the election and to run for president of the board. VII RR 179-182. McDuffee's instructions were "to be elected, become president, pay off the bills, and turn the lights out [on the RUD]." VII RR

---

[3] A candidate did not need to reside within the RUD to run for the Board but had to reside within the RUD to vote. VII RR 41.

[4] DX 1 is the Secretary of State Opinion, GSC-1 (GSC-1). DX 2 is the opinion of the Office of the Attorney General, GA-0141 (GA-0141).

180. While he was in Appellee's office, McDuffee filled out his application for candidacy for the Board and then, in April 2010, changed his voting address to the address for The Residence Inn, which Appellee had posted in his office. VII RR 180-186.

Benjamin Allison testified that he was 23 years old when he had been brought into the voting group by Heath. VIII RR 8. He first heard about the RUD and pending election in March 2010. VIII RR 11. He and his brother, Robert, decided to change their addresses to The Residence Inn so they could vote in the May 8 election. VIII RR 8-9, 16-17.

Goeddertz testified that he first heard about the RUD from Appellee, whom he had known for about 15 years. VIII RR 72. Appellee was very interested in the issue, so they devised a plan to run for director positions so they could disband the RUD. VIII RR 73. Appellee asked Goeddertz, McDuffee, and Berntsen to submit their candidacies for the board, and they agreed. VIII RR 73-74. When Goeddertz applied for a place on the ballot, he listed his permanent address as 15910 Hartman, which was located outside the RUD. VIII RR 75; SX 2. But when he registered to vote on March 31, 2010, he listed The Residence Inn as his residence address while using the Hartman address as his mailing

7

address. VIII RR 76-78; SX 7. Goeddertz testified that he put his property up for sale when he ran for office. VIII RR 93. He testified that The Residence Inn was "[p]robably not" his "fixed place of habitation" and not where he "intend(ed) to return after any temporary absence." VIII RR 96. He admitted that he put his house up for sale solely for the purpose of the lawsuit. VIII RR 110.

Appellee testified that he had resided at the Pastoral Pond home in Montgomery County for approximately twenty years. IX RR 64. He first found out about the RUD elections when Heath called him in late February or early March and asked if he could get a group together for a public meeting in the RUD. IX RR 71. Appellee invited four people – Goeddertz, McDuffee, Berntsen, and Jim Doyle. IX RR 71-72. The topic of the meeting included information on the RUD gleaned from Heath's research. IX RR 72. Heath also provided the Secretary of State opinion on residency and a color map of the RUD. IX RR 73-74.

Phil Grant, the First Assistant District Attorney in Montgomery County, Texas, testified that he sent out letters to the newly registered voters after receiving notification that several individuals had registered to vote listing a hotel in the RUD as their residencies. VII RR 126-27; SX

8

34 (Grant Letter).[5] Grant said that the letters were not intended to be threats, legal advice or blanket encouragements to exercise the right to vote, but rather that they were meant to be informative, cautionary letters. VII RR 127-129. Grant encouraged the recipients in the letter to read election-related statutes, opinions from the Attorney General [GSC-1] and from the Secretary of State [GA-141], and a criminal statute on illegal voting. VII RR 130. He acknowledged that he was not providing an exclusive list of election-related authorities. VII RR 137. Although he did not include the definition of eligibility and residence in the letter, he thought that the definition of residence as laid out in Section 1.015 of the election code provided enough specificity to have the desired effect on the recipients of the letter. VII RR 138-40.

McDuffee remembered receiving the Grant Letter and he said his first thoughts were: "Danger. This wasn't going to be a walk in the park. It was not something taken lightly." VII RR 181. He subsequently spoke with an attorney friend, who said he could not "call" the question of residency. VII RR 207-208. Appellee advised McDuffee not to worry about

---

[5] The Grant Letter referenced GSC-1, GA-141, and section 64.012 of the Election Code criminalizing "Illegal Voting." SX 34. The voters were "encouraged to exercise your right to vote in a manner that is consistent with the law." SX 34.

the Grant Letter because the matter of residency was a "gray area." VII RR 212. Goeddertz remembered that when they first received the Grant Letter, all the voters got together at Appellee's office to review it. VIII RR 97-98. He thought the letter seemed to be cautioning them about what they were about to do. VIII RR 98. The letter directed them to helpful resources, but he did not personally review them. VIII RR 98. They sought attorney Eric Yollick's advice and afterwards decided to go ahead and vote in the election. VIII RR 99. Appellee testified that he was not concerned with the Grant Letter because he had already read the authorities referenced in the letter. IX RR 95. After reviewing those resources again with Yollick, Appellee believed he was complying with the law. IX RR 103.

On May 7, 2010, the night before the election, Appellee checked into The Residence Inn and subsequently checked out on May 9, 2010, the day after the election. VII RR 46-49. Although the registration identified only one registered guest, notes appended to the account identified four other people in the room—Heath, Curry, Goeddertz, and McDuffee. VII RR 50, 91. The records also included a registration for Benjamin Allison and one other guest for one night on May 14, 2010. VII RR 51. Allison said the

first time he stayed at The Residence Inn was May 7, 2010, the night before the election. VIII RR 20. On May 8, he and his brother, who had also stayed at the hotel, went to vote in the morning, after which they returned to the hotel to check out, planning to return at some uncertain date in the future. VIII RR 22-23. He and his brother paid their portion of the hotel cost to Appellee. VIII RR 23. Goeddertz stayed at The Residence Inn for the first time on May 7, 2010 as well. VIII RR 85-86. According to Goeddertz, Appellee oversaw the renting of the rooms, and he paid his portion of the bill to Appellee. VIII RR 84-86. When he left the hotel on May 9, 2010, Goeddertz probably did not intend to return. VIII RR 88. He testified that he only registered to vote from that address because he wanted to vote in the May 8, 2010 election. VIII RR 88-89. McDuffee testified that he did not spend the night at The Residence Inn before the election and had never, in fact, spent the night at The Residence Inn. VII RR 186.

## IV. The Plan to "Make Up" Reasons for Returning to The Residence Inn.

Eric Yollick testified that he was hired after the election by about ten people, including Appellee, to represent them in the election contest. IX RR 35-36. McDuffee testified that Yollick asked the voters to meet at

11

his office and to come prepared with a reason for moving out of their houses and into The Residence Inn. VII RR 187. Allison attended the meeting and said Yollick strongly advised them to rent additional rooms at The Residence Inn. VII RR 27. Appellee testified that Yollick asked the voters to come up with a reason why they moved to The Residence Inn: "We had to prove that we were honestly going to live at the Residence Inn." IX RR 164-165. Yollick claimed, however, that he did not give them any advice with regard to where they should stay during the lawsuit. IX RR 36. McDuffee's "made-up reason" was that he had a security and insurance license and needed to be in the center of the area to be able to do sales and compliance. VII RR 187. According to McDuffee, the group decided to rent more rooms and to put clothes in the rooms to make it look like they were living there. VII RR 188-190. They would then leave and come back the next morning for breakfast. VII RR 188-190; SX 33 (photographs). The group posed for photographs evidencing their post-election stay at The Residence Inn. VII RR 188-198. The photos include McDuffee posing as if reviewing documents because he was supposed to be doing business in the district, people sitting in the lobby, people

playing basketball, people holding up newspapers and mail to evidence their post-election stay, clothes hanging in room closets. VII RR 192-195.

After the civil lawsuit was filed in May 2010, Appellee, according to Stillwell, changed his driver's license to The Residence Inn as his residence. VII RR 94-96. Appellee confirmed with Stillwell that he had never changed his Pastoral Pond homestead exemption. VII RR 87. Appellee also verified that he had registered Pastoral Pond as a voting address for close to 20 years and that the majority of his personal property was either at his house or at his business. VII RR 89-90. Appellee told Stillwell that he had been trying to sell his home at Pastoral Pond. VII RR 92. Stilwell testified that when he visited Appellee's house as part of his investigation for the civil trial, he did see a "for sale" sign on the property. VII RR 103. At the time of trial, Appellee still owned the property. VII RR 119.

Bowlin testified that she issued a grand jury subpoena on The Residence Inn for records of the ten voters during a period of 19 months starting January 2010. VII RR 142-145; SX 19. All told, Appellee stayed seventeen nights at The Residence Inn after the election. VII RR 146-149.

The records did not show any other stays from June 15, 2010 through July 26, 2011. VII RR 150.

## V. Statement of Facts Regarding Appellee's Understanding of Relevant Election-Law Authorities.

Appellee indicated that he had read the sources set out in the Grant Letter prior to receiving the letter. IX RR 94-95. He noted that although the Secretary of State opinion was about a Prairie View student, he believed that the last sentence made it applicable to his situation: "These principles apply equally to college students as well as other voters, and no more can be required of them in order for them to register and vote in the state of Texas." IX RR 79. He believed that the first step, then, was to register to vote. IX RR 79. Secondly, he knew that he would also have to reside in the district. IX RR 80. Appellee interpreted this to mean not that one had to have a specific dwelling or abode but, rather, that one need only be a "community member." IX RR 80. He also read *Mills v. Bartlett*,[6] which he understood to say that "bodily presence alone and intention alone do not determine a residence, but when the two coincide at that moment the residence is fixed and determined . . . [with] no

---

[6] 377 S.W.2d 636 (1964).

14

specific length of time for the bodily presence to continue." IX RR 81. Once someone has established a residence, then, he no longer has to be there. IX RR 81. "[B]odily presence . . . just means I visited there." IX RR 82. Next, one needed the "the intention to create that residence for voting purposes," a right held equally by everyone, who were all treated the same: "The important thing is that you decide. It's you. You have the opportunity to create the residence of your own desires." IX RR 82-83.

Appellee claimed that he had bodily presence in the RUD for twenty years at the time he filled out his voter registration application on April 5, 2010 due to his activity within the RUD. IX RR 84; SX 7. However, on the date he filled out his voter registration, he slept at his Pastoral Pond residence. IX RR 84. He testified that he chose The Residence Inn because it was close to his bank, the library, the community center where people voted, the post office, and his favorite restaurant. IX RR 85. He said he had been planning on selling his house. IX RR 85-87. His home was not sold, and he was still living there. IX RR 117. The Residence Inn was also close to his business, so he intended to have his residence for voting purposes at The Residence Inn as long as he had the business. IX RR 89.

On May 7, 2010, the day before the election, Appellee checked in at The Residence Inn, thus fulfilling the residency requirement. IX RR 113. Residence meant "domicile" and "domicile meant "one's home and fixed place of habitation to which one intends to return after any temporary absence." IX RR 114. One does not lose his residency by going to another place for "temporary purposes." IX RR 116. Appellee testified that he probably stayed sixteen or seventeen nights at The Residence Inn in the three years after he filled out his voter registration application. IX RR 118. He believed that he was returning home when he returned to the Pastoral Pond address "[m]ost of the time." IX RR 118. All of the remaining nights were spent at either his office or at Pastoral Pond. IX RR 118.

While analyzing the definition of "residence" in the election code, i.e. domicile, one's home or fixed place of habitation to which one intends to return after any temporary absence, Appellee said that he interpreted the word "habitation" to mean "what your habits are." IX RR 119. And he said, "My permanent habitation is where I go; where I am; what district I'm in." IX RR 121. Appellee testified that he considered The Residence Inn to be his habitation, despite not sleeping there for over

16

1200 nights since the time of his registration. IX RR 119-20. According to Appellee, a "habitation" is not necessarily where you "live" or "sleep." IX RR 121. He agreed that "everybody has a right to go stay in a hotel somewhere and overthrow a utility district" if they have "the bodily presence and the intent." IX RR 122. Appellee thought one could vote wherever one "can establish residence for voting purposes" and that "residency for voting purposes" means that same thing as "residency" under the Election Code. IX RR 123-125, 139.

[White]: [Showing him DX 2 (GA-0141)] Okay. So, residence for purposes both of registration and voting is defined to mean domicile, one's home and fixed place of habitation to which one intends to return after a temporary absence. And it cites Texas Election Code Section 1.015(a) which we just looked at. So, tell me what difference there is between this fluffy concept of residence for voting purposes and the definition of residence that's in the election code.

[Appellee]: Well, a fixed place of habitation means an area. It's a district. It's a locality.

[White]: You're not answering my question, Mr. Jenkins. What difference is there between the definition of residence for voting purposes and residence as defined in the election code, Section 1.015.

[Appellee]: That's residence.

[White]: It's the same thing, isn't it?

[Appellee]: Right. Right.

17

[White]: There's no residence for voting purposes, is there? That's not a different concept at all, is it?

[Appellee]: Well, residence has a different meaning depending on the contents.

[White]: Residence for voting purposes is not a different term than residence under the election code, is it?

[Appellee]: I agree. I agree with that.

[White]: And if we remember, if all else fails and we're confused, we go back where to get our definition of residency?

[Appellee]: We go to the law and case history.

[White]: Do we go to case history, Mr. Jenkins, or do we go to the election code?

[Appellee]: Well, I would assume we use the case history because that's the – the Secretary of State opinion is full of it and that was given to me for advice.

[White]: So again, residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by this code, isn't it, Mr. Jenkins?

[Appellee]: That's correct.

[White]: So, we come back where?

[Appellee]: You come to the election code but you get some advice from case history.

[White]: You come back here but you get some advice; is that right? Is that what that says?

[Appellee]: No, but that's what I – how I interpret it.

[White]: So, is the law that the jury should follow in this case the law of Jim Jenkins?

[Appellee]: No, it's not. But I think people, when they go to vote, they got to find out if they're the proper resident in a court of law like I'm doing today.

[White]: So this is the proper procedure to figure out your residence is that a [sic] what you're suggesting?

[Appellee]: No, I don't think it's the proper procedure at all. I think the law should be clear enough so someone can decide what residence means and so they can make the proper determination for themselves. And I happen to believe that the law is clear.

[White]: You do believe the law is clear?

[Appellee]: Because it's vague.

[White]: And so, the law is clear because it's vague; is that right?

[Appellee]: The definition is vague and intentionally so.

[White]: So it's clear because it's vague?

[Appellee]: It's clearly vague. And that's done intentionally so that the individual can determine where he wants to vote. He gets one vote. He gets to decide. Not the state. Not my next-door neighbor, you know. Not some government entity in Washington. I do. It's one of your fundamental rights.

IX RR 125-127.

19

The law is vague," according to Appellee, in the sense that "'place'" means "locality," the RUD, for example, "where you spend your time. Where is your – what are you habits." IX RR 129. "Habitation" did not mean "dwelling" or "abode," he said. IX RR 130. Appellee thought one could have a residency "for voting purposes," another for obtaining a driver's license, another for being eligible for in-state tuition, and yet another for eligibility to run for office. IX RR 140. Appellee thought that one could live in a community but have a home somewhere else. IX RR 141. Appellee also added that his home at Pastoral Pond was his residency for "food and shelter purposes." IX RR 143. Appellee claimed the RUD was his habitation even though he also admitted that he did not know it existed for most of the 20 years he lived in Montgomery County. IX RR 147. Further, although Appellee continuously referred to The Residence Inn as his "residence for voting purposes," he admitted on cross-examination that residence for voting purposes is not a different term than residence under the election code. IX RR 125. Despite this admission, Appellee testified that for the purposes of voting in May 2010, his residence was The Residence Inn. IX RR 142. Further, because there was no durational requirement on residence, his residence for the

20

purposes of food and shelter in May 2010 was also the Residence Inn. IX RR 143. He arrived at this conclusion based on his belief that "the law is clear" in that the definition of residence is intentionally vague so that the individual can determine where he wants to vote. IX RR 126-127.

Last, Appellee testified that a paragraph in the election code pertaining to mistaken residence applied to his case, despite the fact that he also believed that he did not make a mistake on his residence and, in fact, "got it right." IX RR 151-52. Appellee firmly believed that he voted lawfully in May of 2010. IX RR 152.

## VI. The Mistake of Law Instruction.

Appellee asked Judge Stevens for Section 8.03 Mistake of Law instruction at the charge conference. IX RR 166-171; CR 318-322; Appendix B. In rejecting the request, Judge Stevens said:

> Number one, as far as Section 8.03 is concerned, the defendant has flatly challenged throughout this trial that he committed the conduct charged. He has stood by his belief and his contention that he was eligible to vote. And that is one of the elements and that is being challenged. It is not an element that he is admitting to. And for that reason, the mistake of law defense is not going to be allowed.

IX RR 169; Appendix C. He also added:

> However, as this Court understands the theory of the Defense case through its presentation and arguments, this

21

mistake of law, that Mr. Heath is submitting, is actually intertwined in the challenge to the element that the State has to prove and that is that the defendant knew he was ineligible to vote. He voted in an election that he knew he was not eligible to vote. He's challenging that element and he will certainly be – he's entitled to do that. And that argument and presentation inherent within this proposed mistake of law this Court looks at is actually a challenge on the element of the offense. He's denying he committed the offense; and that is the battleground of this case is the defendant's – whether the State can prove beyond a reasonable doubt the defendant knew that he acted illegally in voting in the election.

IX RR 169.

## SUMMARY OF THE ARGUMENT

The court of appeals erred in holding that Section 8.03 Mistake of Law was the legal analogue to section 8.02 of the Penal Code, mistake of fact. (Section 8.02 Mistake of Fact). The court below relied on dictum from a case out of this Court that, if properly analyzed, supports the State's argument here – namely that statutory affirmative defenses are in the nature of confession and avoidance. An understanding of how Section 8.03 Mistake of Law works and when it applies has to begin with recognizing that it is labeled an "affirmative defense." Section 8.03 Mistake of Law on its face is subject to confession and avoidance and its legislative history indicates that it is not the legal equivalent to Section 8.02 Mistake of Fact. With the proper understanding of how and when

22

Section 8.03 Mistake of Law applies, the record plainly indicates that Appellee did not qualify for the instruction since in addition to having failed to admit to the conduct charged, he failed to provide the sorts of authorities the statute requires.

Additionally, the sort of mistake-related defensive instruction Appellee asked for, a defense negating the culpable mental state, appears to be completely inapplicable given the State's burden of proving that he was aware of the nature and circumstances of his residency. And even if Section 8.03 Mistake of Law does in fact tend to negate the culpable mental state necessary for the commission of the offense, the failure to give the instruction was not in error since the reasonable-doubt instruction provided a more favorable instruction and actually encompassed the defensive theory the Appellee believes was missing from the charge.

## ARGUMENT

### I. The Trial Court Did Not Err in Failing to Provide the Section 8.03 Instruction.

#### A. Standard of Review.

Examination of charge error begins with determining whether there was in fact error in the charge. *See Posey v. State,* 966 S.W.2d 57,

23

60 (Tex. Crim. App. 1998) (citing *Almanza v. State*, 686 S.W.2d 157, 171-174 (Tex. Crim. App.1984) (op. on reh'g)). Section 8.03 of the Penal Code provides an affirmative defense. Tex. Penal Code § 8.03 (West 2010) (Section 8.03 Mistake of Law); Appendix F. "The issue of the existence of an affirmative defense is not submitted to the jury unless evidence is admitted supporting the defense." *Id.* § 2.04(c). A defendant is entitled to a defensive instruction if it is supported by the evidence "even if the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007). "But the evidence must be such that it will support a rational jury finding as to each element of the defense." *Id.* "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* This threshold inquiry by the trial court judge "serves to preserve the integrity of the jury as the factfinder by ensuring that it is instructed as to a defense only when, given the evidence, that defense is a rational alternative to the defendant's criminal liability." *Id.* Whether a defense

is supported by the evidence is a sufficiency question reviewable on appeal as a question of law. *Id.*

A decision not to include a defensive issue in a jury charge is reviewed for an abuse of discretion. *See Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Westbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000)). A trial court does not abuse its discretion when its decision is within the zone of reasonable disagreement. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). Further, the trial court's decision will be upheld on appeal if it is correct on any theory of law applicable to the case. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). This principle holds true even where the trial court has given an erroneous legal reason for its decision. *See id.*

B.   **Affirmative Defenses Are Subject to Confession and Avoidance.**

In addressing the propriety of Judge Stevens's ruling, the court of appeals does not begin with addressing the application of Section 8.03 Mistake of Law; instead, the analysis begins with Section 8.02 Mistake

of Fact,[7] a statutory defense that was not an issue at trial. The court of appeals found that Section 8.02 Mistake of Fact was an "affirmative defense," despite its designation in the Penal Code to the contrary. This particular finding was a preliminary but necessary step in reversing Judge Stevens because if Section 8.02 Mistake of Fact is an affirmative defense that plainly operates to negate the culpable mental state, then Section 8.03 Mistake of Law, which is plainly labeled an "affirmative defense," might also operate to negate the culpable mental state. The court of appeals, in other words, believed that Section 8.03 Mistake of Law was the legal analogue to Section 8.02 Mistake of Fact. This finding is fundamentally flawed due, in part, to the appellate court's reliance on dictum, failure to recognize the difference between a "true affirmative defense" and a general defense, and the court's confusion over the difference between a mistake of law that tends to negate a mental state and a mistake of law that is in the nature of confession and avoidance.

Appellee provided an instruction that appears to track the pattern jury charge set out in the Texas Criminal Pattern Jury Charges:

---

[7] Tex. Penal Code Ann. § 8.02 (West 2010) (Section 8.02 Mistake of Fact); Appendix F.

26

Defenses. *See* IX RR 166-171 (charge conference); CR 318-322 (requested charge citing Texas Criminal Pattern Jury Charges, State Bar of Texas 2010); § B12.2, at 164-167 (2010); Appendix B. In rejecting the request, Judge Stevens believed that Appellee was not entitled to the instruction since he failed to admit to committing the conduct charged. IX RR 169: Appendix C. He also noted that Appellee's mistake of law defense was "actually intertwined in the challenge to the element that the State has to prove and that is that the defendant knew he was ineligible to vote." IX RR 169.

First, Judge Stevens was right about confession and avoidance. In *Meraz v. State*, this Court said:

> At the foundation of *every affirmative defense* is the practical, if not technical, necessity of the defendant acknowledging he committed the otherwise illegal conduct. This State recognizes *only four* affirmative defenses: Defense to Criminal Responsibility of Corporation or Association (§ 7.24 Tex. Penal Code), Insanity (§ 8.01 Tex. Penal Code), *Mistake of Law (§ 8.03 Tex. Penal Code),* and Duress (§ 8.05 Tex. Penal Code).

785 S.W.2d 146, 153 (Tex. Crim. App. 1990) (emphasis added). An affirmative defense is "defined, in part, as meaning a new matter, *assuming the complaint to be true*, which constitutes a defense to it." *Juarez v. State,* 308 S.W.3d 398, 402-403 (Tex. Crim. App. 2007) (citing

*Kimbro v. State*, 157 Tex. Crim. 440, 249 S.W.2d 919, 919 (Tex. Crim. App. 1952)) (emphasis in orig.); *Barnette v. State*, 709 S.W.2d 650, 651-652 (Tex. Crim. App. 1986) (every defense listed in chapters 8 and 9 of Penal Code except Section 8.02 Mistake of Fact "admits to having committed the culpable conduct charged, but asserts he should be found not guilty because his action was somehow justified or excusable"); *Miller v. State*, 660 S.W.2d 95, 97 (Tex. Crim. App. 1983) ("all statutory affirmative defenses generally apply to justify his admitted participation in the act itself"); *DeHam v. State*, 389 S.W.2d 955, 956 (Tex. Crim. App. 1965) ("Appellant's testimony at most constituted no more than a denial of the truth of the testimony of the witnesses named and is not an affirmative defense under the holding in *Kimbro v. State*, 157 Tex. Crim. R. 438, 249 S.W.2d 919.").

Second, Judge Stevens was right about Appellee's argument concerning the negation of the element of the offense: any defense premised on mistake of law negating the culpable mental state was "intertwined in the challenge to the element that the State has to prove," thus, included in the charge. Even if one assumes for the sake of argument that Section 8.03 Mistake of Law is the legal analogue to

28

Section 8.02 Mistake of Fact, it was not error to deny the requested instruction because the jury charge adequately covered Appellee's mistake of law negating an element of the offense. *See Bruno v. State*, 845 S.W.2d 910, 913 (Tex. Crim. App. 1993) (plurality op. of White, J.).

Third, the majority's approach in fusing the two defenses was erroneous. While acknowledging that *Meraz* stood for the proposition that affirmative defenses were subject to the doctrine of confession and avoidance, the court of appeals believed that this Court in *Juarez* had steered away from its declaration that "every affirmative defense" was in the nature of confession and avoidance: "The Court of Criminal Appeals has since observed, however, that 'the doctrine does not apply when the defensive issue, by its terms, negates the culpable mental state,' citing as an example '[t]he affirmative defense of mistake of fact.'" *Jenkins*, 2015 Tex. App. LEXIS 5667, at *46 (quoting *Juarez*, 308 S.W.3d at 402).[8]

---

[8] This reasoning that not every affirmative defense was in the nature of confession and avoidance was also based in part on Appellee's argument in the court of appeals that this Court in *Willis v. State* corrected a similarly overbroad statement in *Sanders v. State* to the effect that "all defenses require the defendant to admit commission of the offense." *See* 790 S.W.3d at 314 (quoting 707 S.W.2d 78, 81 (Tex. Crim. App.1986)). But this Court in *Willis* identified only one defense that did not require the defendant to admit to the commission of the offense: Section 8.02 Mistake of Fact. *See id.* at 314. Neither *Willis* nor *Juarez* undermine this Court's statement in *Meraz* that "every affirmative defense" is in the nature of confession and avoidance.

As the dissent pointed out there are no Texas cases that might apply when one asked for an instruction "that would negate the culpable mental state of the offense." *See Jenkins*, 2015 Tex. App. LEXIS 5667, at *80.[9] The dissent noted that federal courts dealing with good-faith mistake of law were split on whether the instruction was necessary. *See id.* at **80-84 (noting that federal courts often find argument concerning good-faith mistaken belief about issues of law "redundant" in fraud cases, for example, "because such a belief is incompatible with the required specific intent to deceive") (citations omitted). A non-Penal Code instruction concerning a good-faith mistaken belief of law would not be a valid defense. *See Sanders v. State*, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986). The dissent also noted that this Court had reached "conflicting conclusions" regarding whether it was error to deny a Section 8.02 Mistake of Fact instruction based on this same apparent redundancy or that the defense was subsumed within the reasonable doubt charge. *See Jenkins*, 2015 Tex. App. LEXIS 5667, at **81-82 (citations omitted).

---

[9] As discussed below, the Committee responsible for the Texas Pattern Jury Charge suggests, given the legislative history of the enactment of Section 8.03 Mistake of Law, that defendants should "perhaps" avoid raising a mistake of law defense premised on negating the culpable mental state. *See* Texas Criminal Pattern Jury Charges, State Bar of Texas 2010; § B12.2, at 16; Appendix G.

The problem with the majority's position – and the reason why there were no cases on point – is the erroneous proposition that Section 8.02 Mistake of Fact is an "affirmative defense," according to *Juarez*. Accordingly, if it is an affirmative defense and it applies to negate the culpable mental state, then Section 8.03 Mistake of Law, which is explicitly labeled an "affirmative defense," might also apply when one is attempting to negate the culpable mental state. But this Court's reference in *Juarez* to "[t]he affirmative defense of mistake of fact" was clearly dictum.[10] In citing Section 8.02 Mistake of Fact as an "example" of an "affirmative defense," this Court cited *Granger v. State*, 3 S.W.3d, 36, 41 (Tex. Crim. App. 1999) and *Jackson v. State*, 646 S.W.2d 225, 227 (Tex. Crim. App. 1983). *See Juarez*, 308 S.W.3d at 402. While both *Granger* and *Jackson* involved a Section 8.02 Mistake of Fact instruction, neither case holds that it is an "affirmative defense." This Court in both cases used phrases like "an affirmative mistake of fact instruction" or "an affirmative instruction on mistake of fact," *see Granger*, 3 S.W.3d at 37,

---

[10] *See Edwards v. Kaye,* 9 S.W.3d 310, 314 (Tex. App. – Houston [14th Dist.] 1999, pet. denied) ("Dictum is an observation or remark made concerning some rule, principle, or application of law suggested in a particular case, which observation or remark is not necessary to the determination of the case.") (quoting BLACK'S LAW DICTIONARY 409 5th ed. (1979)).

38, or "an affirmative charge on a defensive issue" or "an affirmative submission of a defensive charge," *see Jackson*, 646 S.W.2d at 225, but nowhere does the Court hold – or even attempt to say – that Section 8.02 Mistake of Fact is an "affirmative defense." This Court has noted in the past that "only the legislature can establish defenses and affirmative defenses to criminal offenses" so this Court did not mean to assign the affirmative defense designation to Section 8.02 Mistake of Fact. *See Giesberg v. State*, 984 S.W.2d 245, 249-250 (Tex. Crim. App. 1998) (citing *Willis*, 790 S.W.2d at 314).

The confusion regarding affirmative defenses may be tied to a distinction between what is considered a "true affirmative defense," which is in the nature of confession and avoidance, and other defenses that arise once the defendant introduces some evidence tending to negate only a mental element:

> A true affirmative defense is a justification or excuse independent of the elements of the offense. It is in the nature of a "confession and avoidance" defense. Even if the state proves all elements of the offense beyond a reasonable doubt, the State may not punish the defendant who meets the burden of proof on an affirmative defense because commission of the offense was justified. Since an affirmative defense shifts the burden of persuasion to the defendant on a particular issue, it must meet the strict requirements of the Due Process Clause. The threshold question we consider is under what

32

> circumstances may the burden of persuasion be shifted to the defendant without violating due process?
>
> . . .
>
> An affirmative defense which negates an essential element (which by definition would not be a true affirmative defense) requires the defendant to prove innocence on that issue by a preponderance of the evidence. Invariably the courts have held that when the burden of persuasion shifts to the defendant on an element of the offense, the shift is a clear violation of due process which renders the trial fundamentally unfair. *See Hicks v. Feiock*, 485 U.S. 624, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988).

*Alford v. State*, 808 S.W.2d 581, 585 (Tex. App. – Dallas 1991), *aff'd by*, 866 S.W.2d 619 (Tex. Crim. App. 1993); *see also Dixon v. United States*, 548 U.S. 1, 6-7 (2006) (defenses like necessity and duress do not "negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the defendant to 'avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present'" quoting *Bailey v. United States*, 524 U.S. 184, 402 (1998)).[11]

---

[11] There also seems to be a distinction between "true defense," "affirmative defenses," and defenses that arise "when the defendant contests a specific element of the state's proof." *See* 5-122 *Texas Criminal Practice Guide* § 122.01; Appendix H. Both "true defenses" and "affirmative defenses" require the defendant to admit commission of the act but seek to excuse or justify commission of the act. *See id.* Unlike Section 8.03 Mistake of Law, Section 8.02 Mistake of Fact challenges "a specific element of the state's proof." *See id.*

Section 8.02 Mistake of Fact cannot be an "affirmative defense" shifty the burden to the defendant to negate an element of the offense violates due process. *See Lowry v. State*, 692 S.W.2d 86, 87 (Tex. Crim. App. 1985) (citing *In re Winship*, 397 U.S. 358, 364 (1970) and *Mullaney v. Wilbur*, 421 U.S. 684, 701-702 (1975)). In *Lowry*, this Court found the affirmative-defense provision of the law sanctioning criminal nonsupport unconstitutional because it shifted an element of the offense to the defendant. *See id.* at 87.

In short, this Court knows that affirmative defenses do not involve the negation of any element of the offense. The court of appeals erred in relying on dictum to equate Section 8.02 Mistake of Fact with Section 8.03 Mistake of Law. Unless Section 8.03 by its terms negates the culpable mental state required for the commission of the offense and, as a consequence, is not in the nature of confession and avoidance, the court of appeals should have affirmed the ruling of the trial court and affirmed the judgment.

### C.  Section 8.03 Mistake of Law Is In The Nature of Confession and Avoidance.

An understanding of whether a Section 8.03 Mistake of Law is subject to confession and avoidance has to start with acknowledging that

34

it is labeled an "affirmative defense." As noted above, a "true" affirmative defense is in the nature of confession and avoidance. *See Alford*, 808 S.W.2d at 585. This Court noted the civil-law foundations of the defense in *Juarez* and used the phrases "confession and avoidance" and "affirmative defense" as if one described the other. *See Juarez*, 308 S.W.3d at 402-403 (citing *Kimbro*, 249 S.W.2d at 919 and Yuval Sinai, *The Doctrine of Affirmative Defenses in Civil Cases – Between Common Law and Jewish Law,* 34 N.C.J. Int'l & Comm. Reg. 111, 117-18 (2008) (hereinafter "*The Doctrine of Affirmative Defenses in Civil Cases*" ).[12] Therefore, by labeling Section 8.03 Mistake of Law an affirmative defense, the Texas Legislature intended to establish not only the burdens of proof but also to establish pleading requirements necessary to invoke the defense, which would include confession and avoidance.

---

[12] Sinai noted, "Affirmative defense is the modern equivalent of the common law plea in confession and avoidance." *See The Doctrine of Affirmative Defenses in Civil Cases,* at 114. He goes on to explain how the defense works:

> An affirmative defense overcomes the claim without regard to whether the claim is true and could be fully proven. An affirmative defense is one that "avoids" rather than "denies" the truth of a plaintiff's allegation. For example, the plaintiff says, "You did it," and the defendant replies, "Maybe, I did it, but I win anyway, because you or I did (or failed to do) something too." The "something too" is the affirmative defense.

*Id.* at 115.

As the dissenting opinion in *Jenkins* pointed out, the majority has confused a mistake of law tending to negate a mental state and a mistake of law that is in the nature of confession and avoidance:

> There are two different kinds of mistakes of law, however, that do provide a defense: (1) a mistake that negates the mental state required to prove the particular offense in question; and (2) a reasonable belief, in reliance on certain official statements that conduct undertaken with the required mental state does not violate the criminal law.

2015 Tex. App. LEXIS 5667, at **74-75 (citing 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.6(a), at 394-397 (2d ed. 2003)); Appendix I (hereinafter "*Substantive Criminal Law*").

LaFave notes that there is considerable "confusion" about the application of the mistake defenses. *See* Substantive Criminal Law, at 394-397 (discussing difference between mistake negating legal element like intent to steal with a legal excuse where all the elements of the offense are established and not contested). LaFave recognizes that there are mistakes of law or fact that tend to negate the "mental state required to establish a material element of the crime." *Id.* at 394-396. One, then, who takes another's property mistakenly or intentionally believing he owned the property is not guilty of the crime of theft because his mistake preempted the formation of larcenous intent. *See id.* at 395-396. In the

36

second example, while "ownership" connotes a sense of legal entitlement, it does not mean that a mistake about ownership is a mistake of law – it is a mistake of fact. *See id.* at 396; *see also* Texas Criminal Pattern Jury Charges, State Bar of Texas 2010); § B12.2, at 162 (most jurisdictions treat mistakes of fact and law and Texas would call these mistakes "failure of proof" mistakes) (Appendix G). LaFave recognizes a third category of defense where the defendant held the culpable mental state needed to commit the offense but sought to excuse the offense because he reasonably believed "his conduct is not proscribed by law and that belief is attributable to an official statement of the law or to the failure of the state to give fair notice of the proscription." *See Substantive Criminal Law* at 396-397 (defendant intended to take the "umbrella he knew was owned by another").

Section 8.03 Mistake of Law is this third type of defense: "the actor reasonably believed that his conduct charged [taking property he knew was owned by another or voting in an election he knew he was not a resident] did not constitute a crime" relying on the types of authorities that could in fact authorize this conduct. As the dissent points out, many states and federal courts recognize a similar governmental-estoppel

37

defense grounded in due process. *See Jenkins*, 2015 Tex. App. LEXIS 5667, at *77 (citing *Commonwealth v. Kratas*, 564 Pa. 36, 764 A.2d 26, 27-33 (Pa. 2001)). The defense requires "an affirmative representation that certain conduct is legal" based on the representation of an official or a body charged by law with responsibility for defining permissible conduct respecting the offense at issue, and actual and good-faith reliance. *See* 764 A.2d at 32-33 (collecting cases). The estoppel defense is grounded on principles of fairness when a governmental official has advised someone that his "particular action was authorized or not criminal." *See People v. Studifin*, 504 N.Y.S.2d 608, 610 (Sup. Ct. 1986). "Thereafter for the State to prosecute someone for innocently acting upon such mistaken advice is akin to throwing water on a man and arresting him because he's wet." *See id.*; *see also Cox v. Louisiana*, 379 U.S. 559 (1965) (where police official informed protesters they could picket near courthouse, state could not prosecute those protestors for violating statute prohibiting demonstrations near courthouse).

This Court has noted in the past that parties may attempt to raise certain statutory defenses but fail to do so because they were simply attempting to negate intent to commit the crime. *See Shaw,* 243 S.W.3d

at 659 (citing as examples *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999) (necessity) and *Ex parte Nailor*, 149 S.W.3d 125, 132–34 (Tex. Crim. App. 2004) (self-defense)). A statutory mistake of law defense does not apply in this case.

Legislative history confirms that Section 8.03 Mistake of Law does not apply when one is attempting to negate the mental element.[13] For more than a century, the Texas Penal Code specifically prohibited the defense of mistake of law while providing one for a mistake of fact. *See* Tex. Penal Code art. 45 (1879) ("No Mistake of Law"), 46 (1879) ("Mistake of Fact"). The law prior to the adoption of the revised Penal Code in 1973 read: **Mistake of law.** –No mistake of law excuses one committing an offense." Tex. Penal Code, art. 40 (1948) (emphasis in orig.). In 1973, Texas enacted sections 8.02 and 8.03 of the Penal Code. *See* Act of May 23, 1974, 63rd Leg., R.S., ch. 399, §1, 1973 Tex. Gen. Laws 883, 896-897. Section 2.04 MPC served as the template to Sections 8.02 and 8.03. *See*

---

[13] While acknowledging that the "parties" had "conflicting interpretations of the statute based on the difference between the language of the Model Penal Code and *Penal Codes sections 8.02 and 8.03*," the majority for the court of appeals opted not to look at the legislative history believing the legislature's intent was "unambiguous." *Jenkins*, 2015 Tex. App. LEXIS 5667, at *10 n.11. A presumption of ambiguity exists, though, when the "parties [] take polar opposite positions." *See Ex parte Canady*, 140 S.W.3d 845, 849 (Tex. Crim. App. 2004) (citations omitted).

*Thompson v. State,* 236 S.W.3d 787, 796 (Tex. Crim. App. 2007) (discussing § 2.04 MPC). Section 2.04 MPC reads in relevant part:

> (1) Ignorance or *mistake as to a matter of fact or law* is a defense if:
>     (a) the ignorance or mistake negatives the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense; or
>     (b) the law provides that the state of mind established by such ignorance or mistake constitutes a defense.
>     . . .
> (3) A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:
>     . . . .

§ 2.04 MPC, p.267 (emphasis added).

Notably absent from Section 8.03 Mistake of Law is the language appearing in Section 2.04(1) MPC to the effect that a mistake of law is a defense if it "negatives the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense." *See* § 2.04(1). That negation language does, though, appear in Section 8.02 Mistake of Fact, which includes "the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense."

As this Court noted in *Lowry,* an affirmative defense cannot burden the defendant with proving an element of the offense. *See* 692 S.W.2d at

40

87. An affirmative defense is constitutional *because* it does not impose a burden on the defendant to negate an element of the offense. *See Smith v. United States*, 133 S. Ct. 714, 719 (2013) (citing *Martin v. Ohio*, 480 U.S. 228, 237 (1987) (Powell, J., dissenting)) (emphasis added). This court in *Cornet* held that the "medical-care defense" was subject to the confession and avoidance doctrine *because* the defense "does not negate any element of the offense, including culpable intent; it only *excuses* what would otherwise constitute criminal conduct." *See Cornet v. State*, 359 S.W.3d 217, 224-225 (Tex. Crim. App. 2012) (emphasis added).

As this Court has observed, issues related to redundancy and necessity arise when juries are given reasonable doubt instructions that subsume defensive theories tending to negate intent. *See Okonkwo v. State*, 398 S.W.3d 689, 695-696 & nn.5-6 (Tex. Crim. App. 2013). Redundant or unnecessary instructions also risk affecting the presumption of innocence:

> The reason for treating a defense that negates an element of the crime differently from other affirmative defenses is plain. If the jury is told that the prosecution has the burden of proving all the elements of a crime, but then also is instructed that the defendant has the burden of disproving one of those same elements, there is a danger that the jurors will resolve the inconsistency in a way that lessens the presumption of innocence. For example, the jury might reasonably believe

41

> that by raising the defense, the accused has assumed the ultimate burden of proving that particular element. Or, it might reconcile the instructions simply by balancing the evidence that supports the prosecutor's case against the evidence supporting the affirmative defense, and conclude that the state has satisfied its burden if the prosecution's version is more persuasive. In either case, the jury is given the unmistakable but erroneous impression that the defendant shares the risk of nonpersuasion as to a fact necessary for conviction.

*Martin*, 480 U.S. at 237-238 (Powell, J., dissenting). The provision of an affirmative defense tending to negate the culpable mental state necessary for the commission of the offense would be unconstitutional. Statutes have to be interpreted to avoid constitutional infirmities. *See Boykin v. State*, 818 S.W.2d 72, 785-786 (Tex. Crim. App. 1991).

Section 8.03 Mistake of Law on its face requires the defendant to admit to having engaged in the "conduct charged" under the mistaken belief that his conduct was not criminal. The operative phrases are (1) "the actor reasonably believed," (2) "the conduct charged" (3) "did not constitute a crime." Tex. Penal Code § 8.03(b). Section 8.03 Mistake of Law applies when the defendant formed a belief, such as would be held by an ordinary and prudent man in the same circumstances, *that committing the act with the requisite mental state was not a crime*. This belief that his conduct was not criminal has to be attributable to

42

reasonable reliance on certain written authoritative sources, like an agency charged with interpreting the law or a judicial opinion interpreting the law. *See* Tex. Penal Code Ann. § 8.03(d)(1)-(2). Therefore:

> Under the narrow exception of Subsections (b)(1) and (b)(2), a cafe owner prosecuted for selling beer for off-premises consumption could defend on the basis of a grant of permission from the Alcoholic Beverage Commission; and a business could defend against an antitrust prosecution on the basis of a court opinion declaring that the practice in question did not constitute a monopoly.

Searcy & Patterson, Practice Commentary to Section 8.03, 1 Tex. Penal Code Ann. 217, 220 (Vernon 1974)). The café owner would acknowledge that he sold beer off-premises (conduct charged) but claim "I did so because the TABC said I could" or the business owner would acknowledge that he conspired with competitors to fix prices (conduct charged) but "The Supreme Court said I could."

There is very little difference between the wording of Section 8.03 Mistake of Law and other affirmative defenses recognized as confession and avoidance.[14] The defense of insanity reads, "It is an affirmative

---

[14] There are no cases addressing whether Section 7.24 Defense to Criminal Responsibility of Corporations or Associations is subject to confession and avoidance but it is a statutory affirmative defense and it appears to apply when the corporation is not contesting whether the offense occurred. Section 7.24 of the Penal Code

defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code § 8.01. Insanity is subject to confession and avoidance. *See Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2009). The defense of duress reads, "It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another. Tex. Penal Code Ann. § 8.05 (West 2010). Duress is subject to confession and avoidance. *Rodriguez v. State*, 368 S.W.3d 821, 824 (Tex. App. 2012, pet. ref'd). There is no reason to believe that the Texas Legislature intended any other meaning for Section 8.03 Mistake of Law. All of these defenses do not undermine the elements of the offense but excuse or justify what would otherwise be unlawful.

As the dissent pointed out it may be unnecessary to decide whether Section 8.03 Mistake of Law is subject to confession and avoidance

---

provides "an affirmative defense to prosecution of a corporation under Section 7.22(a)(1) or (a)(2) that the high managerial agent having supervisory responsibility over the subject matter of the offense employed due diligence to prevent its commission." (West 2010). The statute "on its face" does not attempt to negate a mental element of the offense but instead provides a "due diligence" defense, which is a defense designed not to contest the commission of the offence but excuse the commission by explaining that some "high managerial agent" did all he or she could to "prevent its commission." *See* Model Penal Code § 2.07(5).

because the instruction Appellee provided Judge Stevens "would have submitted the defense as one of confession and avoidance." *See Jenkins,* 2015 Tex. App. LEXIS 5667, at *84.

> Judge Stevens instructed the jury in part as follows:
>
> A person commits the offense of illegal voting if he votes . . . in an election in which the person knows the person is not eligible to vote.
> . . .
> To be eligible to vote in an election of this state, a person must . . . be a resident of the territory covered by the election for the office or measure on which the person desires to vote . . . .
>
> "Residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence. Residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the Texas Election Code . . . .
>
> Now if you find from the evidence beyond a reasonable doubt that . . . [the defendant did] vote in an election . . . when the defendant *knew he was not eligible to vote because he knew he did not reside in the precinct in which he voted*, then you will find the defendant guilty of voting illegally as charged in the indictment.

*Id.* at **71-72 (emphasis in orig.); Appendix J (charge).

> Appellee asked Judge Stevens to instruct the jury with this:
>
> A person's conduct that would otherwise constitute the crime of illegal voting is not a criminal offense if the person *reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime* and that he acted

in reasonable reliance on [an official statement or written interpretation of the law meeting certain requirements].

. . .

To decide the issue of mistake of law, you must determine whether the defendant has proved, *by a preponderance of the evidence*, the following three elements:

1. The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

2. The defendant's belief was reasonable; and

3. The defendant reached his belief in a reasonable reliance on [an official statement or written interpretation of the law meeting certain requirements].

*Id*. at \*72 (emphasis in orig.); Appendix B.

The "conduct charged" was provided by the charge itself: Appellee was charged with voting in an election in which he "knew he was not eligible to vote, to wit: Defendant voted in the May 8, 2010 Woodland Road Utility District Board of Directors election, when he knew he did not reside in the precinct in which he voted." *See* CR at 11. To be entitled to the defensive instruction, then, Appellee would have had to have acknowledged that he believed *voting in an election in which he knew he did not reside was not a crim*e, and he formed that belief in reliance on authorities that could sanction that conduct.

The majority of the court of appeals found this reading flawed. *See Jenkins* 2015 Tex. App. LEXIS 5667, at \*49. But this conclusion rests on a fundamental misunderstanding of Section 8.03 Mistake of Law and fails to acknowledge that Appellee provided an instruction as one requiring confession and avoidance. The defendant in the following cases argued that the Section 8.03 Mistake of Law defense was warranted because the law he relied on authorized what would otherwise be unlawful conduct. *Green v. State*, 829 S.W.2d 222, 222-223 (Tex. Crim. App. 1992) (citing *Taylor v. Taintor*, 83 U.S. (16 Wall.) (1873) as authority for his belief that "common law sureties had the right to arrest principals without an arrest warrant and likened such right to that of a sheriff arresting an escaping prisoner"); *Austin v. State,* 541 S.W.2d 162, 162 (Tex. Crim. App. 1976) (citing *Taylor* as authority that "the law authorized a surety to arrest his defaulting principal without warrant, and that it was customary for bail bondsmen to do so"); *State v. DeRoach*, 458 S.W.3d 696, 697, 701 (Tex. App. – San Antonio 2015, pet. ref'd) (tow truck driver was accused of overcharging in violation of city ordinance claimed reliance on opinion of Attorney General to effect that city ordinance was preempted by state law); *Plummer v. State* 426 S.W.3d

122, 124 (Tex. App. – Houston [1st Dist.] 2012, pet. ref'd), *aff'd as reformed on other grounds,* 410 S.W.3d 855 (Tex. Crim. App. 2013) (defendant charged with felon in possession of firearm claimed he relied on peace-officer exception for belief that he could carry firearm); *Hefner v. State*, 735 S.W.2d 608, 610-611, 625-626 (Tex. App. – Dallas 1987, pet. ref'd) (defendant charged with "the unlawful exercise of control over complainant's money without the effective consent of complainant with the intent to deprive complainant of her money" argued that court opinions justified charges but was denied Section 8.03 Mistake of Law instruction since he "could not have formed the reasonable belief based on court's opinions or official statements that the conduct charged in the indictment was legal"); *see also People v. Marrero*, 507 N.E.2d 1068, 1070-1071 (N.Y. 1987) (correctional officer charged with unlawful possession of firearm not entitled to mistake of law defense since statute at issue never authorized defendant's conduct); *State v. Sheedy*, 125 N.H. 108, 480 A.2d 887 (1984) (trial judge erred in refusing to instruct jury where public utilities commission informed defendant that his conduct, which was otherwise illegal under state law, was permitted).

This understanding that the defendant must present authorities that his conduct was in fact authorized by law has been applied in a case involving illegal voting. The defendant in *Commonwealth v. Cosentino* was charged with illegal voting. *See* 850 A.2d 58, 59-60 (N.Y. 2004). He at one point was registered in the City's Second Ward, First Precinct. *Id.* at 59-60. He and his wife subsequently moved to another voting district, out of the city and into the county. *Id.* at 60. While his wife filed a notice of change of residency with county election officials, he never did. *Id.* He owned property in the city and paid taxes there. *Id.* He then voted in an election in the City's Second Ward, First Precinct and was charged with illegal voting. *Id.* at 60-61. At trial, he asserted an "'entrapment by estoppel'" defense believing that the case *Commonwealth v. Bobino*, 18 A.2d 458 (N.Y. 1941) held "that a lack of knowledge, as reflected by the evidence in this case, does furnish an appropriate excuse since knowledge of the law is an essential element of the offense." *Id.* In *Bobino*, the Superior Court of Pennsylvania found an instruction telling the jury that "lack of knowledge will furnish no excuse" to be erroneous where the law disqualified one who voted "knowing that he does not possess all the qualifications" to vote. *See* 18 A.2d at 459. But the *Cosentino* court

upheld that trial court's ruling that the defendant was not entitled to the defense:

> Thus, even if it is assumed that Cosentino could have invoked the "reliance doctrine" as an affirmative defense to the instant charge at trial, it is clear that he did not demonstrate the requisite elements supporting such a defense. *Id.* As the trial court noted, there is absolutely no evidence which indicates that any public official made any affirmative representation to Cosentino that he could continue to vote in the City's Second Ward, First Precinct election district after he had changed his residence to Allegheny Township.

*Id.* at 67.

All these cases stand for the proposition that to be entitled to a Section 8.03 Mistake of Law instruction, the defendant has to acknowledge that he believed the conduct charged was not a crime and that he relied on specific legal authorities in forming that belief.

## D. Appellee's Reliance Was Unreasonable as a Matter of Law.

As discussed above, Section 8.03 Mistake of Law is designed to excuse the commission of the offense due to some governmental misleading. Section 8.03 Mistake of Law, like entrapment by estoppel, should apply "when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution

50

based upon the conduct ensues." *See United States v. Aquino-Chacon*, 109 F.3d 936, 938-939 (4th Cir. 1997). LaFave reserves the judicial-decision reliance on decisions, opinions or judgments "later determined to be *invalid or erroneous*." *See Substantive Criminal Law*, at 413-414 (emphasis added); *see also Marrero*, 507 N.E.2d at 1071 (must be a "mistake in the law itself"). LaFave reserves the administrative-interpretation defense to situations where he "reasonably relies upon an *erroneous* official statement of the law contained in an administrative order or grant or in an official interpretation by the public officer or body responsible for interpretation, administration, or enforcement of the law defining the offense." *See id*. at 415 (emphasis added). Section 8.03 Mistake of Law applies, then, when one argues that some governmental authority mislead him to committing an offense.

Appellee said he relied on GA-0141, GSC-1, and *Mills* in believing he was a resident of the RUD, but none of these sources give erroneous advice. In fact, Appellee told McDuffee not to worry about the Grant Letter because the issue was a "gray area." *See* VII RR 212. Both GA-0141 and GSC-1 address how Section 1.015 of the Texas Election Code applied to college students attending Prairie View A&M University in

Waller County, Texas, in light of possible attempts by county officials to discourage students living in dormitories from registering to vote in local elections. *See* Appendix K. The court in *Mills v. Bartlett* did not make any clear declarations but instead noted that the "term 'residence' is an elastic one and is extremely difficult to define." 377 S.W.2d 636. GSC-1 gives the reader a similar warning: "As we have noted above, analysts of Texas residence cases select a single case at their peril." GSC-1 at 6. Appellee was obviously trying to establish nominal residency for voting purposes. *See Texas v. Florida*, 306 U.S. 398, 425 (1939) (self-serving declarations of intent indicate a "desire to establish a nominal residence for tax purposes").

In short, one who relies on his own subjective interpretation of the law is not in a position to blame a court or a governmental agency for his mistakes. *See Hefner*, 735 S.W.2d at 625 (defendant's "subjective beliefs" are unimportant where he "could not have formed a reasonable belief based on court's opinions or official statements that the conduct charged in the indictment was legal"); *Davis v. United States,* 690 F.3d 330, 341 (5th Cir. 2012) (reliance unreasonable under Section 8.03 Mistake of Law if based on factually dissimilar decisions). The mistake of law defense is

"designed to recognize good faith reliance, not to encourage gambling."

*See Ostrosky v. State*, 725 P.2d 1087, 1090 (Alaska Ct. App. 1986) (citing

2 P. Robinson, Criminal Law Defenses § 183, at 387 (1984)). This Court

should find this alleged reliance "unreasonable as a matter of law." *See*

*Green*, 829 S.W. 2d at 223 (citing to Section 8.03 Mistake of Law).

E.    **A Mistake-Related Defense That Tended To Negate The Culpability Necessary for the Commission of the Offense Would Not Apply To Illegal Voting.**

Part of the confusion surrounding the application of Section 8.03

Mistake of Law in this case concerns the way in which this offense is

defined and how a defensive instruction designed to negate the

culpability necessary for the commission of the crime would apply. The

court of appeals held that the offense "incorporates knowledge of the law

or legal concepts" and that Appellee's "knowledge of where he resided

turned on his understanding of the legal requirements for residence

under the election code." *See Jenkins*, 2015 Tex. App. LEXIS 5667, at

**48, 54. If the accompanying mental state required knowledge of the

law, then a Section 8.03 Mistake of Law instruction would apply since

the defense applies when the defendant is attempting to "negate a

culpable mental state that is in some way based on knowledge of the law or legal concepts." *See id.* at \*48.

As discussed above, the first problem with the majority's analysis is its understanding that a Section 8.03 Mistake of Law applies when one is attempting to negate the mental state. Even if knowledge of the law is an element of the offense, a Section 8.03 Mistake of Law defense would not apply since it "does not negate a defendant's criminal state of mind." Appellee, though, might be entitled to a Section 8.02 Mistake of Fact instruction premised on the notion that most jurisdictions regard mistakes of fact or law similarly.

Second, under Texas law, knowledge of the law is irrelevant in a prosecution for illegal voting. *See Medrano v. State*, 421 S.W. 3d 869, 884-885 (Tex. App.—Dallas 2014, pet. ref'd) (citing *Thompson v. State*, 26 Tex. Ct. App. 94, 9 S.W. 486, 486 (1888)). A person commits the offense of illegal voting "if the person votes . . . in an election in which the person knows the person is not eligible to vote." *See* Tex. Elec. Code § 64.012(a)(1) (West 2010). "Eligibility" is based on "residency," and "residency" is defined as one's domicile, that is, "one's home and fixed place of habitation to which one intends to return after a temporary

54

absence." *Id.* at 11.001(a)(2) (West 2010); *id.* § 1.015(a) (West 2010).

Therefore, the State had to prove that Appellee voted in an election that was outside his "home and fixed place of habitation."

In *Thompson v. State*, a criminal prosecution of a man accused of voting knowing he was disqualified because he had been convicted of a felony, the court of appeals said:

> As the defendant knew the fact that he had been convicted of the offense of assault with intent to murder, it must be conclusively presumed that he knew the legal consequences of such conviction; that he knew that the law declared that offense to be a felony, and that the Constitution and the law made one of the consequences of the conviction his disqualification to vote. He cannot be heard to deny such knowledge, and it was not necessary that it should be proved that he had such knowledge, because the presumption of law supplied and dispensed with such proof.

> While we have found no adjudicated case determining the precise question in accordance with our view of it we have found none which holds a contrary doctrine. It seems to us that if we were to hold the law to be that the State must prove that the defendant knew that the offense of which he had been convicted was a felony, and that such conviction disqualified him to vote, the effect would be that a conviction for illegal voting by persons convicted of felony could rarely be obtained, because it would be an exceptional case in which such proof could be made. Such a holding would not accord with our understanding of the spirit and reason of the law, and is not supported by any precedent to which we have been cited, or which we have been able to find.

9 S.W. at 98. Accordingly, the State had to only prove factual not legal knowledge; *see also State v. Pruser*, 21 A.2d 641, 641-642 (N.Y. 1941) (defendant charged with "knowing she was not a qualified voter" could not defend on basis that state had to prove she "had knowledge of the legal effect of the proofs adduced by the state").

The holding in *Thompson* that the State only had to prove factual knowledge and did not need to prove knowledge of the law or "legal concepts" where the statute uses the word "knowingly" is well-established. *See Bryan v. United States*, 524 U.S. 184, 192 (1998) (knowledge requisite to knowing violation of statute is factual knowledge not knowledge of the law); *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971) (statute authorizing Interstate Commerce Commission to promulgate regulations governing transportation of certain corrosive liquids and to impose criminal penalties on those who "knowingly violated" those regulations required proof that defendant knew nature of his acts, not proof that he knew his acts violated regulations). Here, Section 64.012 only requires the State to prove that Appellee knew on the day he voted in the RUD election that his "home

and fixed place of habitation" was outside the RUD; it did not require the State to prove that he "had knowledge of the law or legal concepts."

Accordingly, Appellee was not entitled to a Section 8.03 Mistake of Law instruction, Judge Stevens's ruling should be upheld, and the judgment of the trial court affirmed.

## II. The Court of Appeals Erred in Finding that Appellee Was Harmed by the Trial Court's Failure to Provide a Section 8.03 Mistake of Law Instruction.

The failure to provide a properly requested defensive instruction must result in actual not theoretical harm. *See Cornet v. State*, 417 S.W.3d 446, 449-450 (Tex. Crim. App. 2013) (citing *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012). A reviewing court must evaluate the entire record including (1) the entire jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* (citing *Almanza*, 686 S.W.2d 171.

First, given the charge the jury was provided, it would have been impossible for the jury to have found Appellee guilty beyond a reasonable doubt without having first considered whether he mistakenly believed he

was a resident of the RUD. *See Druery v. State*, 225 S.W.3d 491, 495 (Tex. Crim. App. 2007) (no harm where refused charge is adequately covered by charge). As the dissent notes:

> [B]ecause the jury could not find both that appellant knew he was not a resident but had a reasonable belief he was a resident, the knowing requirement in the charge fulfills the same function as the reasonable belief defense: giving the jury a vehicle to find appellant not guilty if he thought he was a resident in reliance on the authorities.

*Jenkins*, at \*\*93-94.

The "knowing" element was clearly provided in the trial court's charge. *See* CR at 312-313. The jury came "face-to-face" with the determination of whether Appellee did in fact vote knowing he was not a resident. *See Sands v. State,* 64 S.W.3d 488, 496 (Tex. App. – Texarkana 2001, no pet.) ("jury came face-to-face with making a decision of whether Sands intentionally and knowingly possessed methamphetamine"); *see also Reyes v. State*, 422 S.W. 3d 18, 31-32 (Tex. App. – Waco 2013, pet. ref'd) (same); *Durden v. State*, 290 S.W.3d 413, 421 (Tex. App. – Texarkana 2009, no pet.) (same).

Additionally, the provision of a defensive instruction disproving a "knowing" violation is "inherently illogical." *See Martin*, 480 U.S. at 238 n.1 (Powell, J., dissenting). Appellee's instruction, which he believes

negated the mental element of "knowing," would have fallen after the reasonable doubt instruction and required him to prove he did not know by a preponderance of the evidence. *See* CR at 318-319. "It makes no sense to say that the prosecution has the burden of proving an element beyond a reasonable doubt *and* that the defense has the burden of proving the contrary by a preponderance of the evidence." *See Martin*, 480 U.S. at 238 n.1 (emphasis in orig.). If the State fails to meet its burden, the jury will acquit, and if the State meets its burden and the jury finds the defendant guilty, then the jury "necessarily has decided that the defendant has not disproved an element of the crime. In either situation the instructions on the affirmative defense are surplusage." *Id.*

Second, the evidence weighed heavily against Appellee. The State's theory that Appellee was one of the ringleaders in a scheme to "overthrow a utility" was well-established. The jury heard that Appellee directed people to change their addresses to The Residence Inn for the temporary purpose of voting one time in an election. The jury also heard that after the election these ten people needed to "make up" reasons for checking back into the hotel to make it appear as if they were in fact bona fide residents of the RUD. Appellee said, "We had to prove that we were

honestly going to live at the Residence Inn." *See* IX RR 164-165. If one "honestly" believed he had established "residency for voting purposes," then there would be no need to check back into the hotel after the vote. There was no good-faith mistaken belief about residency, and no rational jury would believe this was lawful.

Third, Appellee's arguments and the State's arguments were made as if Appellee had received a Section 8.03 instruction. Appellee argued that he believed he was not committing a crime and told the jury to read defense exhibit 1, GSC-1, which discussed *Mills*, and defense exhibit 2, GA-0141, which also discussed *Mills* and pointed out that those sources "say exactly what Mr. Jenkins says they say" and uses the phrase "[r]esidence for voting purposes." IX RR 193, 195-197, 200. Appellee was also able to make an argument that he would not have been able to make if he were confined to Section 8.03: namely, "He talked with a lawyer who understood the election process and got advice from him concerning how do you establish residency for voting purposes." IX RR 199.[15] And Appellee did make the argument he is advancing here on appeal, namely,

---

[15] *Gallegos v. State*, 828 S.W.2d 577, 579 (Tex. App.—Houston [1st Dist.] no. pet.) ("reliance upon the advice of counsel does not constitute a permissible mistake of law").

that he believed that he had established residency. IX RR 192, 199. He concluded by arguing that "the State has failed to prove the most important element in this case and that's knowledge that the person knew that they weren't eligible to vote and they didn't reside in the district they weren't supposed to vote." IX RR 201.

Fourth, Appellee was able to make a Section 8.03 Mistake of Law argument without having to prove his defensive theory beyond a preponderance of the evidence. If Appellee is correct in his interpretation, he would have had the burden of proof to disprove intent. The net effect of this burden-shifting would have been to reduce the State's burden of proof. *See Okonkwo*, 398 S.W.3d at 696 (instruction "problematic" since it "would have decreased the State's burden of proof"). That burden shifting really is "problematic." And, as indicated above, he made arguments he never would have been able to make and presented evidence he never would have been able to present had he received the instruction. Clearly, the failure to provide the instruction in this case worked to his advantage. Appellee was not going to be able to hurdle a preponderance-of-the-evidence standard of proof.

In conclusion, Appellee was not harmed by the omission of the Section 8.03 Mistake of Law instruction. This Court should affirm the trial court's judgment and remand this case to the court of appeals to address Appellee's second point of error.

## PRAYER FOR RELIEF

FOR ALL OF THESE REASONS, the State respectfully requests that this Honorable Court grant this petition for discretionary review, reverse the court of appeals and remand this case to the court of appeals to address Appellee's second point of error.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal Justice

JONATHAN WHITE
Assistant Attorney General
Criminal Prosecutions Division

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

                              /s/ Jon R. Meador
*Lead Counsel                 JON R. MEADOR*
                              Assistant Attorney General
                              Criminal Appeals Division
                              State Bar No. 24039051

                              P. O. Box 12548, Capitol Station
                              Austin, Texas  78711
                              (512) 936-1400
                              (512) 936-1280 (FAX)

                              ATTORNEYS FOR APPELLEE

## CERTIFICATE OF COMPLIANCE WITH
## TEXAS RULE OF APPELLATE PROCEDURE 9.4

I do hereby certify that this brief complies with Tex. R. App. Proc. 9.4 in that it contains 14, 650 words, in Microsoft Word 14.0, Century, 14 points.

                              /s/ Jon R. Meador
                              JON R. MEADOR
                              Assistant Attorney General

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing pleading is served by electronic filing, by email, and by placing the same in the United States Mail, postage prepaid, on this the 2nd day of November, 2015, addressed to:

George McCall Secrest, Jr.
Bennett & Secrest, LLP
808 Travis, 24th Floor
Houston, Texas 77002-4177
gmsecrest@aol.com

Lisa C. McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
512/463-1660 (Telephone)
512/463-5724 (Fax)


/s/ Jon R. Meador
JON R. MEADOR
Assistant Attorney General


64

# APPENDIX A

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

THE STATE OF TEXAS

v.

**James Alan Jenkins**

Co-Defendant(s): Robert Allison;
Benjamin Allison;
William Berntsen;
Roberta Cook;
Thomas Curry;
Sybil Doyle;
Peter Goeddertz and
Adrian Heath

RECEIVED AND FILED
FOR RECORD
At 11 50 O'olock A M.

MAR 0 8 2012

BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS
By

**9th** District Court

NO. 12-03-02579 -CR

# INDICTMENT

| Count | Charge | DA File # | Agency # |
|-------|--------|-----------|----------|
| #1 | ILLEGAL VOTING<br>Sec. 64.012(a); Fel. 3 ° | 12-001005.1 | 113241541 |

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Montgomery, State of Texas, duly selected, empaneled, sworn, charged, and organized as such by the **9th** Judicial District Court for said County, upon their oaths present in and to said court that **James Alan Jenkins**, hereinafter styled Defendant, on or about **May 08, 2010**, and before the presentment of this indictment, in the County and State aforesaid, did then and there vote in an election in which the Defendant knew he was not eligible to vote, to-wit: Defendant voted in the May 8, 2010 Woodlands Road Utility District Board of Directors election, when he knew he did not reside in the precinct in which he voted,

**Against the Peace and Dignity of the State.**

Foreman of the Grand Jury

Minute
Date: 3.8.12

**11**

# APPENDIX
# B

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

NO. 12-03-02579-CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| Vs. | § | 359TH JUDICIAL DISTRICT |
| | § | |
| JAMES ALAN JENKINS | § | MONTGOMERY COUNTY, TEXAS |

DEFENDANT'S REQUESTED INSTRUCTIONS AND DEFINITIONS TO JURY

COMES NOW the defendant, James Alan Jenkins, and requests this Court to

instruct the Jury in the court's CHARGE TO THE JURY as set forth below:

1. FIRST REQUEST: To be placed after the definition of "Residence."

"In determining a person's "residence" you should consider that neither bodily

presence alone nor intention alone will suffice to create the residence, but when the two

coincide at that moment the residence is fixed and determined. There is no specific

length of time for the bodily presence to continue."

Authority:    Mills v. Bartlett, 377 S.W.2d 636, 637 (Tex. 1964).

2. SECOND REQUEST: To be placed after the elements of the offense.

Mistake of Law

If you all agree the state has proved, beyond a reasonable doubt, each of the

elements listed above, you must next consider whether the defense of mistake of law

applies.

You have heard evidence that, when the defendant committed the act of illegal

voting, he believed that his conduct did not constitute a crime.

A person's conduct that would otherwise constitute the crime of illegal voting is

1

318

not a criminal offense if the person reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime and that he acted in reasonable reliance on either--

> 1. An official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

> 2. A written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Mistake of law is an affirmative defense. Therefore, the defendant must prove, by a preponderance of the evidence, three elements:

> 1. The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

> 2. The defendant's belief was reasonable; and

> 3. The defendant reached his belief in a reasonable reliance on either--

> A. an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

> B. a written interpretation of the law contained in an opinion of a court of record; or

> C. a written interpretation of the law made by a public official charged by law with responsibility for interpreting the law in question.

> The affirmative defense of mistake of law is not established by proof that the

2

defendant was simply ignorant of the provisions of any law after the law took effect. The evidence must show the defendant addressed the law and reached a mistaken conclusion about what the law meant.

## BURDEN OF PROOF

The burden of proof is no the defendant to prove, by a preponderance of the evidence, that he comes within the affirmative defense of mistake of law.

## DEFINITIONS

"Law" means the constitution or a statute of this state or of the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioner's court, or a rule authorized by and lawfully adopted under a statute.

"Reasonable belief" means a belief that an ordinary and prudent person would have held in the same or similar circumstances as the defendant.

The defendant's reasonable reliance on a source was reasonable if an ordinary and prudent person in the same circumstances as the defendant would have relied on that source and reached any mistaken conclusion or belief that the defendant reached.

The term "preponderance of the evidence" means the grater weight and degree of the credible evidence.

## APPLICATION OF LAW TO FACTS

If you have found that the state has proved the offense beyond a reasonable doubt, you must next decide whether the defendant has proved, by a preponderance of the evidence, that he comes within the affirmative defense of mistake of law.

To decide the issue of mistake of law, you must determine whether the defendant has proved, by a preponderance of the evidence, the following three elements:

3

**320**

1. . The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

2. The defendant's belief was reasonable; and

3. The defendant reached his belief in a reasonable reliance on either--

A. an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

B. a written interpretation of the law contained in an opinion of a court of record; or

C. a written interpretation of the law made by a public official charged by law with responsibility for interpreting the law in question.

If you find that the defendant has proved, by a preponderance of the evidence, all three elements listed above, you must find the defendant "not guilty."

If you all agree that the state has proved, beyond a reasonable doubt, each of the elements of the offense of illegal voting, and you all agree the defendant has not proved, by a preponderance of the evidence, all three elements listed above, you must find the defendant "guilty."

Authority: Texas Criminal Pattern Jury Charges, State Bar of Texas 2010

Respectfully Submitted,

Audley H. Heath
State Bar No. 09347400
Address: 609 Colquitt Street
Houston, TX 77006-5523
Phone Number: 713-526-4221

4

FAX Number: 832-200-1596

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2013 a true and correct copy of the above and foregoing Defendant's Requested Instruction to Jury was served on Jonathan White and David Glickler, Texas Attorney General's Office, via in-hand delivery in open court, in accordance with the Rules of Criminal Procedure.

_____
Audley H. Heath

5

**322**

# APPENDIX
# C

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

Now, Mr. Heath has -- have you filed this, Mr. Heath, yet?

MR. HEATH: Well, to be candid, Judge, your copy is the one I intended to file.

THE COURT: Okay.

MR. HEATH: And that's the reason why I denied --

THE COURT: Would you be so kind to sign it here?

MR. HEATH: Yes. I'm sorry, Judge. I thought I'd given you the signed one.

THE COURT: And we'll get that file-stamped as well.

And Mr. Heath's requested instructions and definitions to the jury have been submitted and will be made a part of the record for this case.

And essentially, I look at this as two requests. Number one, the definition of residence; and it's from the *Mills v. Bartlett* case. And what the Court is going to do is, in all due respect, deny that request; however, we'll note for the record that the Court's normal and customary practice is to only define terms which are defined in the Texas legislatively enacted codes or laws which are relevant to a case.

However, the Court will also note that this definition is in -- is within the two Defense exhibits, 1 and

2, which have been admitted into evidence. And certainly the parties have a fair opportunity to argue what's in an exhibit that's admitted into evidence. And the Court will allow fair argument and those exhibits speak for themselves.

The second request is for the mistake of law defense. And mistake of law is covered under Section 8.03 of the Texas Penal Code. And it states under subpart B that it is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon: An official and will -- an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or two, a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

And in this case, the defendant has -- is charged with committing the offense of illegal voting by voting or attempting to vote in an election in which the defendant knew he was not eligible to vote. Those are the elements in this crime. And again, it is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and he acted in reasonable reliance upon some authority's written opinions.

Number one, as far as Section 8.03 is concerned, the defendant has flatly challenged throughout this trial that he committed the conduct charged. He has stood by his belief and his contention that he was eligible to vote. And that is one of the elements and that is being challenged. It is not an element that he is admitting to. And for that reason, the mistake of law defense is not going to be allowed.

However, as this Court understands the theory of the Defense case through its presentation and arguments, this mistake of law, that Mr. Heath is submitting, is actually intertwined in the challenge to the element that the State has to prove and that is that the defendant knew he was ineligible to vote. He voted in an election that he knew he was not eligible to vote. He's challenging that element and he will certainly be -- he's entitled to do that. And that argument and presentation inherent within this proposed mistake of law this Court looks at is actually a challenge on the element of the offense. He's denying he committed the offense; and that is the battleground of this case is the defendant's -- whether the State can prove beyond a reasonable doubt the defendant knew that he acted illegally in voting in the election.

And also, the Court would note that the key items that the Defense has urged in support of its theory in acting upon reliance of other authority and those are the Secretary of State opinion and the Attorney General opinion

# APPENDIX
# D

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

DA#:121005.1

RECEIVED AND FILED
At 9:5 o'Clock A M.
JUL 0 1 2013
BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS
By_____ Deputy



CASE No. 12-03-02579 -CR
INCIDENT NO./TRN: 9151287730

| THE STATE OF TEXAS | § | IN THE 359TH DISTRICT |
| | § | |
| v. | § | COURT |
| | § | |
| JAMES ALAN JENKINS | § | MONTGOMERY COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX50020999 | § | |

## JUDGMENT OF CONVICTION BY JURY

| Judge Presiding: | Hon. John Stevens | Date Judgment Entered: | June 28, 2013 |
|---|---|---|---|
| Attorney for State: | Jonathan White | Attorney for Defendant: | Audley H. Heath |

| Offense for which Defendant Convicted: |
|---|
| **ILLEGAL VOTING** |

| Charging Instrument: | Statute for Offense: |
|---|---|
| Indictment | 64.012(a) |

| Date of Offense: |
|---|
| **May 08, 2010** |

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| Fel. 3 | Not Guilty | N/A |

| Verdict of Jury: |
|---|
| GUILTY |

| Plea to Enhancement /Habitual Paragraphs: | N/A |
|---|---|
| Findings on Enhancement /Habitual Paragraphs: | N/A |

| Punishment Assessed by: | Jury | Date Sentence Imposed: June 28, 2013 | Date Sentence to Commence: June 28, 2013 |
|---|---|---|---|

| Punishment and Place of Confinement: | 3 years confinement in the Texas Department of Criminal Justice, Institutional Division |
|---|---|

THIS SENTENCE SHALL RUN CONCURRENTLY.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A.

| Fine: | Court Costs: | Atty. Fees | Restitution: | Restitution Payable to: |
|---|---|---|---|---|
| $ 10,000.00 | $ 364.00 | $ 0 | $ N/A | N/A (see below) |

Sex Offender Registration Requirements do not to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was N/A.

| Time Credited: | If Defendant is to serve sentence in TDCJ, enter total incarceration time. |
|---|---|
| | TOTAL: 1 DAY |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | N/A DAYS    NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Montgomery County, Texas. The State appeared by her District Attorney.353

## Counsel / Waiver of Counsel (select one)

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The Charging Instrument was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel.

The Court received the verdict and **ORDERED** it entered upon the minutes of the Court.

## Punishment Assessed by Jury / Court / No election (select one)

☑ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court **FINDS** Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is **GUILTY** of the above offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the applicable provisions of Tex. Code Crim. Proc. art. 42.12.§ 9.

The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs, attorney fees, and restitution as indicated above.

## Punishment Options (select one)

☑ **Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Texas Department of Corrections.** The Court **ORDERS** Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that upon release from confinement, Defendant proceed immediately to the **Montgomery County District Clerk.** Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above, including $2.00 fee for each payment made (pursuant to Article 102.072, T.C.C.P.).

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court **ORDERS** Defendant immediately committed to the custody of the Sheriff of Montgomery County, Texas on the date the sentence is to commence. Defendant shall be confined in the **Montgomery County Jail** for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall proceed immediately to the **Montgomery County District Clerk.** Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above, including $2.00 fee for each payment made (pursuant to Article 102.072, T.C.C.P.).

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY.** The Court **ORDERS** Defendant to proceed immediately to the Office of the **Montgomery County District Clerk.** Once there, the Court **ORDERS** Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

## Execution / Suspension of Sentence (select one)

☒ The Court **ORDERS** Defendant's sentence **EXECUTED.**

☐ The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED.** The Court **ORDERS** Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

## Furthermore, the following special findings or orders apply:

N/A

**354**

Signed and entered on _____ JUNE ___ 28 ___, 2013.

X _____
JUDGE PRESIDING

Clerk: _____



Right Thumb Print

# APPENDIX
# E

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

# *Jenkins v. State*

Court of Appeals of Texas, Fourteenth District, Houston

June 4, 2015, Majority and Dissenting Opinions Filed

NO. 14-13-00662-CR

**Reporter**
2015 Tex. App. LEXIS 5667

JAMES ALAN JENKINS, Appellant v. THE STATE OF TEXAS, Appellee

Notice: PUBLISH — *TEX. R. APP. P. 47.2(b).*

**Subsequent History:** Petition for discretionary review granted by *In re Jenkins, 2015 Tex. Crim. App. LEXIS 982 (Tex. Crim. App., Aug. 26, 2015)*

**Prior History:** [*1] On Appeal from the 359th District Court, Montgomery County, Texas. Trial Court Cause No. 12-03-02579-CR.
*McDuffee v. Miller, 327 S.W.3d 808, 2010 Tex. App. LEXIS 8676 (Tex. App. Beaumont, 2010)*

## Core Terms

voting, election, mistake of law, reside, negate, defensive, trial court, culpable mental state, authorities, precinct, election law, affirmative defense, confession and avoidance, element of the offense, purposes, eligible, requested instruction, reasonably believed, voter registration, voters, hotel, reasonable reliance, election code, instructions, statutory defense, official statement, jury charge, jury instructions, requirements, courts

## Case Summary

### Overview

HOLDINGS: [1]-The trial court committed reversible error by denying defendant's request to instruct the jury on the defense of mistake of law under *Tex. Penal Code Ann. § 8.03* during his trial for illegally voting in an election in which he knew he was not eligible to vote under *Tex. Elec. Code Ann. § 64.012(a)(1)* because he presented some evidence that he reasonably relied on the election law authorities when he voted in the election and the reasonableness of his beliefs and conduct was an issue for the jury to decide; [2]-The error was not harmless because defendant's entire defense was based on his argument that he reasonably believed that he was eligible to vote and he timely requested the instruction.

### Outcome

Judgment reversed and case remanded.

## LexisNexis® Headnotes

Governments > State & Territorial Governments > Elections

*HN1* See *Tex. Elec. Code Ann. § 1.015* (2003).

Constitutional Law > ... > Case or Controversy > Constitutional Questions > Necessity of Determination

Jon Meador

Constitutional Law > ... > Case or Controversy > Constitutionality of Legislation > General Overview

*HN2* It is well settled that the constitutionality of a statute is not to be determined unless such a determination is absolutely necessary to decide the case.

Criminal Law & Procedure > Appeals > Reversible Error > Jury Instructions

Criminal Law & Procedure > ... > Reviewability > Preservation for Review > Jury Instructions

*HN3* Appellate review of alleged jury charge error involves a two-step process. First, an appellate court must determine whether error occurred. If so, the appellate court must then analyze whether sufficient harm resulted from the error to require reversal. Under this second step, the degree of harm necessary for reversal depends on whether the appellant properly preserved the error by objection. When error in the charge is preserved for review, reversal is required if the error caused "some harm."

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN4* The trial court must provide the jury with a written charge distinctly setting forth the law applicable to the case. *Tex. Code Crim. Proc. Ann. art. 36.14.* The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence. *Tex. Penal Code Ann. § 2.04.* An erroneous or an incomplete jury charge jeopardizes a defendant's right to jury trial because it fails to properly guide the jury in its fact-finding function.

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN5* A defendant has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence. This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. However, if the defensive theory is not explicitly listed in the penal code—if it merely negates an element in the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it.

Governments > State & Territorial Governments > Elections

*HN6* Chapter 64 of the Texas Election Code provides that a person commits the offense of illegal voting if the person votes in an election in which the person knows the person is not eligible to vote. *Tex. Elec. Code Ann. § 64.012(a)(1).* To be eligible to vote in an election in Texas, a person must, among other things, be a resident of the territory covered by the election for the office or measure on which the person desires to vote. *Tex. Elec. Code Ann. § 11.001(a)(2).*

Governments > State & Territorial Governments > Elections

*HN7* See *Tex. Elec. Code Ann. § 1.015(a)-(d)* (2003).

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN8* Although a defendant's ignorance of the law is no defense to prosecution, *§ 8.03(b)(2) of the Texas Penal Code* provides that it is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon: (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or (2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question. *Tex. Penal Code Ann. § 8.03(b).* Thus, to be entitled to the statutory defense of mistake of law, a defendant must present some evidence that (1) he reasonably believed that his conduct did not constitute a crime; and (2) he reasonably relied upon either an official statement of the law or a written interpretation of the law of the type specified in the statute.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN9* Reliance on advice of counsel does not constitute a permissible mistake of law. Instead, *Tex. Penal Code Ann. § 8.03(b)* requires reliance on a narrow class of official statements or interpretations of the law. Moreover, *§ 8.03* was not created to allow a criminal defendant to rely upon old interpretative opinions, opinions that conflict with others, or on overruled opinions.

Criminal Law & Procedure > Defenses > Justification

Criminal Law & Procedure > Defenses > Necessity

Criminal Law & Procedure > Defenses > Self-Defense

*HN10* A "confession and avoidance" or "justification" defense does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct. Accordingly, with respect to such defenses, a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct. Examples of confession and avoidance or justification defenses include the Good Samaritan defense, necessity, and self-defense.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN11* The Court of Criminal Appeals has observed that the confession and avoidance doctrine does not apply when the defensive issue, by its terms, negates the culpable mental state, citing as an example the affirmative defense of mistake of fact.

Governments > Legislation > Interpretation

*HN12* A court construes a statute in accordance with the plain meaning of its text, unless the language of the statute is ambiguous or the plain meaning would lead to absurd results that the legislature could not have possibly intended. If the legislature's intent cannot be determined from the statutory text alone, the court may turn to extra-textual sources such as legislative history to construe the statute.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN13* The Penal Code defines "conduct" as an act or omission and its accompanying mental state. *Tex. Penal Code Ann. § 1.07(a)(10)*. Therefore, "the conduct charged" would include both an act and any accompanying mental state. *Tex. Penal Code Ann. § 8.03(b)*. The operative language of *§ 8.03(b)* is that the actor "reasonably believes" the charged conduct is not a crime and acts in "reasonable reliance" on official statements or interpretations of the law—mental states that necessarily negate a culpable mental state that is in some way based on knowledge of the law or legal concepts. Consequently, the Court of Appeals of Texas concludes that the plain language of *§ 8.03* demonstrates that the legislature intended the mistake of law defense to apply when a charged offense includes, as an element of the crime, a culpable mental state that incorporates knowledge of the law or legal concepts and the accused has presented some evidence that he reasonably believed his conduct did not constitute a crime because he acted in reasonable reliance on official statements or interpretations of the law as specified in the statute.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Fact

*HN14* The mistake of fact defense provides that it is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense. *Tex. Penal Code Ann. § 8.02(a)*.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Fact

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN15* The legislature drafted the definition of mistake of law to reflect the defense's narrowly tailored function to provide a limited defense to a person who reasonably believes their conduct is not criminal based on that person's reasonable

reliance on limited categories of specific legal authorities. *Tex. Penal Code Ann. § 8.03(b)*. In contrast, the mistake of fact defense provides a defense based on "a reasonable belief about a matter of fact" that also negates the culpable mental state of the charged offense. *Tex. Penal Code Ann. § 8.02(a)*. Thus, the Court of Appeals of Texas concludes that the legislature employed different wording, not to signal a difference in the application of the defenses, but in recognition of the distinctive functions of each defense.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN16* *Tex. Penal Code Ann. § 8.03* by its terms may be applied to negate the culpable mental state of an alleged offense when an accused contends that he reasonably believed his conduct was not criminal based on his reasonable reliance on official statements or interpretations of the law. *Section 8.03(b)*. Although the caption of the statutory defense is "mistake of law," a more accurate statement would indicate that a limited exception to the rule that ignorance of the law is no excuse is recognized for reasonable reliance upon an official written statement of the law. As such, the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine.

Governments > State & Territorial Governments > Elections

*HN17* The culpable mental state of the illegal voting statute requires that the person votes or attempts to vote in an election in which the person knows the person is not eligible to vote. *Tex. Elec. Code Ann. § 64.012(a)(1)*. To be eligible to vote, a person must, among other things, be a resident of the territory covered by the election for the office or measure on which the person desires to vote. *Tex. Elec. Code Ann. § 11.001(a)(2)*. And, to be a resident, the person must satisfy the election code's definition of "residence." *Tex. Elec. Code Ann. § 1.015*.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN18* The Court of Criminal Appeals of Texas has instructed that whether a defendant's belief is reasonable is a fact issue for the jury to decide.

Criminal Law & Procedure > Appeals > Reversible Error > Jury Instructions

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Jury Instructions

*HN19* The record must show that the defendant has suffered some actual, rather than merely theoretical, harm from jury instruction error. "Some" harm means the presence of any harm, regardless of degree, and cases involving preserved charge error will be affirmed only if no harm has occurred. When determining whether some harm has occurred, an appellate court considers (1) the charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) other relevant factors present in the record. Neither party has a burden to prove harm.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Jury Instructions

Criminal Law & Procedure > Appeals > Reversible Error > Jury Instructions

*HN20* Mere jury argument cannot substitute for a charge that properly instructs the jury on the application of the law to the facts. An improper jury charge undercuts counsel's ability to argue effectively about the law of the case. Of course, a defendant can argue what is not expressly in the charge. But, the argument is without the authority of the court having pronounced what is the law. Lawyers can argue many things; they are advocates. They may, or may not, be accurate in what they say and they may or may not be believed.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Law

*HN21* By enacting *Tex. Penal Code Ann. § 8.03*, the legislature specifically recognized the affirmative defense of mistake of law as a narrow exception to the general rule that ignorance of the law is no excuse in situations in which an accused acts in reasonable reliance (even if mistaken) on certain official statements or written interpretations of the law.

**Counsel:** For Appellee: George McCall Secrest, Jr., HOUSTON, TX.

Jon Meador

For State: Jon Rodney Meador, AUSTIN, TX.

Judges: Panel consists of Justices Boyce, Busby, and Wise (Busby, J., dissenting).

Opinion by: Ken Wise

# Opinion

## MAJORITY OPINION

A jury convicted appellant James Alan Jenkins of illegally voting in an election in which he knew he was not eligible to vote. Jenkins was sentenced to three years' confinement in the Texas Department of Criminal Justice and ordered to pay a $10,000 fine. Jenkins contends that the trial court erred by refusing to instruct the jury on the defense of mistake of law. Jenkins also contends that _section 1.015 of the Election Code_ is unconstitutionally vague as applied to him. Because we conclude that Jenkins was entitled to a jury instruction on the statutory defense of mistake of law, we reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an election held on May 8, 2010, for members of the Board of Directors of the Woodlands Road Utility District No. 1 in Montgomery County, Texas (the "RUD"). The RUD was created to provide for the construction and maintenance of roadways in and around the Woodlands. The RUD's boundaries encompass primarily commercial properties that pay property taxes used to fund [*2] the RUD's projects.

### 1. Events leading up to the trial

Adrian Heath, a politically active resident of Montgomery County and a long-time friend of Jenkins, learned of the RUD's existence sometime in 2009 while researching issues of local government debt. Heath did not reside in the RUD. He did, however, regularly use the roads and frequent the businesses located in the RUD.

Heath learned that the RUD was formed in 1991 and was governed by a board of five directors who were appointed and then confirmed by an initial election in 1992. Heath became concerned when he discovered that regularly contested elections for board members had not been held since 1992.[1] Heath believed that the RUD's board acted primarily to benefit the Woodlands Development Company, the developer of the Woodlands, rather than the interests of the local residents.

Heath learned that three of the RUD directors' terms would expire in 2010, so he researched the residency requirements for voting and investigated whether there were [*3] registered voters residing in the RUD. As part of his research, Heath contacted state and local election officials and others, reviewed documents, and consulted an attorney. Armed with what he had learned, Heath sought to raise awareness about the RUD through various media outlets. He made presentations to groups and actively encouraged people to run against the incumbent RUD directors. Heath also shared what he had learned with Jenkins.

For nearly twenty years, Jenkins had lived with his family at 16 Pastoral Pond Circle in the Woodlands, which is not within the RUD. But, he used the roads and engaged in activities within the RUD. Jenkins was politically active but had been unaware of the RUD's existence. Jenkins's political activities included regularly attending political meetings and, at one point, running unsuccessfully for a county political party chairmanship. Before moving to the Woodlands, Jenkins served as a city councilmember of West University Place. Jenkins had also earned a master's degree in laser physics and was the owner of World Wide Microsystems, Inc., a company that designs, manufactures, and sells control equipment for industry.

In late February or early March, Heath [*4] asked Jenkins to invite a group of people to attend a meeting concerning the RUD at a public library in the Woodlands. Jenkins invited Richard McDuffee, Peter J. Goeddertz, Bill Berntsen, and Jim

---

[1] The record reflects that three of the RUD's directors are elected in even-numbered years, and two are elected in odd-numbered years; if no positions are contested, no election is required to be held.

Jon Meador

Doyle, all of whom attended the meeting, along with Jenkins and a few other people. At the meeting, Heath gave a presentation about the structure of the RUD, the lack of contested elections for members of the RUD's board of directors, and his understanding of the requirements for establishing a residency for voting purposes in Texas. He also provided copies of a map of the RUD and a formal election law advisory opinion of the Texas Secretary of State.[2] The January 22, 2004 opinion, titled Election Law Opinion GSC-1, addressed the application of Texas residency requirements to college students attending Prairie View A&M University (the "Secretary of State opinion").

The Secretary of State opinion set out in full the Texas Election Code statutes governing voter eligibility and qualifications, and included the Election Code's definition of "residence" as follows:

§ 1.015. Residence

HN1 (a) In this code, "residence" means domicile, that is, [*5] one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

Tex. Elec. Code Ann. § 1.015 (Vernon 2003).

The Secretary of State opinion also included a discussion of applicable federal and state case law, including Mills v. Bartlett, 377 S.W.2d 636 (Tex. 1964), which was cited for the following statements concerning a voter's residence:

The meaning that must be given to [the term 'residence'] depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Volition, [*6] intention, and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile.

. . .

Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. There is no specific length of time for the bodily presence to continue.

Mills, at 637 (emphasis added).

The Secretary of State opinion concluded by noting that "[t]hese principles apply equally to college students as well as other voters, and no more can be required of them in order for them to register and vote in the State of Texas."

After the meeting, Jenkins further investigated the RUD's operations. Jenkins was concerned that although the RUD's activities affected everyone in the Woodlands, the residents had no input into its activities. Jenkins continued to meet with McDuffee, Goeddertz, Berntsen, and others about placing challengers on the ballot and encouraging people to change their residences to vote in the upcoming election. Some of the meetings were held at Jenkins's business office. Ultimately,

---

[2] The Secretary of State is the chief election officer of Texas. See Tex. Elec. Code § 31.001(a).

McDuffee, Goeddertz, and Berntsen agreed to [*7] run against the incumbent directors. They each completed applications for places on the ballot, listing their home addresses, which were not inside the RUD, as their permanent residences.[3]

Jenkins had been registered to vote from his residence at 16 Pastoral Pond Circle, which was not within the RUD, for about eighteen years. On April 5, 2010, however, Jenkins signed a Texas Voter Registration application changing his residence address to 9333 Six Pines Drive, which was the address of a Marriott Residence Inn located within the RUD. On the form, Jenkins listed 16 Pastoral Pond Circle as his mailing address.

Heath, Berntsen, McDuffee, and Goeddertz similarly changed their voter registration addresses to the hotel address, as did five others: Sybil Doyle and her daughter Roberta Cook, Thomas Curry, and brothers Benjamin and Robert Allison. As of the dates each of these people signed their voter registration applications, none of them had stayed at the Residence Inn at any time in 2010.

County [*8] deed records showed that Jenkins and the others owned homes outside the RUD boundaries, except for Benjamin and Robert Allison. The Allison brothers lived in their father's home, which was also outside the boundaries of the RUD. Additionally, Montgomery County Appraisal District records showed that in 1993, Jenkins had applied for, received, and had never withdrawn the homestead exemption he received for his home at 16 Pastoral Pond Circle. Doyle, Goeddertz, Cook, McDuffee, Curry, Heath, Berntsen, and the Allison brothers' father likewise maintained homestead exemptions for their homes.

RUD representatives became aware that several individuals had registered to vote using the address of a hotel in the RUD, and they asked the Montgomery County District Attorney's Office to intervene. On April 21, 2010, First Assistant District Attorney Phil Grant sent Jenkins and most of the others a letter informing them that the district attorney's office had received an official complaint alleging fraudulent voter registrations within the RUD for the upcoming May 8, 2010 election (the "Grant letter"). The Grant letter reflected that it was being sent to all voters registered in the RUD "for informational [*9] purposes only," and encouraged recipients with concerns about the legitimacy of their current voter registration to seek the advice of counsel.

The Grant letter identified "[s]ome helpful resources for review," including the same Secretary of State opinion Heath had previously distributed, and Attorney General Opinion Number GA-0141, dated February 4, 2004 (the "Attorney General opinion"). Like the Secretary of State opinion, the Attorney General opinion was a response to an official inquiry into voter eligibility and residency requirements applicable to students attending Prairie View A&M University. It also cited *Mills* and other authorities, explaining:

> Under current law, the determination regarding "residence" thus involves both physical residence and current intention of the applicant; if a student, like any other applicant, satisfies the requirements of *section 1.015*, that student is a "resident" of the county in which the seeks to register. The intention of the voter registration applicant is crucial to a proper determination of residence, and every person is strongly presumed to have "the right and privilege of fixing his residence according to his own desires." *McBeth* [v. *Streib, 96 S.W.2d 992, 995 (Tex. Civ. App.—San Antonio 1936, no writ)]. . . .*

Recipients of the [*10] Grant letter were advised that they should "be aware that the elections code provides criminal penalties for knowing voting violations." As an example, the Grant letter included the text of *section 64.012 of the Texas Election Code*, specifying the elements of the offense of illegal voting. However, the Grant letter did not include the statutory requirements for voter eligibility or residency. Finally, the Grant letter encouraged each recipient to "exercise your right to vote in a manner that is consistent with the law."

After receiving the Grant letter, Jenkins sought advice from local attorney and long-time acquaintance Eric Yollick. Together, Jenkins and Yollick reviewed the Grant letter, the election code statutes, and the Secretary of State and Attorney

---

[3] Although candidates for election to the RUD's board of directors were not required to be residents of the RUD, individuals who wanted to vote in a RUD election were required to reside in the district.

General opinions. Jenkins also reviewed case law, including *Mills*. Additionally, Jenkins discussed the Grant letter with Heath and the others, some of whom also consulted with Yollick before voting in the May 8, 2010 election.

On May 7, 2010, the day before the election, Jenkins checked into the Residence Inn at 9333 Six Pines Drive for a two-night stay. The Residence Inn's records noted that in addition to Jenkins, there would be four other guests in the room: McDuffee, Goeddertz, Heath, and [*11] Curry, although McDuffee spent only a few minutes in the hotel to change clothes and did not stay overnight. The hotel's records also showed that Curry had separately registered for a single night's stay on May 7, departing on May 8. Benjamin and Robert Allison also stayed overnight as guests before voting. Berntsen, Doyle, and Cook visited the group at the hotel, but did not stay overnight. Yollick also stopped by to visit with Jenkins at the hotel on the evening before the election.

The contested election took place on May 8. Early voting totals for the election showed that two people cast votes. Each of the incumbents received two votes, and no votes were cast for the challengers. On election day, however, ten voters cast votes for each of the three challengers. The ten voters were Jenkins, Heath, Berntsen, McDuffee, Goeddertz, Doyle, Cook, Curry, and the Allison brothers. Consequently, the challengers, Berntsen, McDuffee, and Goeddertz, received more votes than the incumbents.

A few days after the election, the incumbent RUD directors filed a lawsuit to challenge the election results. After meeting with some of the group of voters to discuss this development, Yollick agreed to represent [*12] Jenkins, Heath, McDuffee, Goeddertz, Berntsen, Curry, and the Allison brothers as intervenors in the lawsuit. After meeting with Yollick, some of the intervenors planned additional stays at the Residence Inn. Hotel records showed that Jenkins and three others stayed at the Residence Inn for one night on May 26, 2010; Jenkins also rented a room from May 29 to June 14. While there, the intervenors took photographs of themselves working, relaxing, dining, and socializing at the Residence Inn. In some of the photographs, the intervenors held up documents or the front pages of newspapers. Yollick met with Jenkins and the others at the hotel several times; three of the meetings were specifically to discuss the lawsuit.[4] Jenkins also changed his driver's license address to the Residence Inn.

On March 8, 2012, Jenkins was indicted for the third-degree felony of illegal voting. The State alleged that Jenkins illegally voted in the May 8, 2010 Woodlands Road Utility District Board of Directors [*13] election "when he knew he did not reside in the precinct in which he voted." Jenkins pleaded "not guilty."

*2. The trial on guilt/innocence*

The guilt/innocence phase of the trial began on June 25, 2013. The State's theory was that Jenkins conspired with others to have his associates elected to the board of directors, take over the RUD, and shut it down. As part of the scheme, Jenkins and the others changed their voter registration addresses to the Residence Inn only to manipulate the outcome of the RUD election. The State argued that because Jenkins knowingly violating the election code in an attempt to cheat the system, he should be found guilty of illegal voting.

The defense countered that what Jenkins did was engage in the political process "to right what he perceived to be a wrong" within the confines of the law. The defense urged that it was fundamentally wrong to find an individual guilty of illegal voting by choosing their residence for voting purposes.

As the trial progressed, the defense focused primarily on the theory that Jenkins changed his residence for voting purposes based on his understanding of the law as expressed in the Secretary of State opinion, the Attorney General [*14] opinion, and *Mills*: that residence is determined by an intent to establish a residence combined with bodily presence, and there is no requirement that a person reside at that residence for any specific length of time. Jenkins argued that he reasonably relied on the two advisory opinions and the *Mills* case when he registered to vote and voted in the RUD election because he had

---

[4] The jury was not provided with any information concerning the details or the outcome of the civil lawsuit or subsequent appeal; however, that lawsuit ultimately was resolved against the intervenors. *See McDuffee v. Miller*, 327 S.W.3d 808 (Tex. App.—Beaumont 2010, no pet.).

Jon Meador

both a physical presence and the intent to reside at the Residence Inn for voting purposes at the time he voted. Therefore, the defense maintained, Jenkins lacked the requisite intent to commit the offense of illegal voting.

The State's first witness was James Stilwell, the attorney who represented the incumbent RUD directors in the civil lawsuit. Stilwell provided factual background concerning the RUD and the May 8, 2010 election, explained some of the documents obtained from the trial in the civil suit, and discussed the testimony he elicited from Jenkins at that trial.[5]

Stilwell testified that Jenkins had said that the majority of his personal property was either at his house or at his business. On the night of May 7, when he checked into the Residence Inn, Jenkins took with him one or two suitcases, some toiletries, and some business papers. Jenkins also confirmed that four different individuals representing four families also stayed with him in his room on May 7. Jenkins admitted that he did not live in the hotel on the day he signed and swore on the voter's registration application that he did. Finally, Jenkins stated that one reason he decided to make the hotel his residence was that he had been trying to sell his home at 16 Pastoral Pond Circle, citing a desire to downsize and a concern that his home was near a floodplain. Stilwell acknowledged that when he visited Jenkins's home during his investigation, he saw a "for sale" sign on the home, but as of the date of the civil trial, Jenkins still owned the home and declared it as his homestead. Stilwell conceded, however, that the election code does not require a person to reside at a location for any specific length of time to establish [*16] a residence for voting purposes.

The next witness was Phil Grant, the First Assistant District Attorney of Montgomery County and the author of the Grant letter. He testified that the purpose of the Grant letter was to caution the recipients to make the right decision in regard to where they voted. He denied the letter was intended as a threat, instead characterizing it as informational. Grant explained that his office does not provide legal advice to private citizens, but after receiving several calls from representatives of the RUD, his office felt it was "in the best interest" to remind the voters of the voter registration laws so that there would be no criminal activity in the future. He agreed that if a recipient of the letter reviewed the case law, sought legal counsel, and became convinced they had a right to vote in the RUD election, then they had done everything the letter encouraged them to do. Grant also acknowledged stating to a reporter that it would be helpful if the Secretary of State issued some clear guidelines regarding the definition of residency rather that leaving it "vague."

Richard McDuffee was the first of the voters to testify. McDuffee explained that he learned [*17] of the RUD after Jenkins invited him to a "big meeting" at Jenkins's office in March 2010, about two months before the election. McDuffee attended the meeting, along with Heath, Goeddertz, and Jim Doyle, the husband of Sybil Doyle and father of Roberta Cook. At the meeting, Jenkins specifically discussed with McDuffee his desire that McDuffee participate in the RUD election. Jenkins encouraged McDuffee to change his residence to vote in the election, and to run as a candidate for president of the RUD board of directors. Once elected, Jenkins instructed McDuffee that he was to "pay off the bills," "turn the lights out," and "shut [the RUD] down."

Later, at Jenkins's office, McDuffee filled out a voter registration application and also applied as a candidate. After that, McDuffee received the Grant letter, which concerned him and indicated to him that his actions were "not something taken lightly." However, McDuffee did not review the authorities identified in the Grant letter, and he acknowledged that the group's lawyer told him that the legality of voting in the RUD election was too close to call.

McDuffee testified that he voted in the RUD because he believed it was wrong that there [*18] had been no contested elections held in the RUD, and because he trusted Jenkins. McDuffee also identified Jenkins as the leader of the group because "[e]verything flowed out of [Jenkins's] office." For example, McDuffee explained that the voter registration forms were to be filled out with the address of the Residence Inn based on information on a sheet of paper posted on the wall in Jenkins's office. McDuffee was also asked to recruit others to change their registrations and vote.

McDuffee also testified that after the election, the group went to the next RUD board meeting and learned that the vote would not be canvassed. Shortly after that, the group learned that they were going to be taken to court. McDuffee confirmed

---

[5] Stilwell also testified that as part of his investigation in the civil trial, he visited the home of the voters and found that they appeared to have the kinds of items one would normally find in an occupied home. He also took photographs of the [*15] properties, which were admitted into evidence in this trial.

that, although he was counseled by their attorney, Yollick, to make up a reason for moving to the Residence Inn, the real reason he changed his residence was to vote in the RUD election. Further, as far as he knew, none of the ten voters actually moved to the RUD. In preparation for the upcoming civil trial, Yollick also counseled the group to rent more rooms, bring personal items there, and engage in activities at the Residence Inn. Additionally, the pictures the group took of [*19] themselves at the Residence Inn were all to make appearances for the civil trial.

When McDuffee later learned there was a criminal investigation, he reached out to the district attorney's office and testified before the grand jury. McDuffee stated that he was not promised leniency for cooperating and he was not indicted by the grand jury. Although McDuffee had not been arrested, he believed the possibility of an arrest remained. McDuffee also testified that even though he did not know he was voting illegally on the day he voted, he was uncertain about the legality of his action because—unlike the others—he had never physically stayed at the Residence Inn, and he believed there had to be a simultaneous physical presence and intent to establish residence.

Benjamin Allison testified next. He stated that he was twenty-six years old, and his brother Robert was eighteen. Benjamin testified that he considered himself to be politically active, and he decided to vote in the RUD election because Heath brought it to his attention. He later met Jenkins at an unrelated political meeting. Motivated by the principle of taxation without representation, both he and his brother decided to change their [*20] residence on their voter registrations and stay at the Residence Inn on the night before the election. Benjamin stated that his room was paid for on Jenkins's credit card, and the brothers reimbursed Jenkins for their share of it. He acknowledged that others stayed in the room as well.

Benjamin later learned of the challenge to the election, and testified that Yollick called him to ask if he would be willing to be an intervenor in the civil suit for the purpose of trying to stop the RUD board from invalidating the election. Benjamin and most of the other ten voters, including Jenkins, met with Yollick at his law office to discuss the intervention. According to Benjamin, Yollick encouraged them to rent additional rooms at the Residence Inn for the foreseeable future and to take the photos of themselves there. Benjamin also changed his driver's license to the Residence Inn's address, but changed it back after the civil trial ended. Benjamin admitted that, other than the voter registration card he filled out, there was no evidence connecting him to the Residence Inn as a residence before he voted.

Benjamin testified that Jenkins did not convince him to vote; he decided to vote based on [*21] his own research, including his review of the Secretary of State opinion. He felt that he was engaging in the political process by changing his residence on his voter registration and voting against the RUD board members. Benjamin acknowledged, however, that he did not pay taxes to the RUD unless he voluntarily entered the district and shopped there. Benjamin testified that he did not knowingly commit a criminal offense when he voted, because he believed that all that was required was a physical presence in the district before the election with the intent to return. Benjamin also testified that when he changed his residence to 9333 Six Pines Drive, he intended that to be his permanent voting address.

Peter Goeddertz, who ran for a position on the RUD board and voted from the Residence Inn address, testified that he had lived in Montgomery County for forty years and had voted from his home address for most of those years. Goeddertz had been charged with voter fraud and indicted on the same day as Jenkins, but he testified that he had since reached an agreement with the State and would not be charged with a felony. He also agreed to appear and testify truthfully.

Goeddertz explained that [*22] he had known Jenkins for fifteen years and considered him a friend. He and Jenkins were politically active together and it was Jenkins and Heath who brought the RUD issue to his attention. Goeddertz also discussed the RUD with the Allison brothers, McDuffee, Berntsen, and Curry. The group devised a plan to "run for positions and take over the RUD" and then disband it. Goeddertz stated that it was "probably" Jenkins who first pitched the idea, although he described it as a "consensus" plan. Goeddertz, McDuffee, and Berntsen ultimately ran for the board because they were available to do it.

Goeddertz later filled out the voter registration form, changing his residence address to 9333 Six Pines Drive. Goeddertz testified that it was Jenkins who picked the hotel address, and Jenkins also kept track of the people who were changing their registrations to that address. At the time, Goeddertz intended the 9333 Six Pines Drive address to be his permanent voting residence. He did not believe he was committing an offense because it was his understanding that all that was required to

establish residency was that his intent and his physical presence coincide. However, Goeddertz admitted that he [*23] did not change his voter registration because he intended to make the Residence Inn his home; he did it to vote for himself in the May 8, 2010 election.

After receiving the Grant letter, Jenkins, Goeddertz, and other voters met at Jenkins's office to review the letter. Goeddertz also consulted with Yollick before deciding to go ahead and vote in the election. According to Goeddertz, Jenkins oversaw the room rental at the Residence Inn, and the hotel bill was directed to Jenkins at his office address. Goeddertz stayed in the room two nights with Jenkins and the others. After Goeddertz was elected and the RUD challenged the election results, Yollick agreed to represent the group. Goeddertz subsequently stayed one night at the Residence Inn. On Yollick's advice, Goeddertz took pictures to substantiate that the group was there. Goeddertz also testified that he put his house up for sale at a price that was admittedly "a little high," but he had no interested buyers and ultimately did not sell the property.

After Goeddertz's testimony, the State rested. The defense began its case by presenting Jim Doyle. Doyle had lived at his home in Montgomery County for about forty years, and was a long-time [*24] election judge and precinct chair in his home precinct. Doyle described his duties as precinct chair and the election law he had studied in connection with these duties, including reading the Secretary of State opinion and the *Mills* case. Doyle also explained that the Secretary of State's office controls the election process and is ultimately the source of the informational documents and videos he reviews as a precinct chair.

Doyle first learned about the RUD at the library meeting where Heath had given his presentation. After that, Doyle attended a couple of meetings concerning the RUD. At the meetings, Doyle discussed residency requirements with Jenkins, Heath, and Yollick. Doyle also talked to Sybil Doyle, his wife, and Roberta Cook, his daughter, about changing their residences to vote in the RUD election. Sybil and Roberta ultimately changed their residences and voted, but Doyle did not do so because if he moved out of his district he could no longer be precinct chair.

The defense next presented Adrian Heath, who testified that he was a politically active resident of Montgomery County who had an interest in issues of local government debt. When he learned about the RUD's level of [*25] debt and the lack of contested elections for its board members, Heath investigated further. Among other things, Heath obtained financial information, some check registers, and a map from the RUD. Heath also obtained voter registration records of the existing voters in the RUD from the office of the county election registrar, and contacted the Secretary of State's office to ask about what he thought were "anomalies and unconstitutional issues surrounding the RUD" and how they could be remedied. He also actively sought to inform others about the RUD as part of his effort to "force an election." While researching voter registration requirements, Heath discussed the Secretary of State opinion at length with Joe Kulhavy, the chief elections officer of the Secretary of State.

Heath could not run for one of the open seats on the RUD board himself because he was running for county judge at the time, so he decided to find other people to run so that an election would have to be held. Heath also decided to change his address on his voter registration to establish his residence within the RUD for voting purposes. After Heath changed his address to 9333 Six Pines Drive, he received the Grant letter. [*26] He reviewed the letter, read the suggested authorities, and consulted with an attorney as advised. Heath believed that, based on the Secretary of State opinion and his reading of *Mills*, he needed only a combination of intent and bodily presence in a location to establish a residence for voting purposes, and there was no durational residency requirement. Heath testified that he believed he had legally established his residence at the hotel when he filled out the voter registration change of address form. Additionally, he testified that he intended to vote in all future elections from that address.

Heath further stated that he had two residences—one at his home address and one at 9333 Six Pines Drive, which was his "residence for voting purposes" as that phrase is used in the Attorney General opinion. But Heath did not know if that phrase appeared in any written law in Texas. When asked whether the hotel was his "home and fixed place of habitation to which [he] intended to return after any temporary absence," Heath replied that it was, even though he estimated that he had stayed overnight at the Residence Inn as few as ten nights over the last three years. Heath described all of the other [*27] nights he did not stay overnight as "temporary absences" from the Residence Inn.

Jon Meador

The next witness to testify was attorney Eric Yollick, who testified that he had known Jenkins since the mid-1990s and considered him to be one of the most politically active people he had ever met. Jenkins brought the Grant letter to him and asked for his counsel on the law of establishing a residence for voting purposes.[6] Testifying only as a fact witness, Yollick explained that he discussed with Jenkins the resources identified in the Grant letter, in particular the Secretary of State opinion and the Attorney General opinion. He also reviewed and discussed with Jenkins the *Mills* case, the election code statutes on voter eligibility and residence, and related information.

Yollick testified that he was hired to represent Jenkins and the other intervenors in the RUD lawsuit, but he denied that his office invited the group of voters to a meeting to ask them to become intervenors. He also denied telling the intervenors to rent more rooms to show their intention to reside at the Residence Inn, saying that it was not relevant and was none of his business. He also denied chastising Jenkins "for being too cheap and not booking enough rooms." However, Yollick acknowledged that he met with some of the intervenors at the Residence Inn, twice socially and three times for business meetings. He recalled that Jenkins, Heath, Curry, McDuffee, Berntsen, and the Allison brothers were at all or most of the meetings.

Lastly, Jenkins testified in his own defense. He described his personal and professional background, and described himself as "extremely analytical and very focused." Jenkins explained that he had met many of the people involved in the RUD election through his political activities. Several were also involved [*29] in helping him lodge Texas Ethics Commission complaints against elected officials based on their campaign finance reports. Jenkins explained that his purpose in making the complaints was to hold elected officials accountable.

Jenkins testified that he was in the RUD practically every day, driving on the roads, banking, shopping, going to the post office, walking the trails, and going to the Pavilion, an outdoor music venue. When Jenkins learned about the RUD from Heath, he was shocked that he had been unaware of the RUD's activities and the lack of contested elections. Jenkins also learned that the RUD held its board meetings in the boardroom of the Woodlands Development Company, which troubled him because he reasoned that even if people were interested in the RUD, they would be unable to find out where the meetings were held so that they could attend. Jenkins believed that although the RUD impacted everyone in the Woodlands, the public had no input in its activities; consequently, he felt "totally disenfranchised."

After reading the Secretary of State opinion, Jenkins concluded that "everybody has an equal right for voting and they get a chance to choose where they want to reside and [*30] not somebody else . . . for voting purposes." He understood that the Secretary of State opinion concerned students at Prairie View University, but he believed that it applied to him as well because the last sentence of the opinion stated that the principles discussed apply equally to other voters and that no more could be required of them to register and vote in Texas. Jenkins also decided that the first step to validly vote in an election was to register to vote thirty days before the election, but he also concluded that this was an administrative requirement only and not a requirement that he actually reside at the chosen location at the time of registration.

Jenkins further testified that, based on the Secretary of State opinion, he believed that establishing a residence was more about a general location, rather than a specific dwelling or abode, and about being a community member. According to Jenkins, "your particular location is a location that you decide to call for voting purposes your residence." Jenkins pointed out that the Secretary of State opinion also relied on *Mills*, which explains that bodily presence alone and intention alone do not determine a residence, but when the [*31] two coincide, at that moment the residence is fixed and determined. Additionally, Jenkins noted, the *Mills* case reflects that there is no specific length of time for the bodily presence to continue. Consequently, Jenkins determined that once a residence is established, it is unnecessary to remain there.

Jenkins testified that, when he filled out the voter registration form changing his residence address to 9333 Six Pines Drive, he had "easily" maintained a bodily presence in the RUD for twenty years, since there was hardly a day that he was not

---

[6] At this point, the trial court held a discussion at the bench concerning whether Yollick could testify as an expert witness. The jury was excused for the day, and Yollick was questioned at length concerning the foundation for any opinions he might give. The trial court ultimately ruled that Yollick would not be allowed to testify as an expert because whether Jenkins knew that he did not reside in the precinct in which he voted was an element [*28] of the offense that was a matter for the jury to determine. Therefore, Yollick was not permitted to testify as to the advice he ultimately gave Jenkins.

in the RUD at some point. Jenkins testified that he also intended to make the RUD his residence for voting purposes for the indefinite future. Thus, when he completed the voter registration form, Jenkins believed he was fully complying with the law.

Jenkins explained that he chose the Residence Inn as his residence because it was in the RUD, it was across the street from a favorite restaurant, and it was convenient to his activities in the RUD. Jenkins had also considered staying at the Residence Inn in anticipation of selling his home at 16 Pastoral Pond Circle. He stated that he had been thinking of selling because he was retiring and wanted [*32] to downsize, and he was also concerned that the house bordered a floodplain. Ultimately, though, no buyers expressed interest, and as of the time of trial, he still lived in the home.

When Jenkins received the Grant letter, he felt that it was an attempt to suppress the vote, which also made him feel disenfranchised. He took the Grant letter to his long-time friend, Yollick, and together they reviewed the letter, the Secretary of State opinion, the election code—including the statutes on residency requirements—and other information "in great detail." Jenkins also reviewed the Attorney General opinion, which he felt supported the Secretary of State opinion because it also cited *Mills* and emphasized that "every citizen has the right to determine his own residence." Jenkins concluded that, based on his research and his consultation with Yollick, he was fully within the law by registering to vote at the hotel. Jenkins denied putting down an improper address for his residence, and he denied influencing others to change their residence to the hotel.

On cross-examination, Jenkins also denied knowing he was ineligible to vote on the day he voted. Jenkins acknowledged that the relevant portions [*33] of the election code's definition of residence were:

- "residence" means "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence";

- "residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the code";

- "[a] person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only"; and

- "[a] person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home."[7]

Jenkins also acknowledged that the election code was the governing law, and that the statutory definition "probably" trumps anything inconsistent in the common law. Jenkins agreed that, at least for some people, a hotel would be a good example of a place that people go to for temporary purposes only. But Jenkins disagreed that his home at 16 Pastoral Pond Circle was a good example of a home he left to go to a hotel for temporary purposes because "as the home got sold, [he] would have no place to go back to." Jenkins acknowledged, [*34] however, that his home was not sold.

Jenkins also admitted that, except for the sixteen or seventeen days he stayed at the Residence Inn over the last three years, he has regularly returned to either his home at 16 Pastoral Pond Circle or his office. However, Jenkins denied that 16 Pastoral Pond Circle was his habitation; he stated that for the last twenty years his habitation has been the RUD. Jenkins explained that his definition of a "habitation" was "what your habits are, what includes your habits," and for that reason the Residence Inn, rather than his home, was his habitation. Jenkins expounded on the definition of a "permanent habitation" as "where I go; where I am; what district I'm in," and concluded that it would not necessarily include where he lives or sleeps. In fact, Jenkins testified that he believed that everybody has a right to go stay in a hotel somewhere and overthrow a utility district if they meet the definition of bodily presence combined with intent, because that is their fundamental right.

Jenkins ultimately agreed that the concept of "residence for voting purposes" and residence as defined in the election code is the same thing. Jenkins believed that his understanding [*35] of the law comported with the statutory definition of

---

[7] Tex. Elec. Code § 1.015(a)—(d).

"residence" because, while the definition includes references to one's "home," it refers to "place" five times, and "place" means a locality or an area. Consequently, for Jenkins, the RUD was the place where he spent his time. Jenkins further pointed out that the words "dwelling" or "house" are not mentioned in the definition of "residence," and he denied that "habitation" meant dwelling or abode. Jenkins admitted that, as of the time of trial, his "residence for voting purposes" was again his home at 16 Pastoral Pond Circle. Nevertheless, Jenkins denied that he had been mistaken or that he had done anything wrong when he changed his residence to the Residence Inn to vote in the May 8, 2010 election, and he maintained that he voted lawfully in that election.

After Jenkins's testimony, the defense rested. The State then recalled as rebuttal witnesses Benjamin Allison, Goeddertz, and McDuffee to rebut portions of Yollick's testimony. Allison testified that, after the election, Yollick's office called and asked if his name could be used in the intervenors' lawsuit. Allison also testified that at a meeting concerning the lawsuit, Yollick [*36] insisted that some of them needed to move back to the Residence Inn to strengthen their case. Goeddertz similarly testified that Yollick told the group to spend more time at the Residence Inn to "look good" to the court. McDuffee testified that, not only was Yollick adamant that the group needed to return to the Residence Inn, he also instructed them to plan for expenses to rent more rooms than just the two that were rented on the night before the election, and to come up with a reason for moving to the Residence Inn. McDuffee also testified that it was Yollick's idea to have photographic proof of their physical presence at the Residence Inn after the election.

The parties then rested their cases. At the formal charge conference that followed, the trial judge denied the defense's request to include the statutory defense of mistake of law in the charge for two stated reasons. First, the judge determined that Jenkins was not entitled to the affirmative defense because he did not admit that he committed the conduct charged, which was that he voted in an election in which he knew he was ineligible to vote. Second, the judge explained that, in his view, Jenkins's argument that he reasonably [*37] relied on the proffered authorities when he registered to vote and voted in the RUD election using the address of the Residence Inn was really a challenge to an element of the offense the State was required to prove, namely, that Jenkins knew he was ineligible to vote in the RUD election. The judge noted that the defense's first two exhibits were the Secretary of State opinion and the Attorney General opinion, and that both opinions discussed *Mills*. Accordingly, the judge reasoned that the defense's arguments and authorities were already before the jury for purposes of determining whether the State proved that Jenkins knew he acted illegally in voting in the election.

As charged, the jury found Jenkins guilty. Consistent with the jury's assessed punishment, the trial court sentenced Jenkins to three years' imprisonment and a $10,000 fine.

ANALYSIS OF JENKINS'S ISSUES

Jenkins's primary argument on appeal is that the trial court reversibly erred by refusing to include in its charge to the jury an instruction on the mistake of law defense codified in *section 8.03 of the Penal Code*, which was both raised by the evidence and specifically requested by defense counsel. Jenkins also argues that *section 1.015 of the Election Code* is unconstitutionally vague [*38] as applied to him because the definition of "residence" is fatally ambiguous and encourages arbitrary enforcement of the penal law in violation of Jenkins's right to due process under the state and federal constitutions. Because we conclude that the trial judge reversibly erred by denying Jenkins's requested statutory defense of mistake of law, we sustain his first issue and do not reach the second.[8]

A. Standard of Review

---

[8] *HN2* It is well settled that the constitutionality of a statute is not to be determined unless such a determination is absolutely necessary to decide the case. *See, e.g., Turner v. State,* 754 S.W.2d 668, 675 (Tex. Crim. App. 1988); *Coberly v. State,* 644 S.W.2d 734, 735 (Tex. Crim. App. 1983) (per curiam). Because we are reversing and remanding the case based on charge error, it is unnecessary to address Jenkins's constitutional issue. *See Coberly,* 644 S.W.2d at 735 (instructing that it was unnecessary for the appellate court to address the merits of appellant's constitutional issues after it had concluded that the case should be reversed and remanded due to charge error). Additionally, to the extent that Jenkins seeks dismissal of his indictment by his second issue, we note that in his appellate briefing Jenkins requested only a remand for new trial rather than dismissal. This court cannot grant more relief than an appellant has requested. [*39] *Banks v. State,* 158 S.W.3d 649, 650 n.1 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

*HN3* Appellate review of alleged jury charge error involves a two-step process. *Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994)*. First, we must determine whether error occurred. *Id. at 731*. If so, we must then analyze whether sufficient harm resulted from the error to require reversal. *Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)*. Under this second step, the degree of harm necessary for reversal depends on whether the appellant properly preserved the error by objection. *Id.* When, as here, error in the charge is preserved for review, reversal is required if the error caused "some harm." *Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)* (op. on reh'g).[9]

*HN4* The trial [*40] court must provide the jury with "a written charge distinctly setting forth the law applicable to the case." *Tex. Code Crim. Proc. art. 36.14*; *Walters v. State, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007)*. The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence. *See Tex. Penal Code § 2.04*; *Walters, 247 S.W.3d at 208-09*. "[A]n erroneous or an incomplete jury charge jeopardizes a defendant's right to jury trial because it fails to properly guide the jury in its fact-finding function." *Abdnor, 871 S.W.2d at 731*.

*HN5* A defendant "has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence." *Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)*; *Dyson v. State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984)*. This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. *Granger, 3 S.W.3d at 38*. However, "if the defensive theory is not explicitly listed in the penal code—if it merely negates an element in the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it." *Walters, 247 S.W.3d at 209*; *see Giesberg v. State, 984 S.W.2d 245, 250-51 (Tex. Crim. App. 1998)* ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court concludes [that] a defense [*41] which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction."). The question in this case is what happens when the requested instruction is warranted by the evidence and listed in the Penal Code, but also appears to negate an element of the State's case.

## B. Jenkins's Alleged Election Code Violation and the Mistake of Law Defense

### 1. Did the trial court err by refusing the requested statutory defense of mistake of law?

*HN6* Chapter 64 of the Texas Election Code provides that a person commits the offense of illegal voting "if the person votes . . . in an election in which the person knows the person is not eligible to vote." *See Tex. Elec. Code § 64.012(a)(1)*.[10] To be eligible to vote in an election in this state, a person must, among other things, be "a resident of the territory covered by the election for the office or measure on which the person desires to vote." *Tex. Elec. Code § 11.001(a)(2)*.

The Election Code statute defining "residence" provides, in relevant part:

> *HN7* (a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.
>
> (b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

---

[9] The State suggests that Jenkins failed to preserve his charge error complaint, arguing that nothing in the record indicates any sort of argument in favor of a mistake of law instruction, only "an indication that Jenkins gave the trial court a proposed instruction." The State further contends that, after the trial court denied the proposed instruction, Jenkins did not object and made no argument mirroring that on appeal. However, the record reflects that Jenkins timely presented his proposed instruction in writing to the trial court, the trial court denied it, and it was filed with the court. We conclude that Jenkins has sufficiently preserved error. *See Tex. Code Crim. Proc. art. 36.15*; *Chase v. State, 448 S.W.3d 6, 12 (Tex. Crim. App. 2014)*.

[10] At the time of the May 8, 2010 RUD election, this offense was a third-degree felony. *See Act of May 9, 1985, 69th Leg., R.S., ch. 211, 1985 Tex. Gen. Laws 881 (amended 2011) (current version at Tex. Elec. Code § 64.012(b))*. As amended, the severity of the offense is increased to a second-degree felony. *See Tex. Elec. Code § 64.012(b)*. Because [*42] section 64.012(a)(1) was not amended, however, we will refer to the current version of the statute.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

*Id. § 1.015(a)-(d).*

Consistent with the statutory language, Jenkins's indictment charged that he "did then and there vote in an election in which the Defendant knew he was not eligible to vote, to-wit: Defendant voted in the May 8, 2010 Woodlands Road Utility District Board of Directors election, when he knew he did not reside in the precinct in which he voted." Therefore, the State was required to prove that Jenkins (1) voted in an election [*43] (2) knowing he did not reside in a precinct in the territory covered by the RUD election of May 8, 2010. *See Medrano v. State, 421 S.W.3d 869, 884 (Tex. App.—Dallas 2014, pet. ref'd).*

HN8 Although a defendant's ignorance of the law is no defense to prosecution, *section 8.03(b)(2) of the Texas Penal Code* provides that "[i]t is an affirmative defense to prosecution that *the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance* upon:

(1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

(2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

*Tex. Penal Code § 8.03(b)* (emphasis added); *see also id. § 8.03(a)* ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). Thus, to be entitled to the statutory defense of mistake of law, a defendant must present some evidence that (1) he reasonably believed that his conduct did not constitute a crime; and (2) he reasonably relied upon either an official statement of the law or a written interpretation of the law [*44] of the type specified in the statute. *Id; see Green v. State, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992).*

HN9 Reliance on advice of counsel does not constitute a permissible mistake of law. *Barrera v. State, 978 S.W.2d 665, 671 (Tex. App.—Corpus Christi 1998, pet. ref'd); Gallegos v. State, 828 S.W.2d 577, 579 (Tex. App.—Houston [1st Dist.] 1992, no pet.).* Instead, *section 8.03(b)* "requires reliance on a narrow class of official statements or interpretations of the law." *Hawkins v. State, 656 S.W.2d 70, 73 (Tex. Crim. App. 1983).* Moreover, "[s]ection 8.03 was not created to allow a criminal defendant to rely upon old interpretative opinions, opinions that conflict with others, or on overruled opinions." *Green v. State, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992)* (citing *Linder v. State, 779 S.W.2d 520, 523 (Tex. App.—Waco 1989, pet. ref'd)* (internal quotations omitted)).

In this case, the Secretary of State and Attorney General opinions were admitted into evidence, and although the trial court did not admit a copy of the *Mills* case, the court permitted the parties to refer to the case because it was discussed in the two advisory opinions. It is undisputed that these documents constitute written interpretations of the law for purposes of *section 8.03(b)(2).* For convenience, we refer to the two opinions and the *Mills* case collectively as "the election law authorities."

### a. The confession and avoidance doctrine

Jenkins contends that the trial court erred when it concluded that he was not entitled to a mistake of law instruction because he did not "confess" or admit he committed the allegedly wrongful conduct. In so doing, Jenkins maintains, [*45] the trial court erroneously relied on the confession and avoidance doctrine, which does not apply to defensive issues—like mistake of law—that negate the culpable mental state required for the commission of the offense. *See Juarez v. State, 308 S.W.3d 398, 401-02 (Tex. Crim. App. 2010)* (explaining that the confession and avoidance doctrine is inapplicable when "the defensive issue, by its terms, negates the culpable mental state").

*HN10* A "confession and avoidance" or "justification" defense does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct. *See Shaw v. State, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007)*. Accordingly, with respect to such defenses, "a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Id. at 659* (emphasis in original). Examples of confession and avoidance or justification defenses include the Good Samaritan defense, necessity, and self-defense. *Juarez, 308 S.W.3d at 401-02*.

The State argues that the trial court correctly refused to instruct the jury on the mistake of law defense because, as the trial court implicitly concluded, the statutory defense [*46] of mistake of law is an affirmative defense, and as such, is subject to the confession and avoidance doctrine. *See Tex. Penal Code § 8.03(b)* ("It is an affirmative defense to prosecution . . . .); *Meraz v. State, 785 S.W.2d 146, 153 (Tex. Crim. App. 1990)* (stating that every affirmative defense requires that the defendant acknowledge he committed the otherwise illegal conduct, and noting that *Penal Code section 8.03* is an affirmative defense). *HN11* The Court of Criminal Appeals has since observed, however, that "the doctrine does not apply when the defensive issue, by its terms, negates the culpable mental state," citing as an example "[t]he affirmative defense of mistake of fact." *Juarez, 308 S.W.3d at 402*; *see Cornet v. State, 359 S.W.3d 217, 225 (Tex. Crim. App. 2012)* ("We clarified, in *Juarez*, that the defensive issues the [confession and avoidance] doctrine does *not* apply to are those that 'by [their] terms, negate[] the culpable mental state' required for commission of the offense."); *see also Tex. Penal Code § 8.02(a)* (defense of mistake of fact).

Recognizing that *Juarez* illustrates that not every affirmative defense is subject to the confession and avoidance doctrine, the State next contends that the doctrine nevertheless applies to the mistake of law defense because it does not negate any element of the offense, but only excuses what would otherwise amount to criminal conduct. *See Cornet, 359 S.W.3d at 224-25* (holding that [*47] statutory "medical-care defense" was subject to the confession and avoidance doctrine because it "does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct") (quoting *Shaw, 243 S.W.3d at 659*). Neither party directs us to any case law holding that the statutory defense of mistake of law is a confession and avoidance or justification defense, and we have found none. Therefore, we turn to the language of *Penal Code section 8.03* for guidance.

*HN12* We construe a statute in accordance with the plain meaning of its text, unless the language of the statute is ambiguous or the plain meaning would lead to absurd results that the legislature could not have possibly intended. *Chase v. State, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014)*. If the legislature's intent cannot be determined from the statutory text alone, we may turn to extra-textual sources such as legislative history to construe the statute. *Logan v. State, 89 S.W.3d 619, 627 (Tex. Crim. App. 2002)*.

For purposes of our analysis, we focus on that portion of *section 8.03(b)* providing that "[i]t is an affirmative defense to prosecution that the actor reasonably believed that the *conduct charged* did not constitute a crime and that he acted in reasonable reliance upon" specific types of official statements or interpretations of the law. *See Tex. Penal Code § 8.03(b)* (emphasis [*48] added). *HN13* The Penal Code defines "conduct" as "an act or omission and its accompanying mental state." *See id. § 1.07(a)(10)*. Therefore, "the conduct charged" would include both an act and any accompanying mental state. *Id. § 8.03(b)*. The operative language of *section 8.03(b)* is that the actor "reasonably believes" the charged conduct is not a crime and acts in "reasonable reliance" on official statements or interpretations of the law—mental states that necessarily negate a culpable mental state that is in some way based on knowledge of the law or legal concepts. *See id.* Consequently, we conclude that the plain language of *Penal Code section 8.03* demonstrates that the legislature intended the mistake of law defense to apply when a charged offense includes, as an element of the crime, a culpable mental state that incorporates knowledge of the law or legal concepts and the accused has presented some evidence that he reasonably believed his conduct did not constitute a crime because he acted in reasonable reliance on official statements or interpretations of the law as specified in the statute.[11] *See Giesberg, 984 S.W.2d at 248* (recognizing that the Penal Code includes not only justification defenses, but also "defensive theories which do not involve admission of complicity [*49]

---

[11] Both parties seek support for their conflicting interpretations of the statute based on the difference between the language of the Model Penal Code and Penal Code sections 8.02 and 8.03. However, because we conclude the legislature's intent is unambiguous, it is unnecessary to resort to any extra-textual authorities. *See Logan, 89 S.W.3d at 627*.

in the commission of the alleged crime, but which nonetheless attempt to explain why a defendant is not criminally culpable").

Applying the mistake of law defense in this case demonstrates the flaw in the State's position, because a jury could not conclude that Jenkins "knew he did not reside in the precinct in which he voted" and also conclude, based on mistake of law, that Jenkins "reasonably believed" that he did not commit a crime by voting in the election based on his "reasonable reliance" on the election law authorities. Because a jury could not find both to be true, the mistake of law defense as applied on these facts does not operate as a "confession and avoidance" or "justification" type defense, because it does not merely provide a legal excuse for otherwise criminal conduct.

Nor is it dispositive, as the State argues, that the wording of the mistake of law defense does not track that [*50] of the mistake of fact defense, which is recognized as an affirmative defense not subject to the confession and avoidance doctrine. *See Juarez, 308 S.W.3d at 401-02. HN14* The mistake of fact defense provides that "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact *if his mistaken belief negated the kind of culpability required for commission of the offense." See Tex. Penal Code § 8.02(a)* (emphasis added). The State suggests that because the mistake of law defense does not "expressly" negate the culpable mental state—as does the defense of mistake of fact—the omission signals that the legislature intentionally drafted the mistake of law defense to make it inapplicable in a situation in which a party was attempting to negate the mental element, as Jenkins is attempting to do here.

We recognize that the two defenses employ different wording to effectuate their intended application. But we disagree with the State that the differences compel the conclusion that mistake of law is a defense subject to the confession and avoidance doctrine. *HN15* The legislature drafted the definition of mistake of law to reflect the defense's narrowly tailored function to provide a limited defense to a person who [*51] reasonably believes their conduct is not criminal based on that person's reasonable reliance on limited categories of specific legal authorities. *See Tex. Penal Code § 8.03(b); Hawkins, 656 S.W.2d at 73; see also* 43 George E. Dix & John M. Schmolensky, Texas Practice: Criminal Practice and Procedure § 43:42, at 943-44 (3d ed. 2011) (noting that *section 8.03* "carves out a very narrow exception" to the rule that ignorance of the law is no defense). In contrast, the mistake of fact defense provides a defense based on "a reasonable belief about a matter of fact" that also negates the culpable mental state of the charged offense. *See Tex. Penal Code § 8.02(a).* Thus, we conclude that the legislature employed different wording, not to signal a difference in the application of the defenses, but in recognition of the distinctive functions of each defense.

We hold that *HN16 Penal Code section 8.03* by its terms may be applied to negate the culpable mental state of an alleged offense when an accused contends that he reasonably believed his conduct was not criminal based on his reasonable reliance on official statements or interpretations of the law. *See id. § 8.03(b); see also Ostrosky v. Alaska, 913 F.2d 590, 595 (9th Cir. 1990)* (recognizing that "[t]he purpose of a mistake-of-law defense is to negate the mental state that the defendant must have to be guilty of the charged crime"). [*52] Professors Dix and Schmolesky have similarly observed that, "[a]lthough the caption of the statutory defense is 'mistake of law,' a more accurate statement would indicate that a limited exception [to the rule that ignorance of the law is no excuse] is recognized for reasonable reliance upon an official written statement of the law." Dix & Schmolesky, *supra,* at 944. As such, the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine. *Cf. Juarez, 308 S.W.3d at 401-02.* We therefore hold that Jenkins was not required to admit to the commission of a criminal offense or concede that he erroneously relied on the law to be entitled to a jury instruction on mistake of law.

*b. Applicability of the mistake of law defense to illegal voting offense*

We next address the State's suggestion that the legislature drafted the illegal voting statute, *Election Code section 64.012,* "in such a way as to immunize it from a mistake-related defense." *See Tex. Elec. Code § 64.012.* According to the State, knowledge of the law is not relevant to a prosecution for illegal voting, because all the State is required to prove is that the Residence Inn was not Jenkin's "domicile, [or] fixed place of habitation, to which he intended to return after a temporary absence." *See id. § 1.015(a); Medrano, 421 S.W.3d at 885* (holding that the State [*53] was not required to prove voter subjectively knew she was not eligible to vote, only that she voted in an election when she knew she was not a resident of the precinct for which she was voting). Because the illegal voting statute does not require the State to prove that Jenkins

knew he was violating election law and the offense does not provide for a good-faith exception, the State asserts, Jenkins is not entitled to a mistake-related defense. *See Celis v. State, 416 S.W.3d 419, 432 (Tex. Crim. App. 2013); Tovar v. State, 949 S.W.2d 370, 373-74 (Tex. App.—San Antonio 1997), aff'd, 978 S.W.2d 584 (Tex. Crim. App. 1998).*

*HN17* The culpable mental state of the illegal voting statute requires that the person votes or attempts to vote in an election in which the person *"knows* the person is *not eligible* to vote." *See Tex. Elec. Code § 64.012(a)(1)* (emphasis added). To be eligible to vote, a person must, among other things, "be a *resident* of the territory covered by the election for the office or measure on which the person desires to vote." *Id. § 11.001(a)(2)* (emphasis added). And, to be a resident, the person must satisfy the election code's definition of "residence." *See id. § 1.015.* In this case, the jury was instructed to find Jenkins guilty of the charged offense if it found beyond a reasonable doubt that Jenkins voted in the May 8, 2010 RUD election "when [Jenkins] *knew* he was *not eligible* to vote [*54] *because he knew he did not reside* in the precinct in which he voted" (emphasis added). The charge also tracked the relevant election code definitions of both eligibility and residence.

Jenkins did not deny registering to vote and voting in the RUD election, but he disputed that at the time he cast his vote he acted "knowingly," i.e., that he "knew he was not eligible to vote because he knew he did not reside" in the RUD. Jenkins's entire defense was that he reasonably believed that he did, in fact, reside in the RUD when he registered to vote and voted, based on his reasonable reliance on the election law authorities' interpretation of the very election law the jury was instructed to apply when determining Jenkins's guilt. Consequently, as applied in this case, Jenkins's guilt or innocence turned on his understanding of where he resided based on the election code's definition of residency and distinguishes this case from *Medrano*, on which the State relies.

In *Medrano*, the defendant, Carlos Medrano, was charged with soliciting a niece, Veronica Medrano, to illegally vote in an election in which Medrano was a candidate for office. *See 421 S.W.3d at 873, 881.* Veronica filled out a voter registration card and [*55] voted in the election when she knew she was using an address where she did not reside, she knew she was not a resident of the precinct in which she voted, and she knew that to vote in the election she had to lie on her voter registration card. *See id. at 875.* Thus, there was no dispute that Veronica knew where she resided. On appeal, the court rejected Veronica's contention that the evidence was insufficient to prove that she knew she was not eligible to vote. *Id. at 885.* The court reasoned that the State only needed to prove that Veronica voted in the election "when she knew she was not a resident of the precinct for which she was voting," based on the general rule that "ignorance of the law is no excuse." *Id.*

In this case, however, Jenkins's challenge to the knowledge requirement was based on the mistake of law exception to the general rule found in *section 8.03 of the Penal Code. See Tex. Penal Code § 8.03(a), (b).* Because Jenkins's knowledge of where he resided turned on his understanding of the legal requirements for residence under the election code, the mistake of law defense was applicable in the rather unique circumstances presented in this case.

### c. Reasonable conduct and reasonable reliance

Jenkins contends that he was entitled to the mistake of [*56] law jury instruction because a fact issue was raised as to whether he satisfied the requisites of *Penal Code section 8.03(b)(2).* At trial, Jenkins steadfastly maintained that based on his review of the election law authorities, he reasonably believed he was a resident, for voting purposes, of the precinct in which he voted. Jenkins argues that the authorities he consulted and relied on, even before he received the Grant letter, included many of the same ones that First Assistant District Attorney Phil Grant suggested that he should review. Jenkins also argues that even Grant acknowledged that the Secretary of State's opinions left the definition of residence vague.

The State responds that there is no evidence Jenkins reasonably believed his conduct was lawful or that he reasonably relied on the election law authorities. *See Tex. Penal Code § 1.07(42)* (defining "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor"); *Wilson v. State, 777 S.W.2d 823, 824 (Tex. Crim. App. 1989)* (stating that "ordinary standards of reasonableness" means the standards that an ordinary and prudent person would apply to the circumstances that the actor faced).

Jon Meador

Among other things, the State argues that an ordinary and prudent person would see that a plan [*57] to overthrow a utility district, which involved conspiring with nine other people to establish "residency for voting purposes only"[12] at a hotel within the utility district, was obviously criminal. The State also argues that Jenkins's reliance on the election law authorities was unreasonable because the statutory definition of residence is the controlling law; neither the statutory definition nor the election law authorities support Jenkins's theory of "residence for voting purposes only"; and Jenkins's reliance on opinions specifically addressing college students, and his conclusion that that the election law authorities applied to him, was insufficient to warrant a mistake of law instruction. In essence, the State contends that Jenkins's conduct and reliance on the election law authorities rather than the statutory definition of "residence" in the election code was unreasonable as a matter of law. See *Green, 829 S.W.2d at 223.*

To support its contention that Jenkins was not entitled to the instruction based on his subjective belief that the election law authorities applied to him, the State relies on *Green* and *Hefner v. State, 735 S.W.2d 608 (Tex. App.—Dallas 1987, pet. ref'd), abrogated on other grounds by Campbell v. State, 5 S.W.3d 693 (Tex. Crim. App. 1999).* In *Green*, the Court of Criminal Appeals held that the trial court did not err by refusing an instruction based on mistake of law, concluding that a defendant's reliance on dicta from *Taylor v. Taintor, 83 U.S. 366, 21 L. Ed. 287 (1873),* was unreasonable as a matter of law. *829 S.W.2d at 222-23.* The defendant, who had been convicted of murder, argued that the case formed the basis for his belief that a surety possessed the same authority and powers of arrest as a peace officer. *Id.* The court rejected this argument, noting that the common law as stated in *Taylor* was "not the law in Texas nor has it been since the Legislature abrogated the common law by enacting guidelines which defined the law as it applies to sureties seeking to apprehend their principals." *Id. at 223.* Additionally, the court noted that the mistake of law defense "was not created to allow a criminal defendant to rely [*59] upon old interpretive opinions, opinions that conflict with others, or on overruled opinions." *Id.* (internal quotations and citations omitted).

In *Hefner*, attorney Hefner was charged with theft of client funds. *See 735 S.W.2d at 610-611.* The court first held that Hefner failed to preserve error because his requested special instruction on mistake of law failed to apply the law to the facts of the case, and the record failed to disclose any court opinion or statement by a public official which would have justified a reasonable belief that Hefner's conduct was not criminal. *Id. at 625.* The court went on to note that even if the record contained evidence of an opinion or official statement on which Hefner relied, the evidence would not support the instruction because Hefner's purported reliance on court opinions to believe that certain trial court orders were void was irrelevant to his prosecution for theft. *Id.*

We conclude that the present case is distinguishable from *Green* and *Hefner.* In this case, the election law authorities were admitted into evidence and were the foundation of Jenkins's defense. The State does not contend that these authorities are out of date, overruled, or contain incorrect statements of the [*60] law of residency applicable to voting. Indeed, the State agrees with these authorities that the Election Code's definition of residence in *section 1.015* "applies equally to everyone, student or non-student alike, that one's subjective intent to reside is relevant, that there are no durational requirements, and that stays in hotels for long or short periods of time may be evidence of residency." Moreover, the statutory definition of residence included in the Secretary of State opinion expressly provides that residence "shall be determined in accordance with the common-law rules, as enunciated by the courts of this state" except as otherwise provided by the code. *See Tex. Elec. Code § 1.015(b).* In the *Mills* case, on which the election law authorities rely, our supreme court acknowledged that "residence" in the context of voting is an "elastic" term that "is extremely difficult to define." *Mills, 377 S.W.2d at 637.* And, as the Grant letter reflects, even the Montgomery County District Attorney's office believed the election law authorities were appropriate resources for determining one's residence.[13]

Jenkins was indicted for voting in the May 8, 2010 RUD election when he knew he did not reside in the precinct in which he voted. As recounted above, Jenkins maintained at trial that, based on his review of the election law authorities, he

---

[12] Jenkins takes issue with the State's assertion that Jenkins wanted to establish "residency for voting purposes *only*" as misleading and not fairly supported by the record. As Jenkins points out, his testimony reflected that he was of the opinion that the term "residence" or "residency" [*58] has different meanings depending on the context in which it is used, such as residency for purposes of voting, obtaining a driver's license, or becoming a candidate for office.

[13] Notably, and perhaps unfortunately, the suggested resources recommended in the Grant letter did not include the statutory definition of residence contained [*61] in Election Code section 1.015.

believed he was a resident of the precinct in which he voted. *See Dyson, 672 S.W.2d at 463* ("The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge."). Considerable additional evidence also was adduced raising a fact issue concerning whether Jenkins's belief was reasonable and whether the surrounding circumstances were consistent with that belief. In an analogous circumstance, *HN18* the Court of Criminal Appeals has instructed that whether a defendant's belief is reasonable is a fact issue for the jury to decide. *See Granger, 3 S.W.3d at 39*.

In *Granger*, the court rejected the State's argument that the reasonableness of a defendant's mistaken belief "may be evaluated by the trial judge in determining whether the statutory defense is raised." *See id.* As the court explained:

> [A] holding in accordance with the State's position would tend to undermine the general rule that the jury should be responsible for gauging the credibility and veracity of the defensive [*62] evidence. *See Dyson, 672 S.W.2d at 463* ("The issue before this Court is not the truth of appellant's testimony, for that is for the jury"); *Montgomery, 588 S.W.2d at 952* ("The issue on appeal is not whether appellant's story is true or even believable. That issue is exclusively for the jury as trier of fact"). Trial court judges charged with evaluating the "reasonableness" of an accused's beliefs, no matter how well intentioned, would inevitably be placed in a position in which they were required to make their own decisions about the weight and believability of the defensive evidence.

*Id. at 40*.

Viewing the testimony in the light most favorable to Jenkins, as we must, we conclude that the evidence raised a fact issue concerning whether Jenkins's beliefs were reasonable and, accordingly, the issue was one for the jury to decide. *See id. at 39-41* (holding that defendant who raised an issue of mistaken belief as to the culpable mental element of murder was entitled to a jury instruction on the affirmative defense of mistake of fact); *Jackson v. State, 646 S.W.2d 225, 227 (Tex. Crim. App. 1983)* (holding that defendant's reasonable belief would have negated the culpability necessary for the State's case and therefore the jury should have been charged on mistake of fact issue); *cf. Roberts v. State, 319 S.W.3d 37, 51 (Tex. App.—San Antonio 2010, pet. ref'd)* (holding that jury charged on defense [*63] of mistake of law was entitled to reject testimony of defendant and expert offered in support of defensive argument).

We conclude that the trial court erred by denying Jenkins's requested jury instruction on the statutory defense of mistake of law contained in *Penal Code section 8.03*, because Jenkins presented some evidence that he reasonably relied on the election law authorities when he voted in the May 8, 2010 RUD election and the reasonableness of Jenkins's beliefs and conduct was an issue for the jury to decide. *See Tex. Code Crim. Proc. art. 36.14*; *Tex. Penal Code §§ 2.04 & 8.03(b)*; *Walters, 247 S.W.3d at 208-09*; *Granger, 3 S.W.3d at 38*; *see also Willis v. State, 790 S.W.2d 307, 314-15 (Tex. Crim. App. 1990)* (stating that when statutory defense would negate the culpable mental state element and the defendant has raised evidence supporting the defense, the defendant is entitled to a jury instruction on the defense).

## 2. Was the error harmless?

Having determined that the trial court erred by denying Jenkins's requested instruction on mistake of law, we must now determine whether Jenkins suffered "some harm" as a result. *See Almanza, 686 S.W.2d at 171. HN19* The record must show that Jenkins has suffered some actual, rather than merely theoretical, harm from jury instruction error. *Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986)*. "Some" harm means the presence of any harm, regardless of degree, and cases involving preserved charge error will be affirmed only [*64] if no harm has occurred. *Id.* When determining whether some harm has occurred, we consider (1) the charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) other relevant factors present in the record. *Reeves v. State, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)*. Neither party has a burden to prove harm. *Id.*

Jenkins contends that the trial court's failure to include the requested instruction cannot be deemed harmless in this circumstance when the entirety of the defensive presentation was predicated on the statutory mistake of law defense. In response, the State contends that the trial court correctly concluded that Jenkins's defense was really challenging an element of the offense the State was required to prove, and therefore Jenkins actually received the charge he requested.

In particular, the State points out that the jury was given the definitions of "knowing" and "residence" (including its reference to the common law), and was told that it must acquit Jenkins if the State failed to prove "every element of the

offense charged beyond a reasonable doubt." Moreover, the State asserts, the parties' arguments were made as if Jenkins had received a *section 8.03* instruction, focusing on Jenkins's reliance on the election law [*65] authorities, whether his reliance was reasonable, and whether he believed that he had established residency. Finally, the State points to defense counsel's closing argument that "the State has failed to prove the most important element in this case and that's knowledge that the person knew that they weren't eligible to vote and they didn't reside in the district in which they weren't supposed to vote." Therefore, the State argues, the jury could not find Jenkins guilty without first determining that his reliance on the election law authorities was unreasonable.

Having considered the entirety of the record, we disagree with the State that Jenkins suffered no harm. As the court cogently explained in *Arroyo v. State, HN20* mere jury argument cannot substitute for a charge that properly instructs the jury on the application of the law to the facts:

> An improper jury charge undercuts counsel's ability to argue effectively about the law of the case. Of course, [a defendant] can argue what is not expressly in the charge. *See State v. Renteria, 977 S.W.2d 606, 608 (Tex. Crim. App. 1998).* But, the argument is without the authority of the court having pronounced what is the law. Lawyers can argue many things; they are advocates. They may, or may not, be accurate [*66] in what they say and they may or may not be believed. The trial court in this case instructed the jury that "the law of the case you will receive from the Court, which is given you herein, and [for you to] be governed thereby." The jury was not obligated to accept any of [the defendant's] statements or argument that could otherwise be construed to "make up" for, or "cure," the improperly omitted jury instruction. They were, however, obligated to accept the court's instructions. That's a big difference.

*9 S.W.3d 330, 336 (Tex. App.—San Antonio 1999),* vacated, *32 S.W.3d 868 (Tex. Crim. App. 2000)* (per curiam). The jury in this case was similarly instructed that "the law you must be governed by[,] you shall receive in these written instructions, and you must be governed thereby." The trial court's refusal of the requested instruction prevented the jury from considering the statutory defense of mistake of law as part of the law of the case; therefore, we cannot say that Jenkins suffered no harm as a result.

*HN21* By enacting *Penal Code section 8.03,* the legislature specifically recognized the affirmative defense of mistake of law as a narrow exception to the general rule that ignorance of the law is no excuse in situations in which an accused acts in reasonable reliance (even if mistaken) on certain [*67] official statements or written interpretations of the law. *See Tex. Penal Code § 8.03.* Jenkins's entire defense was based on his argument that he reasonably believed he was eligible to vote in the May 8, 2010 RUD election based on his reasonable reliance on the election law authorities, and he presented evidence supporting his defensive theory. Jenkins also timely requested an instruction on the statutory defense of mistake of law. It was for the jury to decide whether Jenkins unreasonably manipulated those authorities to provide cover for illegally voting in the election—which would be a crime; or whether Jenkins changed his residence and voted in the May 8, 2010 election based on a reasonable, but mistaken, reliance on the election law authorities—which would not be a crime. Jenkins's defense was not merely that he denied voting illegally, or that he acted in good faith, or that he was ignorant of the law. This is a situation in which the defensive theory has no context in the absence of the imprimatur of the court, contained in its charge, that a mistaken interpretation of law—when interpretation of law is an element of the offense and is disputed—might support a finding of not guilty.

We hold that the [*68] trial court erred by refusing to instruct the jury on Jenkins's requested statutory defense of mistake of law, and that this error caused Jenkins some harm. *See Almanza, 686 S.W.2d at 171; see also Hill v. State, 765 S.W.2d 794, 797-98 (Tex. Crim. App. 1989)* (holding that trial court's refusal to give appellant's requested charge on statutory defense raised by the evidence caused appellant some harm and was thus reversible error); *Jackson, 646 S.W.2d at 227* (reversing and remanding case based on trial court's refusal to submit requested defensive issue of mistake of fact when evidence supported submission of the statutory defense). We therefore sustain Jenkins's first issue and reverse and remand the case for a new trial.

CONCLUSION

We sustain Jenkins's first issue and do not reach the second. We reverse and remand the case for a new trial.

Jon Meador

/s/ Ken Wise

Justice

Panel consists of Justices Boyce, Busby, and Wise (Busby, J., dissenting).

Publish — *Tex. R. App. P. 47.2(b)*.

Dissent by: J. Brett Busby

# Dissent

**DISSENTING OPINION**

In this prosecution for illegal voting, appellant contends he was entitled to jury instructions allowing him to prove by a preponderance of the evidence that, due to a mistake of law, he reasonably believed he resided in the precinct in which he voted. But those are not the instructions appellant requested. [*69] Moreover, the charge given to the jury already required the State to prove beyond a reasonable doubt that appellant knew he did *not* reside in the precinct in which he voted. Because this charge gave the jury a more favorable vehicle to acquit the defendant if it agreed with his defensive theory, the trial court did not commit harmful error in denying appellant's requested instructions. I would therefore overrule appellant's first issue and address his second issue challenging the statutory definition of residence used in illegal voting prosecutions as unconstitutionally vague. Because the majority sustains the first issue and does not reach the second, I respectfully dissent.

**I. Background: the jury charge and appellant's requested instructions on mistake of law**

Appellant was charged with "vot[ing] . . . in an election in which the person knows the person is not eligible to vote." *Tex. Elec. Code Ann. § 64.012(a)(1)* (West 2010). At trial, appellant admitted that he voted in an election for the Woodlands RUD Board of Directors. Appellant maintained, however, that he did not know he was ineligible to vote because he reasonably believed—in reliance on certain election law authorities—that his residence was a Residence Inn located [*70] within the territory of the RUD where he had stayed briefly. *See id. § 11.001(a)* (West 2010) (defining eligibility to vote as requiring residence in the territory covered by the election); *see also id. § 1.015* (defining residence) (West 2010). Appellant requested that the trial court instruct the jury on the Penal Code's affirmative defense of mistake of law, which applies if a defendant proves by a preponderance of the evidence that "the actor reasonably believed the conduct charged did not constitute a crime and . . . acted in reasonable reliance upon" an official statement of the law or written interpretation of the law that meet certain requirements. *Tex. Pen. Code Ann. § 8.03(b)* (West 2011); *see also id. § 2.04(d)* (defining burden of proof on affirmative defense) (West 2011).

The trial court denied the requested instructions. The court explained that appellant's theory of the case actually challenged the State's ability to prove beyond a reasonable doubt the element of the crime that appellant knew he was ineligible to vote. Thus, the court reasoned, the jury would already have the issue before it in a different fashion in the charge, and appellant would have a fair opportunity to argue the matter.

To determine whether the trial court [*71] committed error by denying the requested instructions and whether that error harmed appellant, it is useful to begin with the language of the jury charge and the requested instruction themselves. The charge provided, in pertinent part:

> A person commits the offense of illegal voting if he votes . . . in an election in which the person knows the person is not eligible to vote.

> . . .

> To be eligible to vote in an election of this state, a person must . . . be a resident of the territory covered by the election for the office or measure on which the person desires to vote . . . .

Jon Meador

"Residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence. Residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the Texas Election Code. . . .

. . .

Now if you find from the evidence *beyond a reasonable doubt* that . . . [the defendant did] vote in an election . . . when the defendant *knew he was not eligible to vote because he knew he did not reside in the precinct in which he voted,* then you will find the defendant guilty of voting illegally as charged [*72] in the indictment.

(Emphasis added). Appellant's requested instructions provided, in pertinent part:

If you all agree the state has proved, beyond a reasonable doubt, each of the elements listed above, you must next consider whether the defense of mistake of law applies.

You have heard evidence that, when the defendant committed the act of illegal voting, he believed that his conduct did not constitute a crime.

A person's conduct that would otherwise constitute the crime of illegal voting is not a criminal offense if the person *reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime* and that he acted in reasonable reliance on [an official statement or written interpretation of the law meeting certain requirements].

. . .

To decide the issue of mistake of law, you must determine whether the defendant has proved, *by a preponderance of the evidence,* the following three elements:

1. The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

2. The defendant's belief was reasonable; and

3. The defendant reached his belief in a reasonable reliance on [*73] [an official statement or written interpretation of the law meeting certain requirements].

(Emphasis added).

## II. Mistake of law can be either a defense of confession and avoidance or a defense that negates an element of the offense.

The majority first addresses the State's argument that the trial court did not err in denying these instructions because mistake of law is a defense of confession and avoidance, and appellant did not essentially admit to every element of the offense as required to claim such a defense. A defense of confession and avoidance is one that, by definition, does not negate an element of the charged offense; rather, it excuses what would otherwise constitute criminal conduct. *Shaw v. State, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).* An instruction on such a defense is appropriate only when defendant essentially admits to every element of the offense. *Juarez v. State, 308 S.W.3d 398, 401 (Tex. Crim. App. 2010).*

The majority rejects the State's argument by holding that the defense of mistake of law "may be applied to negate the culpable mental state of an alleged offense when an accused contends that he reasonably believed his conduct was not criminal based on his reasonable reliance on official statements or interpretations of the law." *Ante,* at 33. Therefore, the majority holds, [*74] "the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine" requiring appellant to admit the elements of the offense before he can obtain an instruction on the defense. *Id.* Although I agree that the defensive theory of mistake argued by appellant would negate the culpable mental state of the particular offense in question, it is important to recognize that mistake of law can be a defense of confession and avoidance. Indeed, as explained in Part III.A. below, appellant's own requested instructions show that he asked the trial court to submit the defense as one of confession and avoidance.

Jon Meador

"The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system," *Cheek v. United States, 498 U.S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991)*, and it is recognized in our Penal Code. *See Tex. Penal Code Ann. § 8.03(a)* (West 2011). There are two different kinds of mistakes of law, however, that do provide a defense: (1) a mistake that negates the mental state required to prove the particular offense in question; and (2) a reasonable belief, in reliance on certain official statements, that conduct undertaken with that required mental state does not violate the criminal law. *See* 1 Wayne [*75] R. LaFave, *Substantive Criminal Law* § 5.6(a), at 394-97 (2d ed. 2003).[1] Although the first kind of mistake negates an element of the offense, the second kind is a defense of confession and avoidance under Texas law.

Regarding the first kind, "[i]nstead of speaking of ignorance or mistake of . . . law as a defense, it would be just as easy to note simply that a defendant cannot be convicted when it is shown that he does not have the mental state required by law for the commission of that particular offense." *Id.* at 395. When a legal mistake negates the specific intent required for the crime in question, some courts refer to the defense as one of "good faith" mistake, though the mistake may not need to be a reasonable one to negate the required mental state. *See, e.g., Cheek, 498 U.S. at 200-03* (holding defendant's belief need not be objectively reasonable to negate willful mental state required for criminal tax evasion).

As to the second kind of mistake, Texas—like some other states—has created a statutory exception that allows mistake of law to serve as a defense if the defendant reasonably believed the conduct charged did not constitute a crime and acted in reasonable reliance upon an official statement or written interpretation [*76] of the law meeting certain requirements. *Tex. Penal Code Ann. § 8.03(b)*. Because the conduct charged includes the accompanying mental state, *see id. § 1.07(a)(10)* (West 2011), this defense applies even when the defendant's mistake would not negate the culpable mental state for the particular crime charged.

For example, in addressing a charge of intentionally and knowingly possessing a firearm and body armor, our sister court recognized that a defendant's reasonable belief that he was entitled to a police officer exception would involve a mistake of law even though it would not negate the culpable mental state of intentional and knowing possession. *Plummer v. State, 426 S.W.3d 122, 127 (Tex. App.—Houston [1st Dist.] 2012), aff'd as reformed on other grounds, 410 S.W.3d 855 (Tex. Crim. App. 2013)*. Similarly, courts in other states have held that a defendant could assert this type of statutory mistake defense even when he acted with the culpable mental state of the crime charged. *See State v. Sheedy, 125 N.H. 108, 480 A.2d 887, 888-89 (N.H. 1984)* (holding defendant charged with willfully intercepting telephone conversations entitled to present defense that he believed in reliance on letter from public utility commission that his conduct was not governed by state law); *People v. Studifin, 132 Misc. 2d 326, 504 N.Y.S.2d 608, 611-12 (N.Y. Sup. Ct. 1986)* (holding defendant charged with knowingly possessing weapon not guilty given evidence that he believed possession was not offense based [*77] on official statement that license was required to sell weapon).[2]

As these cases show, reasonable reliance on official statements will not necessarily negate any culpable mental state applicable to a charged offense. Rather, this kind of statutory mistake of law may also provide a defense when it does not negate the culpable mental state. In these circumstances, it is a defense of confession and avoidance.

Moreover, the difference between these two kinds of mistakes has significant implications for the question whether denying an instruction on mistake of law is harmful error—implications that the majority does not address. When the mistake would negate the culpable mental state of the crime, a jury charge that simply lays out the crime's [*78] elements already provides the jury with a vehicle to give effect to the defense by finding that the State failed to prove the mental state beyond a reasonable doubt. But when there is evidence of a reasonable mistake that does not negate the culpable mental state, there

---

[1] *See also United States v. Platte, 401 F.3d 1176, 1184 (10th Cir. 2005); State v. Steele, 2010 UT App 185, 236 P.3d 161, 171 (Utah App. 2010)*.

[2] Federal courts and some courts in states with no comparable statute recognize a variant of this exception under principles of due process. *See Commonwealth v. Kratsas, 564 Pa. 36, 764 A.2d 20, 27-33 (Pa. 2001)*. This due process-based mistake defense likewise applies even if the defendant acted with the culpable mental state of the crime charged. *See Miller v. Commonwealth, 25 Va. App. 727, 492 S.E.2d 482, 487-491 (Va. App. 1997)* (dismissing charge of knowing and intentional possession of firearm by felon because defendant reasonably relied on advice of probation officer that possession was lawful).

is no way for the jury to give effect to that evidence unless it is instructed that the mistake provides a defense if the requirements of *section 8.03 of the Penal Code* are met. *See Cornet v. State, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013).* For all of these reasons, we must determine which kind of mistake appellant is asserting here.

Applying this two-part understanding of mistake of law, I agree with the majority's conclusion that the particular mistake appellant claims here is the first kind of mistake—one that negates the culpable mental state of the crime of illegal voting. As the majority succinctly explains, appellant "did not deny registering to vote and voting in the RUD election, but he disputed that at the time he cast his vote he acted 'knowingly,' i.e."—in the language of the jury charge—"that he 'knew he was not eligible to vote because he knew he did not reside' in the RUD." *Ante*, at 35. Indeed, "a jury could not conclude that [appellant] 'knew he did not reside in the [RUD]' and also conclude, [*79] based on mistake of law, that [appellant] 'reasonably believed' that he did not commit a crime by voting in the election based on his 'reasonable reliance' on the election law authorities." *Ante*, at 32.

### III. Because the claimed mistake would negate an element of the offense, denying the requested instructions was not error and did not harm appellant.

Having held that appellant's claimed mistake of law would negate the culpable mental state on which the jury was instructed, it follows that the trial court's denial of appellant's request for separate instructions on that mistake was not error and did not harm appellant. To explain the basis for these conclusions, I examine appellant's arguments regarding error and harm in turn. *See Ngo v. State, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005)* (explaining two-step process for reviewing complaint of criminal jury charge error).

### A. Error

Appellant argues that the trial court erred in denying instructions on the affirmative defense of mistake of law because he offered some evidence that he reasonably relied on the election law authorities to form a reasonable belief that he was a resident, for voting purposes, of the precinct in which he voted. To be sure, the Court of Criminal Appeals has held that a [*80] trial court must instruct the jury on statutory affirmative defenses whenever they are raised by the evidence. *Walters v. State, 247 S.W.3d 204, 208-09 & n.17 (Tex. Crim. App. 2007).* But it has also held that when a defense is one of confession and avoidance, "defensive evidence [that] merely negates the necessary culpable mental state . . . will not suffice to entitle the defendant to a defensive instruction." *Shaw, 243 S.W.3d at 659; see also Cornet, 417 S.W.3d at 451; Villa v. State, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013).* As explained above, the kind of mistake of law that Texas has recognized by statute is a defense of confession and avoidance.

There are no Texas decisions addressing which of these principles should control when a defendant requests a defensive instruction regarding a mistake of law that would negate the culpable mental state of the offense. The federal courts have addressed such requests, however, and most have concluded that the defendant is not entitled to such an instruction. For example, in criminal fraud cases, most circuits have held that an instruction regarding a defendant's good-faith belief that he was following the law is redundant because such a belief is incompatible with the required specific intent to deceive. *See, e.g., Green v. United States, 474 U.S. 925, 106 S. Ct. 259, 88 L. Ed. 2d 266 (1985)* (White, J., dissenting from denial of certiorari and noting circuit split in which Second and [*81] D.C. Circuits, among others, hold that defendant is not entitled to separate good-faith instruction); *United States v. Sirang, 70 F.3d 588, 594 (11th Cir. 1995)* (comparing decisions of the First, Fourth, Fifth, Eighth, and Eleventh Circuits, which do not require good-faith instruction, with decisions of the Tenth Circuit, which does); *see also United States v. Pomponio, 429 U.S. 10, 13, 97 S. Ct. 22, 50 L. Ed. 2d 12 (1976)* (per curiam) (holding in tax fraud prosecution that "The trial judge . . . adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary."); *United States v. Kokenis, 662 F.3d 919, 930 (7th Cir. 2011)* (same); *United States v. Simkanin, 420 F.3d 397, 409-412 (5th Cir. 2005)* (same).

In particular, the Fifth Circuit has changed its mind on this issue. Although it held in some early cases that the district court abused its discretion in omitting a good-faith instruction despite the inclusion of instructions defining the required mental state, its recent cases hold that there is no abuse of discretion if the defendant is able to present his good-faith defense through witnesses, closing arguments, and other jury instructions. *United States v. Hunt, 794 F.2d 1095, 1098 (5th Cir. 1986); see also United States v. Frame, 236 Fed. Appx. 15, 18 & n.5 (5th Cir. 2007).*

Of course, Texas courts analyzing this issue must also take into account that mistake of law is a statutory affirmative defense. *See Walters, 247 S.W.3d at 209-10.* Texas courts analyzing the statutory defense of mistake of fact—which explicitly negates the culpable mental state of [*82] the offense—have reached conflicting conclusions about whether omitting an instruction on that defense is error. *See Okonkwo v. State, 398 S.W.3d 689, 695-96 & nn.5-6 (Tex. Crim. App. 2013).*[3] As Judge Womack has explained, the root of this disagreement is that the defense of mistake of fact sits

astride two principles in the law of the jury charge. While it is true that a defendant is entitled to an affirmative submission of a defensive issue, it is likewise true that no affirmative charge need be given when a defensive theory merely negates an element of the offense. . . . Had the Legislature not codified the defense of mistake of fact, we might be free to say that the jury charge could, and should, handle the issue adequately by requiring the jury to find the element of the culpable mental state in order to convict.

*Posey v. State, 966 S.W.2d 57, 70 (Tex. Crim. App. 1998)* (Womack, J., concurring).

In *Bruno v. State,* a plurality of three judges of the Court of Criminal Appeals concluded that an instruction on mistake of fact was unnecessary in a prosecution for unauthorized use of a motor vehicle. *845 S.W.2d 910, 913 (Tex. Crim. App. 1993)* (plurality op. of White, J.). There, the appellant testified that the owner gave him her car, but the [*83] owner testified that the appellant grabbed her keys and drove away. The charge required the jury to find that the appellant intentionally or knowingly operated the vehicle without the owner's effective consent. The plurality explained that a mistake instruction need not have been given because "the jury could not believe both the testimony of [the] owner and the testimony of appellant," and the jury "would have necessarily been required to disbelieve appellant's story before they could find sufficient evidence to convict." *Id.* Three other judges concurred, agreeing that "the mistake of fact instruction[] was unnecessary in the instant case." *Id.* (Baird, J., concurring). This Court followed *Bruno* in a non-precedential opinion, *Hopson v. State, No. 14-08-735-CR, 2009 Tex. App. LEXIS 2903, 2009 WL 1124389 (Tex. App.—Houston [14th Dist.] Apr. 28, 2009, no pet.)* (mem. op., not designated for publication),[4] as did the Beaumont Court of Appeals in *Traylor v. State, 43 S.W.3d 725, 730-31 (Tex. App.—Beaumont 2001, no pet.).*

On the other hand, the Court of Criminal Appeals has said that when a defendant's evidence "creates an issue of mistaken belief as to only the culpable mental state element of theft . . . , the defendant would be [*84] entitled to a defensive instruction of 'mistake of fact.'" *Willis v. State, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990); see also Giesberg v. State, 984 S.W.2d 245, 249-50 (Tex. Crim. App. 1998).*

It is unnecessary to resolve this disagreement here because mistake of law—unlike mistake of fact—is a statutory affirmative defense that the defendant has the burden to prove, and the kind of mistake of law addressed by the statute is a defense of confession and avoidance. Critically, appellant's own requested instructions would have submitted the defense as one of confession and avoidance. The requested instructions focused on whether appellant "reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime." The jury charge described the conduct charged in this case, in part, as voting when appellant "knew he did not reside in the precinct in which he voted." *See Tex. Penal Code § 1.07(a)(10)* (defining "conduct" as "an act or omission and the accompanying mental state"). Thus, appellant's requested instructions would have asked the jury to decide whether appellant reasonably believed it was not a crime for him to vote when he *knew* he did not reside in the precinct in which he voted. This instruction is not supported by the defensive evidence that appellant contends negates the culpable mental state: [*85] that he reasonably believed he resided at the Residence Inn under the election law authorities, and therefore he did *not* vote in a precinct knowing he did not reside

---

[3] This issue also has divided courts in other states. *See, e.g., State v. Locquiao, 100 Haw. 195, 58 P.3d 1242, 1253-55 (Haw. 2002)* (collecting cases).

[4] In a later opinion, which has been reversed, this Court distinguished *Bruno* but opined in dicta that *Bruno's* discussion of this issue was itself dicta. *See Okonkwo v. State, 357 S.W.3d 815, 820-21 (Tex. App.—Houston [14th Dist.] 2011), rev'd, 398 S.W.3d 689 (Tex. Crim. App. 2013).*

there.[5] Because appellant's requested defensive instructions do not negate an element of the charged offense, but rather excuse what would otherwise constitute criminal conduct, they are subject to the confession and avoidance doctrine.

As the Court of Criminal Appeals has repeatedly held, "[w]hen the defensive evidence does no more than negate an element of the offense, a defendant is not entitled to an instruction on any defense subject to the confession-and-avoidance doctrine." *Cornet, 417 S.W.3d at 451*; *see also Villa, 417 S.W.3d at 462*; *Shaw, 243 S.W.3d at 659*. Applying this rule to the affirmative defense of mistake of law appropriately takes all of the [*86] Legislature's choices into account, especially given the different burdens involved in proving an offense and an affirmative defense. *See Tex. Penal Code Ann. §§ 2.01, 2.04(d)* (West 2011). Requiring courts to instruct that a defendant may prove mistake of law by a preponderance of the evidence respects the Legislature's decision to codify that affirmative defense, while omitting such an instruction when the evidence of mistake would do no more than negate an element of the offense respects the Legislature's requirement that the State prove that element beyond a reasonable doubt.

As explained above, appellant's evidence of mistake would do no more than negate an element of the illegal voting offense. "[A] jury could not conclude that [appellant] 'knew he did not reside in the [RUD]' and also conclude, based on mistake of law, that [appellant] 'reasonably believed' that he did not commit a crime by voting in the election based on his 'reasonable reliance' on the election law authorities." *Ante*, at 32. Moreover, appellant did not support the instructions he actually requested with evidence that he reasonably believed he did not commit a crime even though he voted knowing he did not reside in the RUD. *See Krajcovic v. State, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)* (holding "there [*87] must be at least some evidence to support the defense" before the trial court is required to give the requested instruction). Accordingly, appellant was not entitled to the mistake instructions under *Cornet* and *Krajcovic*, and the trial court did not err in denying them.

## B. Harm

Even if the trial court did err in denying appellant's requested instructions, a proper harm analysis reveals that appellant was not harmed by that error. When the charge contains error and that error has been properly preserved by an objection or request for instruction,[6] reversal is required if the error is "calculated to injure the rights of the defendant." *Trevino v. State, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003)*. The trial record must demonstrate that there is some actual harm, not just a theoretical complaint. *Sanchez v. State, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012)*. In assessing "the actual degree of harm," we consider the whole record, including "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)* (op. on reh'g).

In *Cornet*, a case involving the omission of a medical-care defensive instruction, the Court of Criminal Appeals held the omission was harmless error. *417 S.W.3d at 453*. It observed that the omission of an instruction on a confession-and-avoidance defense "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Id. at 451*. Nevertheless, the court conducted a record-specific analysis of harm and held that the jury implicitly rejected the defendant's defense when it convicted him of a second offense involving the same event that was inconsistent with his claim of providing medical care. *Id. at 452*.

Here, appellant argues (notwithstanding the language of his requested instructions) that his defensive theory of mistake of law sought to negate the culpable mental state of illegal voting by proving that he reasonably believed he resided in the precinct in which he voted. But the mental state of "kn[owing] he did not reside in the precinct in which he voted" was already included in the jury charge, providing the jury with a vehicle to give effect to appellant's defense by finding that

---

[5] Appellant's requested instructions appear to be based on the recommended pattern defensive instruction on mistake of law. The drafting committee notes in its introduction that the recommended instruction does not address a situation in which the mistake tends to show the defendant lacked the required culpable mental state. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Defenses* § B12.2, at 162 (2013).

[6] For purposes of the harm analysis, I assume without deciding that the majority is correct that Jenkins preserved his complaint. *Ante* [*88], at 25 n.9.

the State failed to prove the mental [*89] state beyond a reasonable doubt. Appellant was allowed to introduce evidence to support his defense. Because the jury would have to reject appellant's defensive evidence in order to convict him of knowing he did not reside in the precinct in which he voted, the charge and the state of the evidence indicate that any error in failing to instruct the jury on mistake of law was not harmful. *See Druery v. State, 225 S.W.3d 491, 505 (Tex. Crim. App. 2007)* ("As we have stated, when a refused charge is adequately covered by the charge given, no harm is shown.").

Many courts have reached a similar conclusion regarding the lack of harm from failing to instruct on a defense of mistake of fact that would negate the culpable mental state. *See Reyes v. State, 422 S.W.3d 18, 31-32 (Tex. App.—Waco 2013, pet. ref'd)* (holding "mistake-of-fact instruction was not essential because the factfinder would necessarily have had to reject Reyes's defense to convict Reyes of the elements of the crime as a principal" and that "Reyes was not harmed by the failure to have his requested instruction on the mistake of fact defense submitted to the jury"); *Durden v. State, 290 S.W.3d 413, 421 (Tex. App.—Texarkana 2009, no pet.)* ("While in some instances the denial of a proper defensive instruction would cause harm by preventing the defendant from arguing an issue, i.e., self-defense, here, Durden fully argued that [*90] he thought the wire was abandoned and that he had no intent to deprive the owner of the property . . . . While the trial court did err by denying the mistake-of-fact instruction, the jury's verdict inferentially resolved the issue that would have otherwise been required via the requested instruction. It would require us to resort to mere conjecture to conclude, on this evidentiary record, that Durden suffered any actual harm."); *Sands v. State, 64 S.W.3d 488, 496 (Tex. App.—Texarkana 2001, no pet.)*; *see also Posey, 966 S.W.2d at 70-71* (Womack, J., concurring) (observing that although the power to create defenses belongs to the Legislature, "the close relationship between the defense of mistake of fact and the culpability element of the offense is important in the consideration of the harmfulness of the omission of an instruction on the defense," and concluding that charge on culpable mental state allowed jury to "give effect to the defense of mistake of fact").

This conclusion of harmlessness applies even more strongly to the defense of mistake of law because appellant's defensive theory was less favorable to him than the jury charge he received. The jury charge required the State to prove beyond a reasonable doubt appellant's knowledge that he did not reside in the precinct in [*91] which he voted, while appellant's theory would have required him to prove by a preponderance of the evidence that he reasonably believed he did reside in that precinct. *Cf. Giesberg, 984 S.W.2d at 250* ("A defensive issue which goes no further than to merely negate an element of the offense alleged . . . does not place a burden of proof upon a defendant to establish it."). Given that the jury could not find both knowing non-residence and reasonable belief of residence, including both standards in the charge with different burdens would, at the very least, have confused the jury. *See Lowry v. State, 671 S.W.2d 601, 603 (Tex. App.—Dallas 1984)* ("[W]hen the affirmative defense requires a negation of an element of the crime, there seems to be an insoluble conflict for the jury due to the existence of simultaneous burdens of proof. In other words, the jury may become confused by the different burdens of proof and inadvertently fail to accord due consideration to evidential matters relating to the affirmative defense.") (citing Comment, *Affirmative Defenses Under the New York New Penal Law*, 19 Syracuse L. Rev. 44, 47 (1967)), *aff'd in relevant part, 692 S.W.2d 86 (Tex. Crim. App. 1985)*. Indeed, if the State had requested and received a mistake of law instruction, appellant would surely be arguing on appeal that the instruction unconstitutionally [*92] shifted the burden to him of disproving an element of the offense. *See 692 S.W.2d at 87-88* (affirming portion of court of appeals' decision holding that statute violated due process by labeling element of offense as an "affirmative defense" and shifting burden to defendant to disprove it).

Moreover, the charge required the State to prove actual knowledge of non-residency, while appellant's defensive theory would have required the jury to decide whether appellant's belief regarding residency was reasonable. "This would have been problematic for appellant because the instruction[s] would have decreased the State's burden of proof by permitting the jury to convict him if it concluded that his mistake was unreasonable, even if it found that the belief was honest." *Okonkwo, 398 S.W.3d at 696; see id. at 702* (Cochran, J., concurring).[7] The observation of Professors Dix and Schmolesky in the related context of mistake of fact is equally apt here: "in light of the fact that [the requested instruction] is duplicative of other mandatory instructions and is harmful to the defense, it is difficult to imagine that an erroneous refusal to grant a [request] for a charge concerning the defense would ever fail to be harmless." 43 George E. Dix & John M. Schmolesky, [*93] *Texas Practice: Criminal Practice and Procedure* § 43:36, at 917 (3d ed. 2011).

---

[7] In some other states, the State—not the defendant—has been the party relying on the mistake of law defense to suggest that the mistake must be reasonable in order to negate the culpable mental state for the crime. *E.g., Steele, 236 P.3d at 170-72* (noting but not resolving argument); *State v. Jacobson, 697 N.W.2d 610, 615-16 (Minn. 2005)* (rejecting State's argument).

The majority contends that harm is shown because appellant's defensive theory had "no context in the absence of the imprimatur of the court, contained in its charge, that a mistaken interpretation of law—when interpretation of law is an element of the offense and is disputed—might support a finding of not guilty." *Ante*, at 44. To the contrary, the record as a whole reveals that the charge (quoted above) included as an element of the offense the culpable mental state of knowledge that appellant did not reside in the precinct in which he voted, and appellant's counsel was able to argue that the State failed to prove this element because appellant thought he resided in the precinct and was eligible to vote there under the election law authorities.

In sum, because the jury could not find both that appellant knew he was not a resident [*94] but had a reasonable belief he was a resident, the knowing requirement in the charge fulfills the same function as the reasonable belief defense: giving the jury a vehicle to find appellant not guilty if he thought he was a resident in reliance on the authorities. Indeed, the charge as given was better for appellant because it placed the burden on the State and did not require reasonableness. Accordingly, I would hold that any error in failing to charge the jury separately on appellant's defensive theory of mistake of law was harmless. Because the majority instead holds that this failure was harmful error requiring a new trial, I respectfully dissent.

/s/ J. Brett Busby

Justice

Panel consists of Justices Boyce, Busby, and Wise (Wise, J., majority).

Publish — *Tex. R. App. P. 47.2(b)*.

# APPENDIX

# F

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

# TEXTS OF RULES, REGULATIONS, ORDINANCES, STATUTES ON WHICH ARGUMENTS ARE BASED.

## Sec. 1.015. Residence.

(a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

## Sec. 11.001. Eligibility to Vote.

(a) Except as otherwise provided by law, to be eligible to vote in an election in this state, a person must:

(1) be a qualified voter as defined by Section 11.002 on the day the person offers to vote;

(2) be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and

(3) satisfy all other requirements for voting prescribed by law for the particular election.

(b) For a person who resides on property located in more than one territory described by Subsection (a)(2), the person shall choose in which territory the residence of the person is located.

## Sec. 11.002. Qualified Voter.

(a) In this code, "qualified voter" means a person who:

(1) is 18 years of age or older;

(2) is a United States citizen;

(3) has not been determined by a final judgment of a court exercising probate jurisdiction to be:

(A) totally mentally incapacitated; or

(B) partially mentally incapacitated without the right to vote;

(4) has not been finally convicted of a felony or, if so convicted, has:

(A) fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or

(B) been pardoned or otherwise released from the resulting disability to vote;

(5) is a resident of this state; and

(6) is a registered voter.

(b) For purposes of Subsection (a)(4), a person is not considered to have been finally convicted of an offense for which the criminal proceedings are deferred without an adjudication of guilt.

### Sec. 64.012. Illegal Voting.

(a) A person commits an offense if the person:

(1) votes or attempts to vote in an election in which the person knows the person is not eligible to vote;

(2) knowingly votes or attempts to vote more than once in an election;

(3) knowingly impersonates another person and votes or attempts to vote as the impersonated person; or

(4) knowingly marks or attempts to mark another person's ballot without the consent of that person.

(b) An offense under this section is a felony of the third degree unless the person is convicted of an attempt. In that case, the offense is a state jail felony.

### Sec. 8.02. Mistake of Fact.

(a) It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense.

(b) Although an actor's mistake of fact may constitute a defense to the offense charged, he may nevertheless be convicted of any lesser included offense of which he would be guilty if the fact were as he believed.

### Sec. 8.03. Mistake of Law.

(a) It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect.

(b) It is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon:

(1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

(2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

(c) Although an actor's mistake of law may constitute a defense to the offense charged, he may nevertheless be convicted of a lesser included offense of which he would be guilty if the law were as he believed.

# APPENDIX
# G

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

# TEXAS CRIMINAL

# PATTERN JURY CHARGES

---

## Defenses

Prepared by the

COMMITTEE

on

PATTERN JURY CHARGES—CRIMINAL

of the

STATE BAR OF TEXAS



Austin    2013

KFT
8984
S7
C77
2013
c.3

The State Bar of Texas, through its TexasBarBooks Department, publishes practice books prepared and edited by knowledgeable authors to give practicing lawyers as much assistance as possible. The competence of the authors ensures outstanding professional products, but, of course, neither the State Bar of Texas, the editors, nor the authors make either express or implied warranties in regard to their use. Each lawyer must depend on his or her own knowledge of the law and expertise in the use or modification of these materials.

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that (1) this written material was not intended or written by the author(s) to be used for the purpose of avoiding federal penalties that may be imposed on a taxpayer; (2) this written material cannot be used by a taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer; (3) this written material cannot be used in promoting, marketing, or recommending to another party any tax-related transaction or matter; and (4) a taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

The use of the masculine gender throughout this publication is purely for literary convenience and should, of course, be understood to include the feminine gender as well.

International Standard Book Number: 978-1-938873-05-8

© 2010, 2013 State Bar of Texas
Austin, Texas 78711

All rights reserved. Permission is hereby granted for the copying of pages or portions of pages of this publication by a photocopy or other similar process or by manual transcription, by or under the direction of licensed attorneys for use in the practice of law. No other use is permitted that will infringe the copyright without the express written consent of the State Bar of Texas.

Printed in the United States of America



FSC
www.fsc.org
MIX
Paper from
responsible sources
FSC® C020980

## § B12.1    Statutory References

The defense of mistake of law is provided for in Tex. Penal Code § 8.03(b).

The definition of "reasonable belief" is based on Tex. Penal Code § 1.07(a)(42).

## § B12.2   Texas Penal Code Distinction between Mistakes of "Fact" and Mistakes of "Law"

The Texas Penal Code provides separately and differently for what it calls "Mistake of Fact" (covered in section 8.02) and "Mistake of Law" (covered in section 8.03).

Many modern criminal codes, following the lead of the Model Penal Code, do not distinguish between these types of mistake, that is, between mistakes of fact and those of law. Any evidence of mistake or ignorance "as to a matter of fact or law" requires acquittal of a defendant if it raises a reasonable doubt about whether the prosecution has proved the required culpable mental state. Model Penal Code § 2.04(1) (titled "Ignorance or Mistake") (Proposed Official Draft 1962). These are what the Texas case law would call failure-of-proof defenses.

The Model Penal Code distinguishes these matters from a third, which consists of proof that the defendant believed the conduct involved did not legally constitute a defense. *See* Model Penal Code § 2.04(3). In such cases, the defendant has the burden of proof by a preponderance of the evidence. Model Penal Code § 2.04(4). The Model Penal Code did not explicitly call this mistake of law.

The drafters of the Texas Penal Code took the defense defined in section 2.04(3) of the Model Penal Code, labeled it "Mistake of Law," and embodied it in section 8.03 of the Texas Penal Code. They took the general doctrine of mistake from section 2.04(1) of the Model Penal Code, deleted the language that made it applicable to matters of law as well as to matters of fact, labeled it "Mistake of Fact," and—with other modifications—embodied it in section 8.02 of the Texas Penal Code.

A general question raised by this is what the legislative intent was regarding what the Model Penal Code would call simple mistakes of fact, that as a logical matter suggest the defendant lacked the culpable mental state required for the charged offense. Did the legislature intend to deny defendants the ability to rely on evidence of mistake showing the lack of the required culpable mental state? Did it intend to limit defendants to section 8.03?

Perhaps mistake of (or ignorance about) law that logically tends to show the defendant lacked the required culpable mental state is a viable failure-of-proof defense. But since the Texas Penal Code makes no explicit reference to it, the jury instructions need not address it and, perhaps, must avoid any reference to it.

A mistake-of-law instruction should be submitted only if a defendant establishes that he (1) reasonably believed that his conduct did not constitute a crime and (2) reasonably relied on either an administrative order or a written interpretation of the law contained in an opinion of a court of record. *Green v. State*, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992); *see also Celis v. State*, 354 S.W.3d 7 (Tex. App.—Corpus Christi 2011), *aff'd*, Nos. PD-1584-11, PD-1585-11, 2013 WL 2373114 (Tex. Crim. App. May 15, 2013, pet. granted) (discussing mistake-of-fact defense, mistake-of-law

defense, and required culpable mental states). Moreover, the defense must be based on controlling law, because it was "not created to allow a criminal defendant to rely upon old 'interpretive opinions, opinions that conflict with others, or on overruled opinions.'" *Green*, 829 S.W.2d at 223 (rejecting reliance on 1873 U.S. Supreme Court case applying Connecticut common law); *Stauder v. State*, No. 07-10-0221-CR, 2011 WL 1643689 (Tex. App.—Amarillo May 2, 2011, pet. ref'd) (mem. op., not designated for publication) (rejecting reliance on vacated Texas case).

### § B12.3        Instruction—Mistake of Law

If you all agree the state has proved, beyond a reasonable doubt, each of the [*number*] elements listed above, you must next consider whether the defense of mistake of law applies.

**Mistake of Law**

You have heard evidence that, when the defendant [*insert specific conduct constituting offense*], he believed that his conduct did not constitute a crime.

**Relevant Statutes**

A person's conduct that would otherwise constitute the crime of [*offense*] is not a criminal offense if the person reasonably believed as a result of mistake of law that the conduct charged did not constitute a crime and that he acted in reasonable reliance on either—

    1.    an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

    2.    a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Mistake of law is an affirmative defense. Therefore the defendant must prove, by a preponderance of the evidence, three elements:

*[Select one of the following.]*

    1.    At the time of the conduct, the defendant believed that the conduct did not constitute a crime; and

*[or]*

    1.    The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

*[or]*

    1.    The defendant [mistakenly] believed the law did not make the conduct a crime; and

*[Continue with the following.]*

2. The defendant's belief was reasonable; and

3. The defendant reached this [mistaken] belief in reasonable reliance on either—

    a. an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

    b. a written interpretation of the law contained in an opinion of a court of record; or

    c. a written interpretation of the law made by a public official charged by law with responsibility for interpreting the law in question.

The affirmative defense of mistake of law is not established by proof that the defendant was simply ignorant of the provisions of any law after the law took effect. The evidence must show the defendant addressed the law and reached a mistaken conclusion about what the law meant.

**Burden of Proof**

The burden is on the defendant to prove, by a preponderance of the evidence, that he comes within the affirmative defense of mistake of law.

**Definitions**

*Law*

"Law" means the constitution or a statute of this state or of the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioners court, or a rule authorized by and lawfully adopted under a statute.

*Reasonable Belief*

"Reasonable belief" means a belief that an ordinary and prudent person would have held in the same circumstances as the defendant.

*Reasonable Reliance*

The defendant's reliance on a source was reasonable if an ordinary and prudent person in the same circumstances as the defendant would have relied on

165

that source and reached any mistaken conclusion or belief that the defendant reached.

### Preponderance of the Evidence

The term "preponderance of the evidence" means the greater weight and degree of the credible evidence.

### Application of Law to Facts

If you have found that the state has proved the offense beyond a reasonable doubt, you must next decide whether the defendant has proved, by a preponderance of the evidence, that he comes within the affirmative defense of mistake of law.

To decide the issue of mistake of law, you must determine whether the defendant has proved, by a preponderance of the evidence, the following three elements:

*[Select one of the following.]*

1.   The defendant believed his conduct did not constitute a crime; and

*[or]*

1.   The defendant, before or during his conduct, considered the law applicable to his conduct and mistakenly concluded the law did not make the conduct a crime; and

*[or]*

1.   The defendant [mistakenly] believed the law did not make the conduct a crime; and

*[Continue with the following.]*

2.   The defendant's belief was reasonable; and

3.   The defendant reached this [mistaken] belief in reasonable reliance on either—

   a.   an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or

    b.    a written interpretation of the law contained in an opinion of a court of record; or

    c.    a written interpretation of the law made by a public official charged by law with responsibility for interpreting the law in question.

If you find that the defendant has proved, by a preponderance of the evidence, all three elements listed above, you must find the defendant "not guilty."

If you all agree the state has proved, beyond a reasonable doubt, each of the elements of the offense of [*insert specific offense*], and you all agree the defendant has not proved, by a preponderance of the evidence, all three elements listed above, you must find the defendant "guilty."

*[See chapter 2 for verdict instruction.]*

## COMMENT

**Format of Instruction.**    It is possible that the instructions for affirmative defenses should not use the same format as is used for the definitions of offenses—first setting out the statutory language and then setting out in more flexible language the elements of the matter. The instruction above, however, uses the same format.

*Statement of "Rule."*    There is a question about how to state the basic "rule." Although the affirmative defense is titled "Mistake of Law," the actual statement of the defense does not use that terminology. Instead, it mandates a decision whether the actor "reasonably believed the conduct charged did not constitute a crime." Tex. Penal Code § 8.03(b). The instruction assumes that communication of the substance of this to juries would be furthered if the instruction makes explicit that this belief must be based on a mistaken perception of the law.

Several alternative formulations of the basic rule are also set out.

*Elements of Defense.*    The instruction refers to the "units" of the defenses as "elements." Such terminology may not be appropriate with regard to defenses because it suggests a burden of proof on the defendant. But with regard to affirmative defenses such as mistake of law, the burden is on the defendant and so this convenient terminology is appropriate.

*Further Specification of Defense "Theory."*    The instruction might specifically set out the defense theory and perhaps identify the offered source for the defendant's mistaken belief—as, for example, the official statement of the law in a written order by an administrative agency or the written interpretation of the law contained in an opinion of a court of record. Doing this might focus the jury's attention on the need for the defendant to establish that this source is within Penal Code section 8.03(c).

167

Thus the instruction might specify, for example, that the defendant introduced testimony that he relied on what he regarded as an official statement of the law contained in a hypothetical written opinion of the United States Supreme Court in *Jones v. Arkansas*.

However, article 36.14 of the Code of Criminal Procedure prohibits the charge from summing up the testimony or discussing the facts.

*Ignorance.* The final paragraph of the relevant statutes unit is based on the explicit statement in Penal Code section 8.03(a) that ignorance of the provisions of any law is not a defense.

*Additional Definitions.* A number of additional terms might be defined:

1. "a court of record"

2. "a public official charged by law with responsibility for interpreting the law in question"

3. "an official statement of the law"

4. "an administrative agency charged by law with responsibility for interpreting [a specific] law"

No definitions of these terms or phrases are readily available.

**Guilt of Lesser Included Offense.** The instruction does not provide for implementation of Penal Code section 8.03(c). Under that section, a defendant who prevails on a mistake-of-fact contention to the charged offense is nevertheless potentially convictable of a lesser included offense of which he would be guilty if the law were as the evidence shows he believed it was.

Certainly a jury should not be instructed on section 8.03(c) unless a lesser included offense is submitted on the basis of this provision. Arguably the instruction on the lesser included offense should incorporate the substance of section 8.03(c).

**Problem of Mistaken Belief in Constitutional Protection.** A special problem is presented if a defendant does not claim that he misconstrued the substantive criminal law but instead argues that he erroneously believed that constitutional law made his conviction under that substantive law impermissible.

Whether Texas law provides an affirmative defense in these situations is not clear. The critical question seems to be what is meant in Penal Code section 8.03(b) by "believ[ing] the conduct charged did not constitute a crime."

Arguably, the statutory defense covers a person who at the time of the conduct acknowledged a penal statute purported to cover his conduct but believed a constitution bars his conviction under that statute. Such a person arguably believes his conduct does not constitute an *enforceable* crime and thus, for all practical purposes, a crime at

all. If this is the case, the literal words of the mistake-of-law statute may not convey this to juries.

If it is desirable to provide for this, a special version of the defense of mistake of law might be drafted perhaps by substituting the following for the first part of the relevant statutes unit:

A person's conduct that would otherwise constitute the crime of [*offense*] is not a criminal offense if—

1.   the person [mistakenly] believed constitutional law barred his criminal conviction for this conduct.

The court might provide this for use only in an unusual situation in which the evidence raised this specific kind of mistake regarding law.

**Problem of Mistake-of-Law Evidence Offered to "Negate" Required Culpable Mental State.** In some unusual situations, a criminal offense requires some awareness of the law. When this is the case, a defendant is almost certainly entitled to rely on evidence that because of his mistake about—or ignorance of—that law, he lacked the required culpable mental state.

Section 39.03(a)(1) of the Penal Code, for example, provides: "A public servant acting under color of his office or employment commits an offense if he . . . intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful . . . ."

Suppose a police officer is charged with this offense based on evidence that he arrested the victim. The officer would certainly be entitled to introduce evidence that he mistakenly believed Texas law authorized an arrest of the sort involved. He would even be entitled to introduce evidence that he was simply unaware that Texas law made this sort of arrest unlawful.

If this scenario is correct, should the jury ever be instructed on this? See section B12.2 above for discussion regarding the failure of the Texas Penal Code to address this question.

As an initial matter, this would seem to be a nonstatutory defensive matter no different from alibi. It would follow that a jury instruction is not only unnecessary but if given would also constitute a prohibited comment on the evidence.

On the other hand, it is arguable that unlike the alibi situation, the mistake-of-law area includes multiple rules that a jury might well confuse. An instruction on this permissible defensive use of evidence of mistake of law, then, might be justified to assure that the jury understands two things. First, this use of evidence is not barred by Penal Code section 8.03(a)'s statement that ignorance of the law "is no defense." Second, this use of evidence is completely independent of the very limited defensive use of such evidence permitted under section 8.03(b).

169

Conceptually, these arguments are really those of mistake of "fact" in which "law" becomes a "fact." Arguably, defendants' interests are adequately protected by a plain mistake-of-fact instruction. Or, if special accommodation is to be made, it might be best made in connection with the instruction on mistake of fact.

Accommodation might be made for situations in which the defendant claims a mistake about such law with an instruction along the following lines:

> You have heard evidence that the defendant harbored a mistaken belief about the law governing the right of an officer to make an arrest. If you decide to credit this evidence, you may consider it in deciding whether the state has proved the defendant knew the arrest at issue in this case was unlawful.

# APPENDIX
# H

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

# § 122.01 Defenses

### [1] Defensive Evidence Generally

In a criminal prosecution, the state is required to charge the defendant with a criminal offense by an indictment or information, and then prove the allegations contained in the charging document beyond a reasonable doubt to obtain a conviction [*C.C.P. Arts. 1.05, 38.03*; *Pen. C. § 2.01*]. A defendant, however, may obtain an acquittal despite a valid indictment or information and proof of its allegations beyond a reasonable doubt if the defendant raises an exception to the offense, a defense, an affirmative defense [*Pen. C. § 2.02*; see § *122.01[2], below*], or a justification [*see Ch. 123, Justifications*] to the offense. When defensive issues are raised by the evidence, the trial court must instruct the jury that, if it finds the defense applicable or the defensive evidence raises a reasonable doubt regarding the defendant's guilt, the jury must find the defendant not guilty regardless of the strength of the state's case.

Generally, the term "defense" refers to three types of evidence, each of which absolves a defendant from criminal liability. First, "true defenses" involve evidence showing that the defendant committed the offense charged, but had a sufficient excuse or justification under the circumstances that eliminated criminal liability for the act [*see Hill v. State, 765 S.W.2d 794, 796 (Tex. Crim. App. 1989)*, citing *Barnette v. State, 709 S.W.2d 650, 652 (Tex. Crim. App. 1986)*]. For example, the defenses of entrapment [*Pen. C. § 8.06*], infancy [*Pen. C. § 8.07*], public duty [*Pen. C. § 9.21*], necessity [*Pen. C. § 9.22*], self-defense, and defense of property [*Pen. C. §§ 9.31–9.44*] each require the defendant to admit commission of the crime, but remove criminal liability by excusing or justifying the actions taken. Additional true defenses that apply to particular offenses are found in the sections of the Penal Code concerning these offenses [*see, e.g., Pen. C. § 47.06(d)*].

A second type of defensive evidence concerns "affirmative defenses." Texas law provides for the following four general affirmative defenses:

1. Defense to criminal responsibility of a corporation or association [*Pen. C. § 7.24*].
2. Insanity [*Pen. C. § 8.01*].
3. Mistake of law [*Pen. C. § 8.03*].
4. Duress [*Pen. C. § 8.05*].

Additional affirmative defenses that apply to particular offenses are found in the sections of the Penal Code concerning those offenses [*see, e.g., Pen. C. § 47.04(c)*].

When an affirmative defense is raised, the defendant usually admits commission of the acts constituting the crime but is entitled to an acquittal because of circumstances that suspend criminal liability for the act [*Meraz v. State, 785 S.W.2d 146, 153 (Tex. Crim. App. 1990)*].

Third, some defensive issues may be raised when the defendant contests a specific element of the state's proof. The defense of mistake of fact [*Pen. C. § 8.02*] and defensive issues such as involuntary intoxication are not true defenses. This is because the defendant does not deny commission of the offense. When such evidence is presented, however, it may eliminate criminal liability by raising a reasonable doubt concerning the state's proof of an essential element [*see, e.g., Hill v. State, 765 S.W.2d 794, 796 (Tex. Crim. App. 1989)*].

Other defensive issues are discussed elsewhere in this set. Challenges to jurisdiction are discussed in *Ch. 2, Jurisdiction of State Courts*. The defense of double jeopardy is discussed in *Ch. 51, Double Jeopardy*. The insanity defense is discussed in *Ch. 53, Incompetence and Insanity*, and defenses based on immunity from prosecution are discussed in *Ch. 70, Plea*

_Negotiations._ Necessity, self-defense, defense of property, and public duty are discussed in _Ch. 123, Justifications._ Issues concerning evidentiary matters, such as the failure to corroborate the testimony of particular witnesses, are found in Ch. 73, _Trial Motions._

### [2]   Recognition of Common-Law Defenses Under Penal Code

An issue that has arisen since enactment of the Penal Code's statutory exemptions, defenses, affirmative defenses, and justifications is whether Texas courts may recognize common-law defenses, such as alibi and involuntary intoxication. This is an important question because a determination that evidence raises a defense or an affirmative defense results in specific and varied procedural consequences during the course of a criminal prosecution. The current law yields no clear answer.

Generally, the Court of Criminal Appeals has not recognized common-law defenses under the Penal Code. For example, in one case, the court held that, because the Penal Code lacked any reference to a "good faith purchase" defense to a charge of burglary, the trial court was not required to charge the jury on such a defense, even if the defense was raised by the evidence [_Sanders v. State, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986)_; see _Willis v. State, 790 S.W.2d 307, 315 (Tex. Crim. App. 1990)_; _Williams v. State, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982)_].

The Court of Criminal Appeals departed from this general rule, however, in dicta in _Vasquez v. State [830 S.W.2d 948, 959 (Tex. Crim. App. 1992)]_ stating that, "A defense may be recognized two ways: by the legislature, or by the courts." Whether the Court of Criminal Appeals has effectively overruled the holding in _Sanders_ that common-law defenses are not cognizable must await further action by the court. Defense attorneys, however, should use _Vasquez_ to support submission of any defensive issue raised by the evidence, even if that specific defense is not listed in the Penal Code.

Further support for recognition of defenses that are not established by statute can be found in cases recognizing the defense of involuntary intoxication. The Texas Penal Code makes no formal reference to involuntary intoxication as a defense to a criminal action but the Court of Criminal Appeals has held that the defense of insanity due to involuntary intoxication is "implicit" in the language of the insanity defense in 8.01 of the Texas Penal Code [_see Tex. Penal Code § 8.04(a)_, referring to voluntary intoxication only; _Torres v. State, 585 S.W.2d 746 (Tex. Crim. App. 1979)_].

### [3]   When Separate Jury Charge on Defense Is Required

Generally, a defendant is entitled to a jury charge on any and all defensive issues raised by the evidence [_Willis v. State, 790 S.W.2d 307, 315 (Tex. Crim. App. 1990)_; _Woodfox v. State, 742 S.W.2d 408, 409 (Tex. Crim. App. 1987)_; _Montgomery v. State, 588 S.W.2d 950, 953 (Tex. Crim. App. 1979)]_. Traditionally, Texas law gave the defendant the right to require the trial court to submit to the jury any defensive theory supported by the evidence and no distinction was made between a defensive theory that merely negated an element of the offense and a defensive theory that did not negate an element but that relied upon an independent justification for committing the offense. An example of the former would be alibi, while an example of the latter would be self-defense. After the 1974 Penal Code was enacted, however, the Court of Criminal Appeals began to recognize that instructions on defensive theories not set out in the 1974 Penal Code were inconsistent with the legislature's intent. Thus, for example, the Court of Criminal Appeals held that a specific defense instruction for an alibi is improper because, "an alibi is sufficiently embraced in a general charge to the jury" and "a special instruction on alibi would constitute an unwarranted comment on the weight of the evidence by the trial court" [_Giesberg v. State, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998)]_. For the same reasons, the Court has held that a defendant is not entitled to a defensive charge on accident, good faith, alternative cause, independent impulse, or suicide [_Walters v. State, 247 S.W.3d 204, 210 (Tex. Crim. App. 2007)]_.

Before the 1974 Penal Code was adopted, many statutory defenses included specific descriptions of the type of evidence that established that defense. In those cases, a trial judge appropriately instructed the jury on the wording of the entire statute. The instruction was not considered a comment on the weight of evidence because the statute expressly mandated what evidence should be considered for what purpose. When these descriptions remain in the current code, instructions regarding them are still appropriate; but when these doctrines or descriptions have not been carried forward into the Texas Penal Code, instructions on them would constitute an improper comment on the weight of the evidence that the legislature

has not expressly authorized. When the legislature has not enacted specific statutes, courts may conclude that the legislature intended this silence in the law and in the jury instructions. Thus, generally speaking, neither the defendant nor the State is entitled to a special jury instruction relating to a statutory offense or defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense [*Walters v. State*, 247 S.W.3d 204, 210-13 (Tex. Crim. App. 2007)—overruling *Ellis*, 811 S.W.2d 99, which required verbal threat language when raised by evidence in light of wording of former statute because current statute no longer explicitly addresses verbal threats and issue should be addressed under general standards of reasonable belief in imminent need to use force; *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007)—defendant not entitled to "Good Samaritan" defense that he caused injury to child in attempt to deal with medical emergency because "defense" merely negated mental state element of offense].

### [4]  Credibility or Weight of Defensive Evidence

If evidence is presented to the jury regarding a defense, affirmative defense, or justification, the trial court must charge the jury on that defense, affirmative defense, or justification, regardless of the strength of the evidence or the credibility of the persons from whom the evidence is obtained [*Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991); *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987); *Sanders v. State*, 707 S.W.2d 78, 80 (Tex. Crim. App. 1986)]. This rule ensures that the jury, rather than the trial court, will decide the credibility of the evidence [*Woodfox v. State*, 742 S.W.2d 408, 409–410 (Tex. Crim. App. 1987)].

### [5]  Jury Charges on Conflicting Defenses

If the evidence raises affirmative defenses or defensive issues, the jury must be charged on each of those defenses or issues. Such jury charges must be given even if the evidence raising the issues is conflicting or the defenses are mutually inconsistent [*Thomas v. State*, 662 S.W.2d 677, 679 (Tex. App., Dallas 1983)*, aff'd, 678 S.W.2d 82, 84 (Tex. Crim. App. 1984)].

Texas Criminal Practice Guide

Copyright 2015, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

# APPENDIX

# I

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

# SUBSTANTIVE CRIMINAL LAW

## SECOND EDITION

West's Criminal Practice Series

By

WAYNE R. LaFAVE

David C. Baum Professor of Law Emeritus and
Professor Emeritus in the Center for Advanced Study,
The University of Illinois

Volume 1

Sections 1.1 to 8.4

THOMSON

—✳—™

WEST

Mat #40158987

ISBN 0-314-10802-5

COPYRIGHT © 2003

By

WEST GROUP

West Group has created this publication to provide you with accurate and authoritative information concerning the subject matter covered. However, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. West Group is not engaged in rendering legal or other professional advice, and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

## § 5.6 Ignorance or Mistake

*Analysis*

Subsec.
(a) Generally.
(b) Ignorance or Mistake Negating Mental State; Reasonableness.
(c) The "Lesser Legal Wrong" and "Moral Wrong" Theories.
(d) Belief Conduct Not Proscribed by the Criminal Law.
(e) Belief Conduct Not Proscribed Because of Governmental Action or Inaction.
   (1) Enactment Not Reasonably Made Available.
   (2) Reasonable Reliance Upon a Statute or Judicial Decision.
   (3) Reasonable Reliance Upon an Official Interpretation.
   (4) Reliance Upon Advice of Private Counsel.

Ignorance or mistake as to a matter of fact or law is a defense if it negatives a mental state required to establish a material element of the crime, except that if the defendant would be guilty of another crime had the situation been as he believed, then he may be convicted of the offense of which he would be guilty had the situation been as he believed it to be. (A quite different kind of mistake of law, whereby the defendant believes that his conduct is not proscribed by the criminal law, is generally not a defense.)

**(a) Generally.** No area of the substantive criminal law has traditionally been surrounded by more confusion than that of ignorance or mistake of fact or law. It is frequently said, on the one hand, that ignorance of the law is no excuse, and, on the other, that a mistake of fact is an excuse. Neither of these propositions is precisely correct, and both are subject to numerous exceptions and qualifications.[1] Uncertainty as to the precise significance of the defendant's mistake or ignorance of the surrounding facts is attributable in part to assertions, usually unexplained, in some decisions that the error must be a reasonable one or that the defendant is subject to conviction notwithstanding the mistake. Another source of confusion is the indiscriminate use of the phrase "ignorance of the law" to encompass both the situation in which the defendant is unaware of the existence of a statute proscribing his conduct, and that where the defendant has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct (as where, in a bigamy case, the defendant mistakenly believes that his prior divorce is valid). These two situations call for quite different analysis and, frequently, different results.[2]

### § 5.6

1. See J. Hall, General Principles of Criminal Law ch. 11 (2d ed. 1960).

2. See Dutile & Moore, Mistake and Impossibility: Arranging a Marriage Between Two Difficult Partners, 74 Nw.U.L.Rev.

166, 171–81 (1979). On the difficulties that sometimes arise in distinguishing mistake of fact from mistake of law, see Leonard, Rape, Murder and Formalism: What Happens if We Define Mistake of Law?, 72 U.Colo.L.Rev. 507 (2001).

In actuality, the basic rule is extremely simple: ignorance or mistake of fact or law is a defense when it negatives the existence of a mental state essential to the crime charged.[3] Indeed, it is so simple because, unlike the defenses discussed in later chapters, it is merely a restatement in somewhat different form of one of the basic premises of the criminal law. Instead of speaking of ignorance or mistake of fact or law as a defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law[4] for commission of that particular offense.[5] For example, to take the classic case of the man who takes another's umbrella out of a restaurant because he mistakenly believes that the umbrella is his, it is not really necessary to say that the man, if charged with larceny, has a valid defense of mistake of fact; it would be more

**3.** Model Penal Code § 2.04(1)(a). Several modern codes contain such a provision. Ala.Code § 13A–2–6; Ark.Code Ann. § 5–2–206; Ill.Comp.Stat.Ann. ch. 720, § 5/4–6; Iowa Code Ann. § 701.6; Kan.Stat.Ann. § 21–3203; Ky.Rev.Stat.Ann. § 501.070; Me.Rev.Stat.Ann. tit. 17–A, § 36; Mo.Ann. Stat. § 562.031; N.J.Stat.Ann. § 2C:2–4 (if "reasonably arrived at"); Wis.Stat.Ann. § 939.43.

Surprisingly, however, a larger number of modern codes (as well as some earlier ones) have a provision which so provides only as to mistakes of fact. Alaska Stat. § 11.81.620 (mistake must be "a reasonable one"); Ariz. Rev.Stat.Ann. § 13–204; Cal.Penal Code § 26 (mistake "which disproves any criminal intent"); Colo.Rev.Stat.Ann. § 18–1–504; Conn.Gen.Stat.Ann. § 53a–6; Ga.Code Ann. § 16–3–5 (only if, if true, conduct would be justified); Haw.Rev.Stat. § 702–218; Idaho Code § 18–201 (only if mistake disproves any criminal intent"); Ind.Code Ann. § 35–41–3–7 (must be "reasonably mistaken"); La.Rev.Stat.Ann. §§ 14:16, 14:17 (must be "reasonable"); Nev.Rev. Stat.Ann. § 194.010 (if mistake "disproves any criminal intent"); N.H.Rev.Stat.Ann. § 626.3; N.Y.Penal Law § 15.20; Okla.Stat. Ann. tit. 21, § 152 (if mistake "disproves any criminal intent"); Pa.Cons.Stat.Ann. tit. 18, § 304 (must be "reasonable explanation or excuse"); S.D.Cod.Laws § 22–3–1; Tenn.Code Ann. § 39–11–502; Tex.Penal Code Ann. § 8.02 (must be "reasonable belief"); Utah Code Ann. § 76–2–304. "This is no doubt due to the reaction of legislators who, even if laymen, are familiar with the common law maxim that 'ignorance of the law is no excuse.'" 1 P. Robinson, Criminal Law Defenses § 62(d) (1984). That is, the failure to follow the Model Penal Code formulation is probably attributable to legislative confusion of the two kinds of mistakes of law discussed herein. In these states, it is

unclear at best whether a mistake of law would be recognized as a defense when because of the mistake the defendant lacks the requisite state of mind (e.g., knowledge of lack of license or privilege in the crime of trespass). Ibid.

**4.** See § 5.1.

**5.** See State v. Silveira, 198 Conn. 454, 503 A.2d 599 (1986) (for this reason, defendant not entitled to instruction on "defense" of mistake; defendant's claim, that he not reckless because he did not know victim would move in path of gunfire, relates to mental state on which instructions given); State v. Molin, 288 N.W.2d 232 (Minn.1979) (for this reason, defendant not entitled to an instruction on the defense of mistake where an adequate instruction on the prosecution burden to prove intent was given); State v. Sexton, 160 N.J. 93, 733 A.2d 1125 (1999) ("the better way to explain the concepts so to explain what is required for liability to be established;" for "evidence of an actor's mistaken belief relates to whether the State has failed to prove an essential element of the charged offense beyond a reasonable doubt").

Compare State v. Freeman, 267 N.W.2d 69 (Iowa 1978) (mistake of fact is "a separate and distinct issue notwithstanding its relation to the State's duty to prove a criminal intent," and thus mistake of fact instruction was necessary); General v. State, 367 Md. 475, 789 A.2d 102 (2002) (over strong dissent, court requires mistake of fact instruction even when trial court instructs on required mental element; majority and dissent collect cases in support of their respective positions); Stagner v. State, 842 P.2d 520 (Wyo.1992) (court over strong dissent holds defendant entitled to mistake of fact instruction, though accurate instruction on mental state and burden of proof given).

direct and to the point to assert that the man is not guilty because he does not have the mental state (intent to steal the property of another) required for the crime of larceny.[7] Yet, the practice has developed of dealing with such mistakes as a matter of defense,[8] perhaps because the facts showing their existence are usually brought out by the defendant, but they are not so classified in this Treatise,[10] so as to emphasize that (for the reasons stated above) it is commonly accepted that the prosecution is required to disprove the mental state-negating mistake beyond a reasonable doubt.[11]

Once the basic rule is understood, it is then apparent why the two different kinds of mistake of law mentioned earlier call for different results. If, instead of the mistake of fact in the umbrella hypothetical, the defendant took the chattel through a mistake of law, such as that his prior dealings had vested ownership of it in him, he would again not have the intent-to-steal mental state required for the crime of larceny. By contrast, this intent to steal would be present if the defendant took the umbrella he knew was owned by another but he could honestly say that he was unaware that such a taking was proscribed by the criminal

law.[13] It is in this latte ignorance of the law is discussed later, there ar believes his conduct is no able to an official statem give fair notice of the pro

**(b) Ignorance or** ableness. The rather sin is a defense when it ne would appear to be fairly identifies the mental sta inquires whether that m ignorance or mistake o receiving property knowi knowledge concerning t obtained. If the defendar them to be television se apparent that this mista not negate the mental e defendant by a mistake stolen, even though the believe they were stolen thus may not be convict do not proceed along t uncritical acceptance of reasonable; and (2) beca mental element is actua

Illustrative of the The defendant was con he appealed on the g defense-requested instr lieved the girl had con held that the requeste qualify the defendant's support of this conclu

**6.** See § 19.5.

**7.** Cf. United States v. Miranda–Enriquez, 842 F.2d 1211 (10th Cir.1988) (defendant is guilty of offense defined in terms of alien being found in United States after being deported, even if defendant believed he lawfully in U.S., as mental state for crime is *only* knowing re-entry); State v. Freeman, 450 N.W.2d 826 (Iowa 1990) (defendant, prosecuted for selling simulated controlled substance, guilty though he believed he selling actual controlled substance, as mental state is knowing representation that what being sold is controlled substance, not knowing *mis*representation); Reese v. State, 106 N.M. 498, 745 P.2d 1146 (1987) (because assault-on-officer statute requires knowledge victim is police officer, defendant not guilty if he believed victim was ordinary citizen); People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987) (defendant, charged with possession of weapon, guilty notwithstanding his mistaken belief that as federal corrections officer he fit within statutory peace officer exception; court distinguishes another case and notes that there, unlike here, statute had a "without authority of law" element).

**8.** The practice is even followed in Model Penal Code § 2.04, although it is noted that "ignorance or mistake has only evidential import; it is significant whenever it is logically relevant, and it may be logically relevant to negate the required mode of culpability or to establish a special defense." Model Penal Code § 2.04, Comment at 269 (1985).

**9.** "It may well be, as a practical matter, that the defendant may have to act affirmatively to raise the issue, to carry the burden of pleading, to undercut a prima facie case that the prosecution has established. But this can be true with respect to negating any other element of the offense, as it is with those situations in which we speak of the defendant as having a 'mistake defense.'" 1 P. Robinson, Criminal Law Defenses § 62(b) (1984).

**10.** However, problems of ignorance or mistake of fact or law also arise in connection with other defenses, as, for example, when the homicide defendant claims self-defense but he was mistaken in his belief that he was under deadly attack. These matters are considered in later chapters.

**11.** People v. Mayberry, 15 Cal.3d 143, 125 Cal.Rptr. 745, 542 P.2d 1337 (1975); People v. Andrews, 632 P.2d 1012 (Colo. 1981); People v. Williams, 80 Ill.App.3d 963, 36 Ill.Dec. 112, 400 N.E.2d 532 (1980); State v. Sexton, 160 N.J. 93, 733 A.2d 1125 (1999).

**12.** State v. Sawyer, 95 Conn. 34, 110 A. 461 (1920). See also State v. Cude, 14 Utah 2d 287, 383 P.2d 399 (1963) (where statute makes it larceny to take one's own property with intent to deprive another person of his rights in it, defendant entitled to instruction that he not guilty if by ignorance of law he unaware garageman had a mechanic's lien on defendant's car, kept at garage when defendant did not pay repair bill).

**13.** That, however, is p the mental state for the cri cerns the intent to take and if the crime has a mental s make unawareness the c scribed an aspect of the r state, then of course such i bar conviction. See, e.g., R States, 510 U.S. 135, 114 L.Ed.2d 615 (1994) (des principle that ignorance of is no defense to a crimin gress may sometimes, as only certain conduct "wi

law.[13] It is in this latter sense that it may be correctly said that ignorance of the law is no excuse, although even here, as will be discussed later, there are exceptions when the defendant reasonably believes his conduct is not proscribed by law and that belief is attributable to an official statement of the law or to the failure of the state to give fair notice of the proscription.

**(b) Ignorance or Mistake Negating Mental State; Reasonableness.** The rather simple rule that an honest mistake of fact or law is a defense when it negates a required mental element of the crime would appear to be fairly easy to apply to a variety of cases. One merely identifies the mental state or states required for the crime, and then inquires whether that mental state can exist in light of the defendant's ignorance or mistake of fact or law. For example, on a charge of receiving property knowing it to be stolen, the critical mental element is knowledge concerning the illegal means by which the property was obtained. If the defendant knew that the goods were stolen, but believed them to be television sets when they were in fact radios, it would be apparent that this mistake of fact would be no defense because it does not negate the mental element of the crime. On the other hand, if the defendant by a mistake of either fact or law did not know the goods were stolen, even though the circumstances would have led a prudent man to believe they were stolen, he does not have the required mental state and thus may not be convicted of the crime.[14] Frequently, however, the cases do not proceed along this easy route, for two reasons: (1) because of uncritical acceptance of the general statement that the mistake must be reasonable; and (2) because imprecise drafting has left it uncertain what mental element is actually required for the offense in question.

Illustrative of the first point is the case of *United States v. Short*.[15] The defendant was convicted of assault with intent to commit rape, and he appealed on the ground that the court had erred in refusing a defense-requested instruction that he could not be convicted if he believed the girl had consented. The conviction was affirmed, and it was held that the requested instruction was too broad because it failed to qualify the defendant's belief by stating the belief must be reasonable. In support of this conclusion, the court noted that on a charge of rape the

---

**13.** That, however, is precisely because the mental state for the crime merely concerns the intent to take another's property. If the crime has a mental state which *does* make unawareness the conduct is proscribed an aspect of the requisite mental state, then of course such ignorance would bar conviction. See, e.g., Ratzlaf v. United States, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (despite "venerable principle that ignorance of the law generally is no defense to a criminal charge," Congress may sometimes, as here, proscribe only certain conduct "willfully" done in sense of done with knowledge conduct unlawful because that conduct not "obviously 'evil' or inherently 'bad' "); Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (ignorance of duty to file taxes a defense to crime of tax evasion, as Congress made "intent to violate the law an element" of this crime).

**14.** State v. Ebbeler, 283 Mo. 57, 222 S.W. 396 (1920).

**15.** 4 U.S.C.M.A. 437, 16 C.M.R. 11 (1954).

defendant would only be entitled to an instruction that reasonable belief as to consent was a defense.[16]

As the dissenting judge in *Short* pointed out, the notion that a mistake of fact is a defense only when reasonable is far too general and does not apply in many cases. One example cited was where the defendant is charged with knowing possession of marijuana; because such possession denotes conscious knowledge of the thing possessed, even negligent ignorance of the character of the cigarettes would be a defense, for knowledge is a higher and different statutory requirement than negligence.[17] As for the majority's reliance upon the reasonable belief requirement under the crime of rape, the dissenting judge contended that the crime of rape was distinguishable from assault with intent to rape because the former requires only a general criminal intent while the latter requires a specific intent. As discussed earlier, the phrases "general intent" and "specific intent" only tend to cause confusion,[18] and thus the dissenting judge's point can be best related by avoiding those terms and by instead going directly to the kind of mental element required for these two crimes. First of all, at least under the case relied upon by the majority in *Short*,[19] the crime of rape must be understood as *not* including an element of knowledge of the woman's lack of consent,[20] from which it follows that not every mistake by the defendant by which

...he believes the woman is ...assault with intent to r...defendant's purpose in as ...of intercourse against th...dant believes—even unre...fundamental point has g...codes.[22])

The second factor m...tion as to precisely wh...accounted for much of tl...by the offense of bigamy...are silent on the matter ...of the crime of bigamy i...defense: reasonable beli...belief that the first marri...concerning the first marr...that a foreign divorce v...results have been reache

---

**16.** The court cited McQuirk v. State, 84 Ala. 435, 4 So. 775 (1888), for that proposition.

**17.** United States v. Lampkins, 4 U.S.C.M.A. 31, 15 C.M.R. 31 (1954).

**18.** See § 5.2(e). But the terminology persists, see, e.g., Simms v. District of Columbia, 612 A.2d 215 (D.C.App.1992), sometimes even in jurisdictions with modern codes in which the statutes on mistake of fact do not themselves do so. See, e.g., State v. Smith, 210 Conn. 132, 554 A.2d 713 (1989).

**19.** See note 16 supra. Other cases also take the view that in a rape case the defendant's belief in consent must be reasonable, e.g., People v. Mayberry, 15 Cal.3d 143, 125 Cal.Rptr. 745, 542 P.2d 1337 (1975); State v. Smith, 210 Conn. 132, 554 A.2d 713 (1989). State v. Dizon, 47 Haw. 444, 390 P.2d 759 (1964), although it is sometimes asserted, under the moral wrong theory discussed later in this section, that even a reasonable belief would be no defense because the defendant, even under the facts as he believed them to be, would be committing an immoral act. See White v. State, 44 Ohio App. 331, 185 N.E. 64 (1933); and further discussion in § 17.2(b).

Under a reasonable belief approach, a rule of evidence may, in effect, make belief grounded in certain bases unreasonable.

See United States v. Saunders, 943 F.2d 388 (4th Cir.1991) (even if reasonable belief in victim's consent a defense, Fed.R.Evid. 412(b)(2)(B) says that on claim of victim's consent evidence of victim's past sexual behavior limited to prior relations between victim and this defendant; rule "manifests the policy that it is unreasonable for a defendant to base his belief of consent on the victim's past sexual experiences with third persons"). And in any event, the defendant may get to the jury with his claim if and only if "there is substantial evidence of equivocal conduct that could be reasonably and in good faith relied upon to form a mistaken belief of consent." People v. Williams, 4 Cal.4th 354, 14 Cal.Rptr.2d 441, 841 P.2d 961 (1992).

**20.** If, on the other hand, this crime is interpreted as requiring a subjective mental state as to the lack of consent, then a mistake causing defendant to believe the woman is consenting would be a defense. See Director of Public Prosecutions v. Morgan, 1976 A.C. 182, 2 All E.R. 347, [1975] W.L.R. 913 (H.L.), discussed in Comment, Pac.Int'l L.Rev. 207 (1995).

Another variation is that defendant is guilty of rape only if he was subjectively reckless in believing there was consent. Reynolds v. State, 664 P.2d 621 (Alaska App.1983)

**21.** The same is true in ot...in which a court starts with ...intent" characterization and t...fendant's mistake must be rea...e.g., Williams v. United Stat...772 (D.C.App.1975) (unautho...vehicle statute is "general int...crime, and thus defendant's a...reasonable belief the car had ...loned no defense); State v. Mo...25, 617 P.2d 1141 (1980) (rec...property charge; because "spe...not an element," instruction tl...of law no excuse proper).

**22.** Namely, those requirin...fendant's mistake be reason...Stat. § 11.81.620 (covers mis...only); Ind.Code Ann. § 35-41...mistake of fact only); La.l...§§ 14:16, 14:17; N.J.Stat.An...Pa.Cons.Stat.Ann. tit. 18, §...mistake of fact only); Tex.Pen...§ 8.02 (covers mistake of fact...suspects that some jurisdictio...not understand the implicatio...provision, especially when a ju...conflicting provisions: one re...lessness as to circumstance of ...another requiring reasonable ...P. Robinson, Criminal La...§ 62(c)(2) (1984).

These provisions should *not* ...to nullify the mental state ...contained in the definition...crimes. State v. Williams, 168 ...A.2d 457 (2001) (that statute l...mistake "as a defense" only ...not control a "failure of proof"

he believes the woman is consenting will be a defense.[21] But, the crime of assault with intent to rape clearly sets forth a mental element; the defendant's purpose in assaulting the woman must be rape. This purpose of intercourse against the woman's will cannot be present if the defendant believes—even unreasonably—that the woman is consenting. (This fundamental point has gone unrecognized even in some of the modern codes.[22])

The second factor mentioned earlier, uncertainty in criminal legislation as to precisely what mental state, if any, is required—has also accounted for much of the confusion in this area, as is aptly illustrated by the offense of bigamy. Many of the bigamy statutes in this country are silent on the matter of *mens rea*.[23] As a consequence, a common view of the crime of bigamy is that none of the following constitutes a valid defense: reasonable belief that the first spouse is dead;[24] reasonable belief that the first marriage was illegal;[25] reasonable belief that a decree concerning the first marriage was a divorce decree;[26] or reasonable belief that a foreign divorce would be recognized in the jurisdiction.[27] Such results have been reached through a process of statutory construction of

**21.** The same is true in other contexts in which a court starts with a "general intent" characterization and then says defendant's mistake must be reasonable. See, e.g., Williams v. United States, 337 A.2d 772 (D.C.App.1975) (unauthorized use of vehicle statute is "general intent" type of crime, and thus defendant's actual but unreasonable belief the car had been abandoned no defense); State v. Morse, 127 Ariz. 25, 617 P.2d 1141 (1980) (receiving stolen property charge; because "specific intent is not an element," instruction that ignorance of law no excuse proper).

**22.** Namely, those requiring that the defendant's mistake be reasonable. Alaska Stat. § 11.81.620 (covers mistake of fact only); Ind.Code Ann. § 35–41–3–7 (covers mistake of fact only); La.Rev.Stat.Ann. §§ 14:16, 14:17; N.J.Stat.Ann. § 2C:2–4; Pa.Cons.Stat.Ann. tit. 18, § 304 (covers mistake of fact only); Tex.Penal Code Ann. § 8.02 (covers mistake of fact only). "One suspects that some jurisdictions simply do not understand the implications of such a provision, especially when a jurisdiction has conflicting provisions: one requiring recklessness as to circumstance of elements and another requiring reasonable mistakes." 1 P. Robinson, Criminal Law Defenses § 62(c)(2) (1984).

These provisions should *not* be read so as to nullify the mental state requirements contained in the definitions of specific crimes. State v. Williams, 168 N.J. 323, 774 A.2d 457 (2001) (that statute has to do with mistake "as a defense" only and thus does not control a "failure of proof" defense, i.e.,

a claim that the required mens rea not proved, and thus in instant case, re charges of attempted murder and aggravated assault, defendant's belief in need for force needed to defend his wife must be reasonable, but on charge of possession of weapon with intent "to use it in a manner that is proscribed by law," state must prove subjective intent by defendant, and thus defendant "may not be deprived of the opportunity to assert a mistaken belief that could negate the mental state"); State v. Sexton, 160 N.J. 93, 733 A.2d 1125 (1999) (notwithstanding mistake-of-fact defense statute, which requires that mistake be reasonable, because defendant here charged with reckless variety of manslaughter it follows that even a negligent mistake of fact negates mental state required for conviction).

**23.** See Moore, Bigamy, A Crime Though Unwittingly Committed, 30 U.Cinn.L.Rev. 35, 36 (1961).

**24.** Commonwealth v. Mash. 48 Mass. (7 Metc.) 472 (1844), is the leading American case. See also Cornett v. Commonwealth, 134 Ky. 613, 121 S.W. 424 (1909); State v. Goonan, 89 N.H. 528, 3 A.2d 105 (1938); Manahan v. State, 188 Tenn. 394, 219 S.W.2d 900 (1949); State v. Ackerly, 79 Vt. 69, 64 A. 450 (1906).

**25.** People v. Hartman, 130 Cal. 487, 62 P. 823 (1900).

**26.** Burnley v. State, 201 Miss. 234, 29 So.2d 94 (1947).

**27.** State v. DeMeo, 20 N.J. 1, 118 A.2d 1 (1955).

399

bigamy statutes, often based upon these principles: (a) that when the legislature specified certain defenses (e.g., belief in the death of the other spouse based upon seven years absence) it intended to exclude all others; (b) that if the legislature had intended to require *mens rea* for the crime of bigamy it would have explicitly indicated this in the statute; and (c) that the statutory language justifies the assumption that the legislature favored the policy that those who remarry do so at their peril.[28]

These three principles are highly questionable, however, and they have been rejected in the more carefully reasoned decisions. As to the notion that the enumeration of certain defenses indicates an intention to bar other defenses, it is more logical to conclude that the legislature merely intended to set forth special defenses applicable to this particular crime while at the same time permitting resort to defenses which are applicable to crimes generally.[29] Likewise, the absence of words in the statute requiring a certain mental state does not warrant the assumption that the legislature intended to impose strict liability; to the contrary, at least for an offense as serious as bigamy, it should be presumed that the legislature intended to follow the usual *mens rea* requirement "unless excluded expressly or by necessary implication."[30] The implication that the legislature favored the remarry-at-your-peril doctrine certainly is not "necessary." Indeed, consideration of the matter on policy grounds justifies the conclusion that no good purpose would be served by punishing those who remarry honestly believing their prior spouse to be dead, or reasonably believing that their prior marriage was terminated by a valid divorce.[31]

Of course, if an offense is truly of the strict liability variety,[32] then the most obvious consequence of that fact is that there is no mental state to be negated and no mistake or ignorance of fact or law will suffice to exonerate. Illustrative is the offense of selling liquor to a minor or permitting him to stay upon premises licensed for the sale of liquor, which in most jurisdictions is viewed as imposing absolute liability upon those who operate establishments licensed to sell intoxicating beverages.[33] Under such a strict liability provision, it is no defense that defendant believed the minor was of age,[34] and this is true even if the minor appeared to be of age,[35] represented himself as having reached the

**28.** See Moore, supra note 23, at 38–39.

**29.** This point is forcefully made in People v. Vogel, 46 Cal.2d 798, 299 P.2d 850 (1956); and Long v. State, 44 Del. 262, 65 A.2d 489 (1949).

**30.** People v. Vogel, supra. To the same effect is the leading English case, Regina v. Tolson, 23 Q.B.D. 168 (1889).

A rebuttable presumption against strict liability is utilized by many courts in a variety of circumstances. See, e.g., United States v. Garrett, 984 F.2d 1402 (5th Cir. 1993).

**31.** Long v. State, 44 Del. 262, 65 A.2d 489 (1949). For a discussion of the policy

considerations, see Model Penal Code § 230.1, Comment at 384–87 (1980); Comment, 15 Mercer L.Rev. 275 (1963).

**32.** See § 5.5.

**33.** The cases are collected in Annot. 12 A.L.R.3d 991 (1967).

**34.** People v. Wilson, 106 Colo. 437, 106 P.2d 352 (1940); State v. Koliche, 143 Me. 281, 61 A.2d 115 (1948); State v. Parr, 129 Mont. 175, 283 P.2d 1086 (1955); Commonwealth v. Koczwara, 397 Pa. 575, 155 A.2d 825 (1959).

**35.** Crampton v. State, 37 Ark. 108 (1881); Duncan v. Commonwealth, 289 Ky.

requisite age,[36] or produced false credentials showing that he was of age.[37] So too with the crime of statutory rape, which in the majority of states "impose[s] strict liability for sexual acts with underage complainants."[38] Under such a provision, a conviction may be obtained "even when the defendant's judgment as to the age of the complainant is warranted by her appearance, her sexual sophistication, her verbal misrepresentations, and the defendant's careful attempts to ascertain her true age."[39]

The possible harshness of the strict liability approach is made most apparent when the defendant can show that he made a reasonable mistake of fact or law. For this reason, cases in which such a mistake is in evidence have sometimes influenced appellate courts to accept such a mistake as a defense notwithstanding the regulatory nature of the offense and the absence of any *mens rea* requirement in the statutory formulation. For example, even where the statute provided that no person should sell liquor to any minor "actually or apparently, under the age of eighteen years," it was interpreted to mean "actually *and* apparently" on the ground that otherwise a businessman would be penalized for acting in good faith in selling intoxicants to one who appeared to be over the statutory age.[40] Similarly, a conviction for transporting undersized fish was reversed because the defendant truck driver established that he did not know the fish were undersized and the cargo was so packed that he could not have reasonably been expected to examine it.[41]

231, 158 S.W.2d 396 (1942); State v. Hartfiel, 24 Wis. 60 (1869).

**36.** Edgar v. State, 37 Ark. 219 (1881); People v. Werner, 174 N.Y. 132, 66 N.E. 667 (1903); State v. Sasse, 6 S.D. 212, 60 N.W. 853 (1894).

**37.** State v. Dahnke, 244 Iowa 599, 57 N.W.2d 553 (1953); People v. Davin, 1 App. Div.2d 811, 148 N.Y.S.2d 903 (1956); West Allis v. Megna, 26 Wis.2d 545, 133 N.W.2d 252 (1965).

**38.** Garnett v. State, 332 Md. 571, 632 A.2d 797 (1993). See also State v. Oar, 129 Idaho 337, 924 P.2d 599 (1996); State v. Yanez, 716 A.2d 759 (R.I.1998), noted at 5 Roger Wms.U.L.Rev. 499 (2000)(but with forceful dissent); and further discussion in § 7.20(c).

**39.** Garnett v. State, 332 Md. 571, 632 A.2d 797 (1993).

**40.** People v. Malinauskas, 202 Misc. 565, 110 N.Y.S.2d 314 (1952). See also United States v. Anton, 683 F.2d 1011 (7th Cir.1982) (8 U.S.C.A. § 1326, on reentry by deported alien, construed to require at least negligence, and thus defendant could defend on ground he reasonably believed he had the requisite consent of the Attorney General to reenter); Perez v. State, 111 N.M. 160, 803 P.2d 249 (1990) (in statutory

rape case, where defendant told by victim and another that victim over the age limit, court says that "while we do not hold that knowledge of the victim's age is an element of the offense, we do hold that under the facts of this case the defendant should have been allowed to present his defense of mistake of fact").

**41.** State v. Williams, 94 Ohio App. 249, 115 N.E.2d 36 (1952). See also United States v. Delahoussaye, 573 F.2d 910 (5th Cir.1978) (regulation prohibiting shooting of migratory game birds over a baited field interpreted to have "should have known" scienter requirement re baited field, as contrary interpretation "would simply render criminal conviction an unavoidable occasional consequence of duck hunting"); United States v. Herbert, 698 F.2d 981 (9th Cir.1983) (despite the fact that generally a violation of 26 U.S.C.A. § 5861 does not require proof that defendant knew possession of certain types of weapons was against the law or that weapon he possessed was of the type required to be registered, such strict liability would not be applied to "an ordinary firearm that is internally and undetectably modified to be automatic yet legal in appearance," as surely "Congress did not intend that this statute be so draconian").

These courts, in effect, have concluded that the statute is *not* an absolute liability statute but rather requires negligence,[42] and thus their holding do not conflict with the general principle that ignorance or mistake of fact or law is a defense only if it negates a required mental state.

### (c) The "Lesser Legal Wrong" and "Moral Wrong" Theories

It sometimes happens that because of ignorance or mistake of fact or law, the defendant is unaware of the magnitude of the wrong he is doing. That is, if the circumstances were as the defendant believed them to be, then he would be guilty of some lesser crime or else a noncriminal but (in the eyes of society) immoral act. For example, assume that the defendant, in a jurisdiction which by statute makes burglary of a dwelling a more serious offense than burglary of a store, reasonably believes that the building he has entered is a store when it is in fact a dwelling. Is he guilty of the crime of burglary of a dwelling, or of the crime of burglary of a store, or neither? Or, assume a defendant is charged with the crime of statutory rape, but he shows that he reasonably believed the girl had reached the age of consent so that, at most he thought he was merely engaging in an immoral act. Is he, or is he not, guilty of the crime of statutory rape?

Some cases appear to support the general proposition that in such instances the mistake by the defendant may be disregarded because of the fact that he actually intended to do some legal or moral wrong. For that reason, the assumption seems to be, he is not deserving of the usual ignorance or mistake defense. Thus, in the leading English case of *Regina v. Prince*,[43] where the defendant, charged with unlawfully taking a girl under the age of sixteen out of the possession of the father against his will, acted on the reasonable belief that the girl was eighteen, it was held no defense that he "thought he was committing a different kind of wrong from that which in fact he was committing." And in *White v. State*,[44] where the defendant was convicted of the statutory offense of abandoning a pregnant wife, it was held that his defense that he did not know his wife was pregnant was properly refused, for in any event his abandonment was "a violation of his civil duty," and thus he acted at his peril. Similar reasoning accounts in part for the nearly unanimous view that a reasonable mistake of age is not a defense to a charge of statutory rape.[45] As one court explicitly stated, even under his own understanding of the circumstances the defendant intended to commit the crime of

---

fornication, and on that different and more serious

Although the matter assumption in these cases the strict liability variety law as a defense. Rather, ignorance or mistake sh indicate that the defenda or moral wrong. (In the defendant would have mistakenly believed the not know he was doing and moral wrong theorie a "guilty mind," in a ve tion of penal sanctions knowingly, recklessly or the statute. That is, the rests ultimately on th observed the community

That position is un substantive criminal la crimes defined in term fault of the same kind a other kind of crime wi intent to injure a pe property, may not res destroy-property type deterrence, correction, focus attention upon t caused. In the above tion, he stands in need is warranted as a det because of the actor's i is called for when, be defendant's mental st results his conduct ha

If this is true, the for failing to take acc as a result he though labelled immoral. "M duties,"[51] and thus w

---

**42.** Hence the conclusion that a negligent mistake of fact can *never* suffice in the case of a supposed strict liability offense. State v. Schmidt, 640 N.W.2d 702 (N.D. 2002).

**43.** L.R. 2 Cr.Cas.Res. 154 (1875).

**44.** 44 Ohio App. 331, 185 N.E. 64 (1933).

**45.** See, e.g., People v. Olsen, 36 Cal.3d 638, 205 Cal.Rptr. 492, 685 P.2d 52 (1984); People v. Cash, 419 Mich. 230, 351 N.W.2d 822 (1984); Jenkins v. State, 110 Nev. 865,

877 P.2d 1063 (1994). The cases are collected in Annot., 8 A.L.R.3d 110 (1966).

Of course, the result may be otherwise under a modern code which particularizes the limited circumstances in which a statute may be read as imposing strict liability. See, e.g., State v. Elton, 680 P.2d 727 (Utah 1984) (because under code scheme unlawful sexual intercourse statute cannot be construed as a strict liability offense, prosecution must prove at least recklessness or mistake as to the girl's age).

**46.** Commonwealth v Mass. 66, 42 N.E. 504 (189

**47.** P. Brett, An Inqui Guilt 149 (1963).

**48.** That position is ex but one of the modern cc

fornication, and on that basis he may be held accountable for a crime different and more serious than he intended.[46]

Although the matter is sometimes not made entirely clear, the assumption in these cases is not merely that the crimes involved are of the strict liability variety, thus barring ignorance or mistake of fact or law as a defense. Rather, they rest upon the notion that *some* varieties of ignorance or mistake should not be a defense, namely, those which indicate that the defendant still intended to do what constitutes a legal or moral wrong. (In the *Prince* case, for example, it was noted that the defendant would have a valid defense if he were to show that he mistakenly believed the girl's father had consented, for then he "would not know he was doing an act wrong in itself.") The lesser legal wrong and moral wrong theories, then, are grounded upon the proposition that a "guilty mind," in a very general sense, should suffice for the imposition of penal sanctions even when the defendant did not intentionally, knowingly, recklessly or even negligently engage in the acts described in the statute. That is, the defense of ignorance or mistake of fact or law "rests ultimately on the defendant's being able to say that he has observed the community ethic."[47]

That position is unsound, and has no place in a rational system of substantive criminal law.[48] As noted herein,[49] it is generally true that crimes defined in terms of causing a certain bad result require mental fault of the same kind and intensity, and mental fault sufficient for some other kind of crime will not suffice. (For example, acts done with an intent to injure a person, if they unexpectedly result in injury to property, may not result in conviction of the actor for an intent-to-destroy-property type of crime.[50]) This is because considerations of deterrence, correction, and just condemnation of the actor's conduct all focus attention upon the harm intended rather than the harm actually caused. In the above example, the actor's conduct deserves condemnation, he stands in need of correction, and official response to his actions is warranted as a deterrent—*not* because of the property damage, but because of the actor's intent to harm a person. Clearly, the same analysis is called for when, because of ignorance or mistake of fact or law, the defendant's mental state is not of the same kind or intensity as the bad results his conduct has brought about.

If this is true, then it obviously follows that there is no justification for failing to take account of the defendant's ignorance or mistake when as a result he thought he was doing something which at most may be labelled immoral. "Moral duties should not be identified with criminal duties,"[51] and thus when fornication is itself not criminal it should not

**46.** Commonwealth v. Murphy, 165 Mass. 66, 42 N.E. 504 (1896).

**47.** P. Brett, An Inquiry Into Criminal Guilt 149 (1963).

**48.** That position is expressly adopted in but one of the modern codes. Me.Rev.Stat.

Ann. tit. 17–A, § 36. Compare the statutes cited in note 58 infra.

**49.** See § 6.3.

**50.** Regina v. Pembliton, 12 Cox Crim. Cas. 607 (1874).

**51.** Hughes, Criminal Responsibility, 16 Stan.L.Rev. 470, 481 (1964).

403

become criminal merely because the defendant has made a reasonable mistake about the age of the girl with whom he has intercourse. Moreover, the moral wrong theory poses the added difficulty of determining precisely what the "community ethic" actually is, not an easy task in a heterogeneous society in which our public pronouncements about morality often are not synonymous with our private conduct.

This is not to say, however, that the law should always recognize as a defense ignorance or mistake of fact or law by which the actor believes he is only committing a lesser degree of crime or merely an immoral act. There may be sound policy reasons for, in effect, imposing strict liability as to certain elements of particular crimes. Indeed, illustrations of this are to be found in the Model Penal Code, which clearly rejects the lesser legal wrong and moral wrong theories as general principles. For example, the Code position on sex offenses is that when criminality depends on a child's being below the age of 10, it is then and only then no defense that the actor believed the child to be older,[54] "for no credible error regarding the age of a child in fact less than 10 years old would render the actor's conduct anything less than a dramatic departure from societal norms."[55] The point is that such judgments should be made as matters of policy on an offense-by-offense basis, as in the Code,[56] in lieu of uncritical acceptance of the more general lesser legal wrong and moral wrong theories.

When one of those exceptional situations is not present, so that ignorance or mistake of fact or law is a defense, yet the defendant would be guilty of some other crime if the facts had been as he believed them to be, there remains the question of what disposition is appropriate. To return to an earlier illustration, what if the defendant is on trial for burglary of a dwelling, but he shows by way of defense that he believed the building to be a store, and burglary of a store constitutes a lesser crime? As already concluded, conviction for burglary of a dwelling would not be possible because the mistake negates a required mental state. Moreover, conviction for burglary of a store might appear to be precluded because the required *actus reus* is not present; and even conviction of attempted burglary of a store might be in doubt under some versions of the impossibility doctrine.[57] Under the Model Penal Code, the defendant in these circumstances may be convicted "of the offense of which he

would be guilty had the provision avoids some pro ate result whereby the d which on his own assumpt

**(d) Belief Conduct**

bears repeating here that the significance of the d failure to distinguish two defendant consequently l of the crime and thus, as

**52.** People v. Hernandez, 61 Cal.2d 529, 39 Cal.Rptr. 361, 393 P.2d 673 (1964). See also Myers, Reasonable Mistake of Age: A Needed Defense to Statutory Rape, 64 Mich.L.Rev. 105 (1965). As discussed in the text following, the result is different if the legislature has made statutory rape a strict liability offense. See, e.g., Goodrow v. Perrin, 119 N.H. 483, 403 A.2d 864 (1979).

**53.** Hughes, supra note 51, at 481.

**54.** Model Penal Code § 213.6(1).

**55.** Model Penal Code § 213.6, Comment at 414 (1980).

**56.** Compare with the situation discussed in the preceding text that covered by

Model Penal Code § 223.1. Though the traditional view was "that the amount actually stolen determined whether the offense was grand or petty theft," meaning a defendant's reasonable mistake as to value was no defense to a charge of grand theft, that position is rejected in the Code because the "amount involved in a theft has criminological significance only if it corresponds with what the thief expected or hoped to get." Model Penal Code § 223.1, Comment at 146 (1980).

**57.** See § 11.5.

**58.** Model Penal Code § 2. modern codes contain a provis like the Model Penal Code which contemplates that the reduce the grade and degre fense." Alaska Stat. § 11.81.6 ed to mistake of victim's age property); Ark.Code Ann. § refers only to mistake of fa Stat. § 702–218 (but refers on of fact); N.J.Stat.Ann. § 2C Ky.Rev.Stat.Ann. § 501.070 () mistake would relieve of lia would be guilty of another o situation been as he suppos may be convicted of that of which if read literally would ousness of the crime determ dant's mental state, even if was more serious than indi dant's acts.

Another variation found i ern codes is that mistakes when they negate a ment that the defendant may be included offense of which guilty if the fact or law wer it to be." Ill.Comp.Stat § 5/4–6; Kan.Stat.Ann. § Code Ann. § 39–11–502 (b) mistake of fact); Tex.Pe § 8.02 (mistake of fact o Ann. § 76–2–304. This va criticized because no con permissible if defendant committing some other cr nically, is not included w charged (e.g., charge is ar other offense is arson o Robinson, Criminal § 62(c)(5) (1984). As obse nal Code § 2.04, Comm No. 4, 1955), there ar thought on this. One i only of an included offen ble, for otherwise the o received sufficient noti against him; the other

would be guilty had the situation been as he supposed."[58] Such a provision avoids some procedural difficulties,[59] and permits an appropriate result whereby the defendant is found "guilty of the lesser crime which on his own assumptions he committed."[60]

**(d) Belief Conduct Not Proscribed by the Criminal Law.** It bears repeating here that the cause of much of the confusion concerning the significance of the defendant's ignorance or mistake of law is the failure to distinguish two quite different situations: (1) that in which the defendant consequently lacks the mental state required for commission of the crime and thus, as explained above, has a valid defense;[61] and (2)

---

**58.** Model Penal Code § 2.04(2). A few modern codes contain a provision essentially like the Model Penal Code formulation, which contemplates that the mistake will "reduce the grade and degree of the offense." Alaska Stat. § 11.81.620 (but, limited to mistake of victim's age or value of property); Ark.Code Ann. § 5–2–206 (but refers only to mistake of fact); Haw.Rev. Stat. § 702–218 (but refers only to mistake of fact); N.J.Stat.Ann. § 2C:2–4. Compare Ky.Rev.Stat.Ann. § 501.070 (if ignorance or mistake would relieve of liability "but he would be guilty of another offense had the situation been as he supposed it was, he may be convicted of that other offense"), which if read literally would have the seriousness of the crime determined by defendant's mental state, even if the crime then was *more* serious than indicated by defendant's acts.

Another variation found in several modern codes is that mistakes are a defense when they negate a mental state, except that the defendant may be convicted of "an included offense of which he would be guilty if the fact or law were as he believed it to be." Ill.Comp.Stat.Ann. ch. 720, § 5/4–6; Kan.Stat.Ann. § 21–3203; Tenn. Code Ann. § 39–11–502 (but refers only to mistake of fact); Tex.Penal Code Ann. § 8.02 (mistake of fact only); Utah Code Ann. § 76–2–304. This variation has been criticized because no conviction would be permissible if defendant thought he was committing some other crime which, technically, is not included within the offense charged (e.g., charge is arson of a dwelling, other offense is arson of a store). 1 P. Robinson, Criminal Law Defenses § 62(c)(5) (1984). As observed in Model Penal Code § 2.04, Comment (Tent. Draft No. 4, 1955), there are two schools of thought on this. One is that conviction only of an included offense should be possible, for otherwise the defendant has not received sufficient notice of the charge against him; the other is that defendant

needs no such notice when he defends by avowing his effort to commit some other crime.

**59.** The lesser offense might not be an included offense, so that conviction of the lesser on a charge of having committed the greater offense would not be permissible. However, deviation from the principal that the requirement of fair notice to the defendant limits conviction to the offense charged or an included offense would be justified, for the defendant can hardly claim lack of fair notice when he has raised his intention to commit the lesser crime as a matter of defense. See Model Penal Code § 2.04, Comment at 273 n. 11 (1985).

**60.** Ibid. See, e.g., State v. Guest, 583 P.2d 836 (Alaska 1978) (adopting Model Penal Code position and holding that if defendant, charged with statutory rape, reasonable believed the girl was 16, he could not be convicted of that crime; defined in terms of girls under 16, but could be convicted of contributing to the delinquency of a minor, defined in terms of all minors under 18).

Cf. State v. Freeman, 450 N.W.2d 826 (Iowa 1990) (reliance on this provision in holding defendant who sold simulated controlled substance could be convicted of that crime though he believed he selling actual controlled substance, as he "would not be innocent of wrongdoing had the situation been as he supposed").

**61.** It is possible, of course, that a defendant unaware that his conduct is proscribed by law (otherwise a case belonging in the second category stated in the text following) will fall into this first category because the mental state is so stated. See Ratzlaf v. United States, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (despite "venerable principle that ignorance of the law generally is no defense to a criminal charge," Congress may sometimes, as here, proscribe only certain conduct "willfully" done in sense of done with knowledge con-

that in which the defendant still had whatever mental state is required for commission of the crime and only claims that he was unaware that such conduct was proscribed by the criminal law, which, as explained below, is ordinarily not a recognized defense.[62]

Except for one particular situation which is explored later in this section, it is usually an easy task to determine in which of these two categories the defendant's mistake belongs.[63] For example, the crime of larceny is not committed if the defendant, because of a mistaken understanding of the law of property, believed that the property taken be-

longed to him;[64] it i
was lawful to take ce
of the custom in the
(intent to steal[66]) is 1
not the intent to vio.
is a violation of law"

Why is it that r
that the defendant i
nor mistake of the
mistakenly conclud(
conduct) is a defens
and knowable,"[69] o1
that everyone is pres
a time when the cri
such a presumption
"so far-fetched in m
really "know" all
conduct. Indeed, the
the ignorance-of-the
been applied even w
he had good reason 1

A somewhat m
pragmatic propositi

duct unlawful because that conduct not "obviously 'evil' or inherently 'bad' ''); Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (because tax laws are so complicated, Congress in enacting the statutory crime of tax evasion made "intent to violate the law an element").

**62.** Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) (Court reads into statute on sale of drug paraphernalia a requirement that "a defendant must act knowingly," but then stresses government "need not prove specific knowledge that the items are 'drug paraphernalia' within the meaning of the statute"; "it is sufficient for the Government to show that the defendant 'knew the character and nature of the materials' with which he dealt"); United States v. Mitchell, 209 F.3d 319 (4th Cir. 2000); United States v. Fuller, 162 F.3d 256 (4th Cir.1998); Mueller v. Sullivan, 141 F.3d 1232 (7th Cir.1998); United States v. Gabriel, 125 F.3d 89 (2d Cir.1997); United States v. Pitrone, 115 F.3d 1 (1st Cir.1997); United States v. Baker, 807 F.2d 427 (5th Cir.1986); People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987); State v. Dann, 167 Vt. 119, 702 A.2d 105 (Vt.1997).

It is possible, of course, for the legislature to provide in certain circumstances that ignorance of the law is an excuse. See, e.g., the cases in note 87 infra, finding such a legislative intent. But most courts are not prepared to depart from the general principle that ignorance of the law is no excuse unless such a legislative intention clearly appears. See United v. International Minerals and Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (given that general principle, "knowingly violates any such regulation" language of statute construed as "a shorthand designation for specific acts or omissions which violate the Act" rather than as a requirement defendant know what the regulations proscribe).

**63.** Difficulties are most likely to arise when the statute is unclear as to the extent of the mental state requirement, as in Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). At issue there was the meaning of 7 U.S.C.A. § 2024(b), providing that "whoever knowingly uses, transfers, acquires, alters, or possesses [food stamp] coupons or authorization cards in any manner not authorized by" statute or regulations is guilty of a crime. The Court interpreted the statute as meaning the defendant must know his acquisition or possession of food stamps was unauthorized by law. However, the majority mischaracterized the issue by asserting that it was whether the statute should be read as requiring such knowledge or, on the other hand, as a strict liability offense. The dissent correctly pointed out that a contrary reading of the statute would not involve "creating a strict liability offense," for it still would be true that a defendant could not be convicted if "he was unaware of the circumstances of the transaction that made it illegal."

As the Court later concluded in Bryan v. United States, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998), the requirement that defendant "knowingly" engage in certain conduct refers to knowledge of the facts constituting the offense, as distinguished from knowledge that the conduct is unlawful. See, e.g., United States v. Frazier-El, 204 F.3d 553 (4th Cir.2000) (notwithstanding fact that possession of firearm by felon statute has mens rea of "knowingly," defendant's belief type of weapon he had was exempted under the statute no defense, as the "conventional mens rea of criminal statutes, unless Congress clearly specifies otherwise, requires not that a defendant know that his conduct was illegal, but only that he 'know the facts that make his conduct illegal' ").

Another statutory ambiguity arises out of use of the word "willful." See Tigar, "Willfulness" and "Ignorance" in Federal Crim-

nal Law, 37 Clev.St.L.Re
§ 5.1 note 9.

**64.** State v. Sawyer, !
461 (1920).

**65.** Commonwealth
5 (1848).

**66.** See § 19.5.

**67.** State v. Downs,
S.E. 689 (1895).

**68.** It has been ar
meaning of a statute is
not been judicially deter
acted 'in good faith' s
guilty of crime if his c
been proper had the stat
reasonably believed' it t
court should decide lat
construction is otherwi
rance and Mistake in
U.Pa.L.Rev. 35, 45 (19
has not prevailed. See,
rero, 69 N.Y.2d 382, 51!
N.E.2d 1068 (1987) (quo
man, Mistake of Law
U.Chi.L.Rev. 641, 667
cludes that if "a statute
nite to meet [the not
test, it is hard to see
mistake of law is neede
vagueness doctrine, see

longed to him;[64] it is committed, however, if the defendant believed it was lawful to take certain kinds of property belonging to others because of the custom in the community to do so.[65] The requisite mental state (intent to steal[66]) is lacking only in the first of these two cases, for it "is not the intent to violate the law but the intentional doing the act which is a violation of law"[67] which is proscribed.

Why is it that neither ignorance of the criminal law (in the sense that the defendant is unaware of the statute proscribing his conduct[68]) nor mistake of the criminal law (in the sense that the defendant has mistakenly concluded that the relevant statute does not reach his conduct) is a defense? Upon the early notion that the law is "definite and knowable,"[69] one common explanation is provided by the maxim that everyone is presumed to know the law.[70] But even if there was once a time when the criminal law was so simple and limited in scope that such a presumption was justified, it is now an "obvious fiction"[71] and "so far-fetched in modern conditions as to be quixotic."[72] No person can really "know" all of the statutory and case law defining criminal conduct. Indeed, the maxim has never served to explain the full reach of the ignorance-of-the-law-is-no-excuse doctrine, for the doctrine has long been applied even when the defendant establishes beyond question that he had good reason for not knowing the applicable law.[73]

A somewhat more satisfying explanation for the doctrine is the pragmatic proposition that if all defendants were entitled to raise an

nal Law, 37 Clev.St.L.Rev. 525 (1989). See § 5.1 note 9.

**64.** State v. Sawyer, 95 Conn. 34, 110 A. 461 (1920).

**65.** Commonwealth v. Doane, 55 Mass. 5 (1848).

**66.** See § 19.5.

**67.** State v. Downs, 116 N.C. 1064, 21 S.E. 689 (1895).

**68.** It has been argued that if "the meaning of a statute is not clear, and has not been judicially determined, one who has acted 'in good faith' should not be held guilty of crime if his conduct would have been proper had the statute meant what he reasonably believed' it to mean, even if the court should decide later that the proper construction is otherwise." Perkins, Ignorance and Mistake in Criminal Law, 88 U.Pa.L.Rev. 35, 45 (1939). But this view has not prevailed. See, e.g., People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987) (quoting Hall and Seligman, Mistake of Law and Mens Rea, 8 U.Chi.L.Rev. 641, 667 (1941), court concludes that if "a statute is sufficiently definite to meet [the not void-for-vagueness] test, it is hard to see why a defense of mistake of law is needed"). On the void-for-vagueness doctrine, see § 2.3.

**69.** 1 J. Austin, Jurisprudence 497 (4th ed. 1879).

**70.** Weeks v. State, 24 Ala.App. 198, 132 So. 870 (1931); State v. Bellows, 596 N.W.2d 509 (Iowa 1999); Satterfield v. State, 172 Neb. 275, 109 N.W.2d 415 (1961).

**71.** J. Hall, General Principles of Criminal Law 376 (2d ed.1960). Consider, e.g., the study showing that "residents of states * * * that had adopted a minority position on some aspect of criminal law reported the relevant law of their state to be no different than did citizens of 'majoritarian' states," Darley, Carlsmith & Robinson, The Ex Ante Function of the Criminal Law, 35 Law & Soc'y Rev. 165 (2001).

**72.** J. Hall, supra note 71, at 378.

**73.** In one classic case the defendant was at sea and beyond all communications when the statute was enacted and when he violated it. Rex v. Bailey, 168 Eng.Rep. 651 (1800); In another he was a foreigner recently arrived from a country where the conduct was not criminal, Rex v. Esop, 173 Eng.Rep. 203 (1836). See also People v. Bock, 69 Misc. 543, 125 N.Y.S. 301, affirmed 148 App.Div. 899, 132 N.Y.S. 1141 (1911); Oakland v. Carpentier, 21 Cal. 642 (1863).

ignorance-of-the-criminal-law defense, then the finders of fact in criminal cases would repeatedly be confronted with an issue which in most instances could not be readily resolved. Both commentators[74] and courts[75] have argued that such a defense would become a shield for the guilty because (a) the defendant's claim of ignorance could not ordinarily be refuted, and (b) assuming the defendant was in fact ignorant, it would require a far-reaching inquiry to ascertain whether the defendant was at fault in not knowing the law. Holmes questioned whether "a man's knowledge of the law is any harder to investigate than many questions which are gone into,"[76] as have others,[77] and thus it may be doubted if part (a) of the above argument is sound. The same may not be said for part (b) of the argument, however; the questions involved in pursuing an inquiry into whether or not the defendant was at fault in his ignorance would be "even more complicated than those raised by the defenses of insanity and infancy, where the justification for the defendant's failure to know of the law and mores is not in issue, being assumed to be due to mental disease or youth."[78]

Another argument in favor of the present rule is that while it may be harsh upon the individual defendant who was reasonably ignorant or mistaken concerning the penal law, "public policy sacrifices the individual to the general good."[79] The "larger interests on the other side of the scales"[80] include realization of the educational function of the criminal law. So the argument goes, conviction of defendants for violation of new or forgotten criminal laws serves to bring home to the general public the existence of these rules and aids in establishing them as the social mores of the community.[81] If individuals were acquitted because of their own unawareness of the law, such acquittals would—if anything—only increase the public uncertainty and confusion as to what conduct has been made criminal.

A related point, on a somewhat more theoretical plane, is that it would conflict with the principle of legality to treat a defendant in a

**74.** J. Austin, supra note 69, at 498–99.

**75.** United States v. Aguilar, 883 F.2d 662 (9th Cir.1989); People v. O'Brien, 96 Cal. 171, 31 P. 45 (1892); People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987).

**76.** O. Holmes, The Common Law 48 (1881).

**77.** "The fear that an issue of knowledge of the law cannot be adjudicated seems to be unfounded. If a normal adult fires at another at point-blank range, his defense that he did not intend to kill would be received with incredulity, and so would a defense that he did not know murder to be a crime. On the other hand, if he shoots another when hunting at dusk, his defense that he did not intend to kill a man might be believed; and in the same way his belief that he is entitled by law to shoot a would-

be thief might be believed whether it represents the true legal position or not" (G. Williams, Criminal Law: The General Part 291 (2d ed.1961).

**78.** Hall and Seligman, Mistake of Law and Mens Rea, 8 U.Chi.L.Rev. 641, 647 (1941). It has sometimes been suggested that this problem may be solved by imposing a "duty to inquire" as to the law, but just when the circumstances should be deemed to have prompted one to do so is itself a very difficult question. See Singer, The Proposed Duty to Inquire as Affected by Recent Criminal Law Decisions in the United States Supreme Court, 3 Buff.Crim. L.Rev. 701 (2000).

**79.** O. Holmes, supra, note 76, at 48.

**80.** Ibid.

**81.** G. Williams, supra note 77, at 289; Hall and Seligman, supra note 78, at 648.

criminal case as if the law were as the defendant thought it to be. Under the principle of legality, rules of law express objective meanings which are declared by competent officials and which are then binding.[82] There "is a basic incompatibility between asserting that the law is what certain officials declare it to be after a prescribed analysis, and asserting, also, that those officials *must* declare it to be * * * what defendants or their lawyers believed it to be. A legal order implies the rejection of such contradiction. It opposes objectivity to subjectivity, judicial process to individual opinion, official to lay, and authoritative to nonauthoritative declarations of what the law is."[83]

Whatever the merit of these several arguments in support of the general rule that ignorance or mistake as to the penal law is no defense, several commentators have expressed concern with the harshness of the rule when applied to the lesser regulatory crimes involving conduct not inherently immoral.[84] The early criminal law was "well integrated with the mores of the time," so that "a defendant's mistake as to the content of the criminal law * * * would not ordinarily affect his moral guilt."[85] But the vast network of regulatory offenses which make up a large part of today's criminal law does not stem from the mores of the community, and so "moral education no longer serves us as a guide as to what is prohibited."[86] Under these circumstances, where one's moral attitudes may not be relied upon to avoid the forbidden conduct, it may seem particularly severe for the law *never* to recognize ignorance or mistake of the criminal law as a defense.[87] Moreover, some would question whether

**82.** J. Hall, supra note 71, at 383.

**83.** Ibid. Compare Kahan, Ignorance of Law is an Excuse—But Only for the Virtuous, 96 Mich.L.Rev. 127 (1997), questioning the various traditional explanations for the doctrine.

**84.** See Cass, Ignorance of the Law: A Maxim Reexamined, 17 Wm. & Mary L.Rev. 671, 689–99 (1976); Fletcher, The Individualization of Excusing Conditions, 47 So.Cal. L.Rev. 1269, 1295–99 (1974); Seney, "When Empty Terrors Overawe"—Our Criminal Law Defenses (Part Two), 19 Wayne L.Rev. 1359, 1364–76 (1973).

Courts taking this view may construe fault words in statutes accordingly. See, e.g., State v. Azneer, 526 N.W.2d 298 (Iowa 1995) (word "willfully" to be construed as including a knowing violation of law if offense "not inherently wrong," but only as initially acting if offense "inherently wrong").

**85.** Hall and Seligman, supra note 78, at 644.

**86.** Mueller, On Common Law Mens Rea, 42 Minn.L.Rev. 1043, 1060 (1958).

But consider Green, Why It's a Crime to Tear the Tag Off a Mattress: Overcriminalization and the Moral Content of Regulatory Offenses, 46 Emory L.J. 1533 (1997) (developing "a framework for determining whether, and when, the moral content of such offenses justifies the application of criminal sanctions").

**87.** Cases recognizing some sort of ignorance of law defense typically are of this type. See, e.g., Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (federal statute making it a crime to knowingly use, transfer, acquire, alter or possess food stamps in a manner not authorized by law interpreted to mean defendant must know what he did not authorized by statute or regulation, as otherwise the statute would "criminalize a broad range of apparently innocent conduct"); United States v. Weintraub, 273 F.3d 139 (2d Cir.2001) ("knowing" violation of Clean Air Act by one renovating or demolishing a building requires that defendant know building contains asbestos materials, for absent knowledge of such material "one would not expect regulation of such innocent activities," but government "need not establish the defendant's knowledge that the conduct proscribed by the statute involved the kind and quantity of asbestos sufficient to trigger the asbestos work-practice standard"); United States v. Simpson,

it is desirable to characterize as criminal an individual who has not demonstrated any degree of social dangerousness,[88] that is, a person whose conduct is not anti-social because (i) he reasonably thought the conduct was not criminal, and (ii) the conduct is not by its nature immoral.

The United States Supreme Court was confronted with this issue in *Lambert v. California*,[89] where the defendant had been convicted under an ordinance making it unlawful for any convicted person to remain in Los Angeles for more than five days without registering with the police department. The ordinance was held to violate the notice requirements of due process when applied to a defendant "who has no actual knowledge of his duty to register," for "circumstances which might move one to inquire as to the necessity of registration are completely lacking." This language is significant, for it emphasizes that the defendant was in no way at fault in not being aware of the legal duty in question. Thus, the holding in *Lambert* would be inapplicable to a defendant who could rightly be said to be under an obligation to ascertain the legality of his conduct. For example, it would certainly be proper to hold to the position that an individual has a "duty to keep informed about the legal regulation governing conduct in which [he] is peculiarly engaged,"[90] so that one engaged in the manufacture of dairy products could not defend on the ground of his ignorance of an available statute or administrative regulation prohibiting the sale of butter without a certain percentage of fat.[91]

---

561 F.2d 53 (7th Cir.1977) (on charge of willfully broadcasting without a license, mistake of law defense recognized for defendant who claimed he thought broadcasts lawful because his estranged wife had CB license and left the transmitter in family home); United States v. Lizarraga–Lizarraga, 541 F.2d 826 (9th Cir.1976) (statute on "willfully" exporting specified property from U.S. construed to allow defense that defendant did not know the law covered items he had; Congress assumed to have so intended because the statute prohibits exportation of items listed by administrative regulation, and the regulation contained an exhaustive list of items not "known generally to be controlled by government regulation"). See also the dissent in United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

By the same token, cases concluding that the mental state for the crime in question should *not* be interpreted as requiring awareness of the fact the conduct is proscribed by the criminal law often stress that the defendant's conduct was morally wrong. United States v. Moncini, 882 F.2d 401 (9th Cir.1989) (in defendant's prosecution for mailing child pornography into U.S., court rejects due process defense that conviction barred because defendant was ignorant of the law and was a foreigner prosecuted for acts done in his own country, where they are legal; court notes "child pornography laws are directly related to a commonly understood moral censure"); United States v. Baker, 807 F.2d 427 (5th Cir.1986) (concluding it "not surprising that Congress would allow conviction of one who knows that he is selling bogus 'Rolex' watches even though he does not know his conduct is punishable as a crime").

See Comment, 62 U.Chi.L.Rev. 1301, 1302 (1995), concluding that "mistake of law should be a viable defense * * * to all mala prohibita crimes requiring a mens rea of recklessness or higher."

**88.** See Ryu and Silving, Error Juris: A Comparative Study, 24 U.Chi.L.Rev. 421, 467 (1957).

**89.** 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

**90.** Mueller, supra, note 86, at 1060 n. 49.

**91.** Cf. the *Moncini* case, described in note 87 supra. See also United States v. Denis, 297 F.3d 25 (1st Cir.2002) (defendant "knowingly subjected himself to a host of state and federal regulations when

---

It is important to require legislative tan criminal law is no exc when it negatives a rec fairly simple to redraft that guilt depends upo is a statute making i payment of income t States[92] as not reachin the law to pay taxes. tion of statutes and r average citizen to kno obligations imposed by "intent to violate the offenses."[94] Analytical

he purchased a firearm," convicted of assaulting his that sufficient to "remove[ class of ordinary and innoc would expect no special re possession of a firearm").

**92.** 498 U.S. 192, 111 L.Ed.2d 617 (1991). *Cheek* Yochum, Cheek is Chic: Law is an Excuse for Tax ion That Does not Wear L.Rev. 249 (1993).

**93.** The Court went because the mental state i dant "knew of the duty," erred in concluding the de derstanding must be reaso

However, lower courts called "good faith defense *Cheek*-like interpretation question have sometimes demanding. See, e.g., Uni trie, 302 F.3d 1280 (11th good faith constitutes a to the charge of conspirac ey because it negates the of willfulness," proffered torney's advise properly the evidentiary predicat is that the defendant 't material facts to his attor good faith on the advice ney,'" neither of which s ed States v. Mathes, 1 Cir.1998) (where defenda willfully failing to pay to claimed that an attorney officer had both told hi quishment of his parent his obligation to pay chil ly accrued, that defense trial because defendant attorney a copy of the

It is important to note, however, that the *Lambert* decision does not require legislative tampering with the doctrine that ignorance of the criminal law is no excuse. Ignorance of the law, after all, *is* an excuse when it negatives a required mental element of the crime, so it would be fairly simple to redraft legislation of the kind condemned in *Lambert* so that guilt depends upon a knowing violation of a legal duty. Illustrative is a statute making it an offense knowingly to attempt to evade the payment of income taxes, properly interpreted in *Cheek v. United States*[92] as not reaching a defendant who was unaware of his duty under the law to pay taxes.[93] As the Supreme Court explained, the "proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws," and accordingly the Congress made "intent to violate the law an element of certain federal criminal tax offenses."[94] Analytically, this approach is to be preferred over that of

he purchased a firearm," and upon being convicted of assaulting his live-in girlfriend that sufficient to "remove[ ] him[ ] from the class of ordinary and innocent citizens who would expect no special restrictions on the possession of a firearm").

**92.** 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). *Cheek* is criticized in Yochum, Cheek is Chic: Ignorance of the Law is an Excuse for Tax Crimes—A Fashion That Does not Wear Well, 31 Duq. L.Rev. 249 (1993).

**93.** The Court went on to hold that because the mental state is whether defendant "knew of the duty," the court below erred in concluding the defendant's misunderstanding must be reasonable.

However, lower courts applying a so-called "good faith defense" as a result of a *Cheek*-like interpretation of the statute in question have sometimes been a bit more demanding. See, e.g., United States v. Petrie, 302 F.3d 1280 (11th Cir.2002) (while "good faith constitutes a complete defense to the charge of conspiracy to launder money because it negates the mens rea element of willfulness," proffered testimony of attorney's advise properly excluded here, as "the evidentiary predicate for this defense is that the defendant 'fully disclosed all material facts to his attorney' and 'relied in good faith on the advice given by his attorney,' " neither of which shown here); United States v. Mathes, 151 F.3d 251 (5th Cir.1998) (where defendant, charged with willfully failing to pay to pay child support, claimed that an attorney and his probation officer had both told him that his relinquishment of his parent rights extinguished his obligation to pay child support previously accrued, that defense properly rejected at trial because defendant never showed the attorney a copy of the judgment ordering

payment of child support and thus "did not fully disclose all of the pertinent facts to the attorney"); United States v. Johnson, 139 F.3d 1359 (11th Cir.1998) (where defendant charged with making false statements to government claimed reliance on advice of counsel, judge properly instructed jury such reliance "requires not only full and complete disclosure of the facts then known but also of material facts or information later acquired").

**94.** Because that was the concern of Congress, the Court concluded that the knowledge-of-duty element was not defeated if defendant knew of the law but believed, even reasonably, that it was unconstitutional as applied to him. In such circumstances, Congress anticipated that the person should pay the tax and then file for a refund and, if denied, then challenge the constitutionality of the tax in court.

Of course, the extent of the awareness required by the statute may vary from case to case, depending upon the circumstances. In Bryan v. United States, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998), where defendant was prosecuted for "willfully" violating the federal statute proscribing dealing in firearms without a federal license, the Court ruled the statute only required proof that the defendant knew his conduct was unlawful, not evidence he had specific awareness of the federal licensing requirement. As for defendant's reliance on *Cheek*, the Court distinguished it as a case involving a highly technical statute that threatened to ensnare individuals engaged in apparently innocent conduct, a danger deemed not present in *Bryan*.

The tendency of the federal courts to find that ignorance of the law is an excuse as to

411

creating an exception to the general rule that ignorance of the criminality of the conduct is no excuse, for neither Lambert nor Cheek should escape conviction merely because of ignorance that their conduct was punishable under the criminal law. Rather, the important matter is ignorance of the legal duty—in *Lambert* the duty to register, and in *Cheek* the duty to pay taxes.

**(e) Belief Conduct Not Proscribed Because of Governmental Action or Inaction.** Under the better view, there are limited situations in which the defendant's belief that his conduct was not proscribed by the criminal law is a defense. These exceptions are somewhat akin to the void-for-vagueness[95] and ex post facto[96] doctrines,[97] in that the government is rightly barred from obtaining a conviction because the government (through its representatives acting in an official capacity) is responsible for the inability of the defendant to know that his conduct was proscribed.

**(1) Enactment Not Reasonably Made Available.** A mere claim by the defendant that the statute under which he is being prosecuted had not come to his attention prior to the time he engaged in the conduct charged is, of course, not a valid defense.[98] But, in some instances the defendant may show more—either that his conduct occurred very soon after the statute was enacted and before it was made generally available, or that his conduct occurred later but still before the usual formalities of official publication had been fully complied with. Although the earlier decisions recognize no defense even under these circumstances,[99] the more rational position is that the defendant's belief that his conduct is not criminal is a defense when "the statute or other enactment defining the offense is not known to [him] and has not been published or otherwise reasonably made available prior to the conduct alleged."[100]

---

Such a situation state criminal legis mally these laws publication prior t necessarily true as ties, local ordinance available. Nor is it tive agencies, viola "substantive rules agencies must be p not attempted a sy: trative regulations.

**(2) Reasonak sion.** An individua other enactment u: he need not fear c declared invalid.[105] policy that the con legislation.[106] Thus believed the statut

---

a variety of federal statutes employing, as in *Bryan*, the mens rea of willfulness has been strongly criticized. See Davis, The Jurisprudence of Willfulness: An Evolving Theory of Excusable Ignorance, 48 Duke L.J. 341 (1998).

**95.** See § 2.3. See also United States v. Dollar Bank Money Market Account, 980 F.2d 233 (3d Cir.1992) (regarding 31 U.S.C.A. § 5324(3), proscribing the structuring of financial transactions "for the purpose of evading the reporting requirements of section 5313(a)," defendant need not know that what he is doing is proscribed by the criminal law, but does need to know of the reporting requirements and act to avoid them).

**96.** See § 2.4.

**97.** The relationship of these doctrines to the mistake-of-law area is explored in Hall and Seligman, supra note 78, at 654–55, 666–68.

**98.** Debardelaben v. State, 99 Tenn. 649, 42 S.W. 684 (1897).

**99.** State v. Click, 2 Ala. 26 (1841) (no official publication); Zakrasek v. State, 197 Ind. 249, 150 N.E. 615 (1926) (conduct 3 weeks after statute passed); Jellico Coal Co. v. Commonwealth, 96 Ky. 373, 29 S.W. 26 (1895) (conduct 6 weeks after statute passed).

**100.** Model Penal Code § 2.04(3)(a). A few modern codes contain such a provision. Me.Rev.Stat.Ann. tit. 17–A, § 36; N.J.Stat. Ann. § 2C:2–4, while a few others include a similar provision applicable only to "administrative regulations" and require also that defendant "could not have acquired such knowledge by the exercise of due diligence." Ill.Comp.Stat.Ann. ch. 720, § 5/4–8; Kan. Stat.Ann. § 21–3203; Mo.Ann.Stat. § 562.031; Mont.Code Ann. § 45–2–103.

It has been argued that this is a constitutional requirement. "If the due process

---

clause prevents one fro losing property in litij notice, and prevents injunction before notic vided, would it not al fore the effective date which the later adju Murphy, The Duty of Make the Law Known 265 (1982).

**101.** A number of cation as a precondi Model Penal Code § 2 Draft No. 4, 1955). Cc v. Casson, 434 F.2d 41 burglary and robbery effect immediately up tion by President, and to defendant's conduct

**102.** See § 2.6.

**103.** 5 U.S.C.A. §

**104.** "The old-tim in more than half the regulations in a centr that of the secretary that a lawyer or a par the state capital in or tive law. Even when l state capital, he ma: unable or unwilling t he seeks, for the reg unclassified or poorly are often inadequate

Such a situation is unlikely to arise today with respect to national or state criminal legislation; all such enactments are published, and normally these laws carry an "effective date" which affords time for publication prior to their actually becoming law.[101] The same is not necessarily true as to local legislation. Particularly in smaller communities, local ordinances may never be printed or otherwise made generally available. Nor is it often true of regulations promulgated by administrative agencies, violation of which may carry criminal sanctions.[102] While "substantive rules of general applicability" of federal administrative agencies must be published in the Federal Register,[103] many states have not attempted a systematic publication and codification of their administrative regulations.[104]

**(2) Reasonable Reliance Upon a Statute or Judicial Decision.** An individual should be able reasonably to rely upon a statute or other enactment under which his conduct would not be criminal, so that he need not fear conviction if subsequent to his conduct the statute is declared invalid.[105] A contrary rule would be inconsistent with the sound policy that the community is to be encouraged to act in compliance with legislation.[106] Thus, just as it is no defense that the defendant mistakenly believed the statute under which he was prosecuted to be unconstitution-

clause prevents one from being punished or losing property in litigation without prior notice, and prevents the operation of an injunction before notice of the order is provided, would it not also require notice before the effective date of the very law on which the later adjudication is based?" Murphy, The Duty of the Government to Make the Law Known, 51 Ford.L.Rev. 255, 265 (1982).

**101.** A number of states require publication as a precondition of effectiveness. Model Penal Code § 2.04, Comment (Tent. Draft No. 4, 1955). Compare United States v. Casson, 434 F.2d 415 (D.C.Cir.1970) (new burglary and robbery statutes for D.C. took effect immediately upon signing of legislation by President, and thus could be applied to defendant's conduct later that day).

**102.** See § 2.6.

**103.** 5 U.S.C.A. § 552.

**104.** "The old-time system still in effect in more than half the states is that of filing regulations in a central state office, usually that of the secretary of state. This means that a lawyer or a party may have to look to the state capital in order to know the effective law. Even when he goes or sends to the state capital, he may find that clerks are unable or unwilling to dig out the material he seeks, for the regulations often remain unclassified or poorly classified, the indexes are often inadequate or non-existent, and

piles of uncodified material may be either still effective or long superseded." 1 K. Davis, Administrative Law § 6.11 (1958).

**105.** Model Penal Code § 2.04(3)(b) so provides, as do several modern codes. Ala. Code § 13A–2–6; Ark.Code Ann. § 5–2–206; Colo.Rev.Stat.Ann. § 18–1–504; Conn.Gen. Stat.Ann. § 53a–6; Haw.Rev.Stat. § 702–218; Ill.Comp.Stat.Ann. ch. 720, § 5/4–8; Kan.Stat.Ann. § 21–3203; Ky.Rev.Stat.Ann. § 501.070; La.Rev.Stat.Ann. §§ 14:16, 14:17; Mo.Ann.Stat. § 562.031; Mont.Code Ann. § 45–2–103; N.H.Rev.Stat.Ann. § 626:3; N.J.Stat.Ann. §. 2C:2–4; N.Y.Penal Law § 15.20; Tex.Penal Code Ann. § 8.02.

Because the matter is put this way, these provisions do *not* cover the situation in which the defendant makes an erroneous (even if reasonable) interpretation of a statute but the statute is not thereafter found to be invalid. People v. Fraser, 96 N.Y.2d 318, 728 N.Y.S.2d 115, 752 N.E.2d 244 (2001); People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987).

**106.** Hall and Seligman, supra note 78, at 662–63. Because the matter is put this way, these provisions do *not* cover the situation in which the defendant makes an erroneous (even if reasonable) interpretation of a statute but the statute is not thereafter found to be invalid. People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987).

al,[107] it is a defense that he reasonably relied upon a statute permitting his conduct though it turned out to be an unconstitutional enactment.[108]

For essentially the same reason, the better view is that it is a defense that the defendant acted in reasonable reliance upon a judicial decision, opinion or judgment later determined to be invalid or erroneous.[109] The clearest case is that in which the defendant's reliance was upon a decision of the highest court of the jurisdiction, later overruled, whether the first decision involved the constitutionality of a statute,[110] the interpretation of a statute,[111] or the meaning of the common law.[112] A contrary rule, whereby the subsequent holding would apply retroactively to the defendant's detriment, would be as unfair as ex post facto legislation.[113]

There are several decisions supporting the proposition that reasonable reliance upon a decision of a lower court is likewise a defense. Thus, if the lower court has found a repealer statute constitutional,[114] has declared the relevant criminal statute unconstitutional,[115] or has enjoined enforcement of the statute,[116] there may be a basis for reasonable

reliance.[117] However, in t likely to arise a question been suggested, for exam it was known that the dec modern codes only recogn

**(3) Reasonable Re**
Consistent with the ab reasonably relies upon a tained in an administrati tion by the public officer tration, or enforcement that the conduct was not so when the defendant i license, as required by st such a license to the pro required.[123] In such a sit may reasonably be expec

---

107. Hunter v. State, 158 Tenn. 63, 12 S.W.2d 361 (1928). The same is true when the defendant believes that the statute could not constitutionally be applied to his conduct because of the assumption, for example, that his conduct is protected by the First Amendment. Holdridge v. United States, 282 F.2d 302 (8th Cir.1960).

Distinguishable are cases in which, because of a belief in the unconstitutionality of a statute, the defendant lacks a required mental state, as in Leeman v. State, 35 Ark. 438 (1880) (defendant's belief statute taking away his right to fees was unconstitutional a defense to extortion prosecution, for it negatived corrupt intent required for guilt). And see United States v. Spock, 416 F.2d 165 (1st Cir.1969), on the uncertainty as to the relevance of a belief that the conduct is constitutionally protected in the context of a conspiracy prosecution.

108. Brent v. State, 43 Ala. 297 (1869) (unconstitutional statute giving defendant right to carry on lottery a defense to prosecution for violation of general lottery statute); State v. Godwin, 123 N.C. 697, 31 S.E. 221 (1898) (statute relieving defendant public officials of duty a defense, though later declared unconstitutional). Contra: Swincher v. Commonwealth, 24 Ky.L.Rep. 1897, 72 S.W. 306 (1903) (unconstitutional statute permitting private police to carry weapons no defense).

While Model Penal Code § 2.04 requires "reasonable reliance" upon the statute, as generally do the cases interpreting similar provisions, e.g., Fowler v. State, 283 Ark. 325, 676 S.W.2d 725 (1984), Hall and Seligman, supra note 78, at 662, argue that

"such a defense should not necessarily rest on estoppel, and the defendant ought not to be required to prove knowledge of the law or his express reliance on its constitutionality."

109. Model Penal Code § 2.04(3)(b) so provides. Some modern codes contain similar provisions. Colo.Rev.Stat.Ann. § 18-1-504 (if decision "binding in the state of Colorado"); Conn.Gen.Stat.Ann. § 53a-6 (decision "of a state or federal court"); Ky. Rev.Stat.Ann. § 501.070; Me.Rev.Stat.Ann. tit. 17-A, § 36; N.H.Rev.Stat.Ann. § 626:3; N.J.Stat.Ann. § 2C:2-4; N.Y.Penal Law § 15.20 (decision of a state or federal court); Tex.Penal Code Ann. § 8.02 (decision of "court of record"); Utah Code Ann. § 76-2-304 (decision of "court of record"). Several others have provisions which are much more limited. See note 120 infra.

110. State v. O'Neil, 147 Iowa 513, 126 N.W. 454 (1910).

111. State v. Longino, 109 Miss. 125, 67 So. 902 (1915).

112. Stinnett v. Commonwealth, 55 F.2d 644 (4th Cir.1932).

113. See § 2.4.

114. Lutwin v. State, 97 N.J.L. 67, 117 A. 164 (1922).

115. State ex rel. Williams v. Whitman, 116 Fla. 196, 156 So. 705 (1934).

116. United States v. Mancuso, 139 F.2d 90 (3d Cir.1943); State v. Chicago, M. & St.P.R. Co., 130 Minn. 144, 153 N.W. 320 (1915); Coal & C.R. v. Conley, 67 W.Va. 129, 67 S.E. 613 (1910). Contra: State v.

Keller, 8 Idaho 699, 70 P. State v. Wadhams Oil Co., 149 N.W. 1121 (1912).

117. The same would seem the lower court only interpret nal statute as not reaching thereafter engaged in by the though a contrary result wa State v. Striggles, 202 Iowa 1 137 (1926).

118. There should be no c ever, if the matter has been federal court of appeals, even court is "lower" in the limit decisions of these courts are versal by the Supreme Cour States v. Albertini, 830 F.2d 1987) (where defendant convi uting leaflets outside naval conviction reversed by court First Amendment ground bas forum during open house, a thereon—before the Supre versed the court of appeals— gaged in the same conduct house, such reliance a bar

119. Hall and Seligman, at 672. See also Ostrosky v. 913 F.2d 590 (9th Cir.1990) process challenge in such even though lower court de this defendant; court distin the note 118 supra, because pellate court decision).

120. Ala.Code § 13A-2-cial decision of the highest court which has decided o Ark.Code Ann. § 5-2-206 Ill.Comp.Stat.Ann. ch. 720 sions of Illinois appellate c

reliance.[117] However, in the case of lower court decisions there is more likely to arise a question of whether the reliance is reasonable.[118] It has been suggested, for example, that reliance should not be a defense when it was known that the decision of the lower court was on appeal.[119] Some modern codes only recognize reliance upon appellate decisions.[120]

### (3) Reasonable Reliance Upon an Official Interpretation.

Consistent with the above, the better view is that if a defendant reasonably relies upon an erroneous official statement of the law contained in an administrative order or grant[121] or in an official interpretation by the public officer or body responsible for interpretation, administration, or enforcement of the law defining the offense, then his belief that the conduct was not criminal is a defense.[122] This is most obviously so when the defendant is prosecuted for engaging in activity without a license, as required by state law, and he shows that upon application for such a license to the proper authority he was advised that no license was required.[123] In such a situation, the defendant has done everything which may reasonably be expected of him.

Keller, 8 Idaho 699, 70 P. 1051 (1902); State v. Wadhams Oil Co., 149 Wis. 58, 134 N.W. 1121 (1912).

**117.** The same would seem to be true if the lower court only interpreted the criminal statute as not reaching the conduct thereafter engaged in by the defendant, although a contrary result was reached in State v. Striggles, 202 Iowa 1318, 210 N.W. 137 (1926).

**118.** There should be no question, however, if the matter has been decided by a federal court of appeals, even though such a court is "lower" in the limited sense that decisions of these courts are subject to reversal by the Supreme Court. See United States v. Albertini, 830 F.2d 985 (9th Cir. 1987) (where defendant convicted of distributing leaflets outside naval base but that conviction reversed by court of appeals on First Amendment ground base was a public forum during open house, and in reliance thereon—before the Supreme Court reversed the court of appeals—defendant engaged in the same conduct at a later open house, such reliance a bar to conviction).

**119.** Hall and Seligman, supra note 78, at 672. See also Ostrosky v. State of Alaska, 913 F.2d 590 (9th Cir.1990) (rejecting due process challenge in such circumstances, even though lower court decision involved this defendant; court distinguishes Albertini, note 118 supra, because it involved appellate court decision).

**120.** Ala.Code § 13A–2–6 ("latest judicial decision of the highest state or federal court which has decided on the matter"); Ark.Code Ann. § 5–2–206 (same as Ala.); Ill.Comp.Stat.Ann. ch. 720, § 5/4–8 (decisions of Illinois appellate or supreme court

or federal appellate court); Kan.Stat.Ann. § 21–3203 (decisions of Kansas supreme court or federal appellate court); La.Rev. Stat.Ann. §§ 14:16, 14:17 (decisions of "a competent court of last resort"); Mo.Ann. Stat. § 562.031 (decisions of "an appellate court"); Mont.Code Ann. § 45–2–103 (decisions of state supreme court or federal appellate court).

**121.** Model Penal Code § 2.04(3)(b)(iii) so provides. To the same effect are Colo. Rev.Stat.Ann. § 18–1–504; Conn.Gen.Stat. Ann. § 53a–6; Haw.Rev.Stat. § 702–218; Ky.Rev.Stat.Ann. § 501.070; N.H.Rev.Stat. Ann. § 626:3; N.J.Stat.Ann. § 2C:2–4; N.Y.Penal Law § 15.20; Tex.Penal Code Ann. § 8.02 (order must be "written" and by agency "responsible for interpreting the law"); Utah Code Ann. § 76–2–304 (same limits as Tex.).

**122.** Model Penal Code § 2.04(3)(b) so provides. To the same effect are Ala.Code § 13A–2–6 (opinion must be "written"); Colo.Rev.Stat.Ann. § 18–1–504 (opinion must be "written"); Conn.Gen. Stat.Ann. § 53a–6; Haw.Rev.Stat. § 702– 218; Ky.Rev.Stat.Ann. § 501.070; Me.Rev. Stat.Ann. tit. 17–A, § 36; N.H.Rev.Stat. Ann. § 626:3 (opinion must be "written"); N.J.Stat.Ann. § 2C:2–4; N.Y.Penal Law § 15.20; Tex.Penal Code Ann. § 8.02 (opinion must be "written"); Utah Code Ann. § 76–2–304 (opinion must be "written"). See, e.g., State v. Sheedy, 125 N.H. 108, 480 A.2d 887 (1984), applying such a provision. See Annot., 89 A.L.R.4th 1026 (1991). Some statutes are more limited as to what officials may be relied upon. See note 132 infra.

**123.** People v. Ferguson, 134 Cal.App. 41, 24 P.2d 965 (1933). Contra: State v. Foster, 22 R.I. 163, 46 A. 833 (1900).

But what if the defendant, not in the context of seeking a license or permit, obtains an advisory opinion from some enforcement official, most likely the local prosecuting attorney, that his contemplated conduct would not be in violation of the criminal law? "Local prosecuting attorneys and law officers have a duty to give legal opinions to the local officials within their district, and it is only natural for private citizens as well to come to them for advice on questions of criminal liability."[124] Thus, it would seem that here as well a defense of reasonable reliance[125] should be available. But in *Hopkins v. State*,[126] the defense was rejected on the ground that otherwise the prosecutor's advice "would become paramount to the law." Such an objection is ill-founded, for the law would still be paramount; the advice would establish a defense of good faith only for the individual who received it and only so long as that individual was not authoritatively advised to the contrary.[127]

Indeed, the result in *Hopkins* would appear to be contrary to due process, for to permit conviction of a person for conduct which he has been told by state officials is permissible "would be to sanction an indefensible sort of entrapment by the State."[128] Thus, as the Supreme Court held in *Cox v. Louisiana*,[129] demonstrators may not constitutionally be convicted of parading "near" a courthouse when they did so after the highest police officials of the city told them, in effect, that they could lawfully meet 101 feet from the courthouse steps.[130] Similarly, due process was held to bar conviction of persons for refusing to answer questions of a state investigating commission when they relied upon assurances of the commission that they had a privilege to refuse to answer, although in fact they did not.[131]

**124.** Hall and Seligman, supra note 78, at 679.

**125.** Just what reliance is reasonable can be a difficult issue. A rather strict view is taken in State v. Patten, 353 N.W.2d 30 (N.D.1984), where defendant, charged with removing a child from the state in violation of a custody decree, claimed the state's attorney had advised him this would not be criminal. The court held that the mistake of law defense did not extend to "conduct that is blatantly offensive."

**126.** 193 Md. 489, 69 A.2d 456 (1949).

**127.** This is not to suggest that assertions as to what the law "is" may be relied upon on into the indefinite future. United States v. Hancock, 231 F.3d 557 (9th Cir. 2000) ("The government cannot be estopped from prosecuting Defendant on the ground that it expressly told him the law in 1982, but failed at that time to inform him of the possibility that he could be exposed to prosecution in 1998 under a 1996 law").

**128.** Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). The situa-

tion is somewhat different, however, from the usual entrapment defense, see § 9.8, although the constitutional version of the defense is commonly referred to as "entrapment-by-estoppel." See, e.g., United States v. Hancock, 231 F.3d 557 (9th Cir. 2000).

**129.** 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

**130.** As noted in Commonwealth v. Kratsas, 564 Pa. 36, 764 A.2d 20 (2001), "most jurisdictions require that there be an affirmative representation that a certain conduct is legal. * * * It is frequently observed that mere laxity in law enforcement will not satisfy this condition, * * * nor will vague or contradictory messages."

**131.** Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). See also United States v. Tallmadge, 829 F.2d 767 (9th Cir.1987) (the *Cox–Raley* "entrapment by estoppel" rule means that defendant who was told by federally licensed firearms dealer that he could purchase firearms despite his prior felony conviction because earlier charge reduced to misdemeanor

It does not follow, [...] out any public official [...] upon the opinion receive [...] that the reliance itself [...] Penal Code, that the in [...] law with responsibility [...] ment of the law definin [...] the defense is unwarrar [...] not rely upon advice fro [...] concerning the closing [...] rely upon the court cl [...] opinion about the lawf [...]

could not be convicted of fe [...] offense); State v. Guzman, 8[...] P.2d 194 (App.1998) (on fe [...] *Cox*, court applies an "entrap [...] pel" defense grounded in tl [...] clause of the state constitut [...] Donovan, 53 Misc.2d 687, 27 [...] (Ct.Spec.Sess.1967) (police a [...] defendant seated in car par [...] property to leave the prope [...] estoppel barring convictio [...] while intoxicated); Common [...] sas, 564 Pa. 36, 764 A.2d 20 [...] defense grounded in state on [...] tution, issue to be decided [...] ant to pretrial motion).

In United States v. Penn [...] trial Chemical Corp., 411 U. [...] 1804, 36 L.Ed.2d 567 (197[...] defendant corporation was [...] voke a reasonable reliance [...] Court cited to both *Raley* ar [...]

**132.** Model Penal Cou [...] See, e.g., State v. Davis, 63 [...] N.W.2d 31 (1974) (county c [...] sel may give legal opinions [...] criminal matters, and the [...] member appointed as airp [...] the board had a defense [...] interest prosecution where [...] pointment was lawful).

Some of the modern cod [...] more narrowly what offici [...] upon. Ark.Code Ann. § 5– [...] agency responsible "for [...] administration"); Ill.Com [...] 720, § 5/4-8 ("legally aut [...] pret such statute"); Kan [...] 3203 (same); Mo.Ann. [...] (same); Tex.Penal Code An [...] Utah Code Ann. § 76-2-30 [...]

**133.** "Although the co [...] not state that the 'appro[...] official controlled in deci[...] defense, most courts stre[...]

It does not follow, of course, that one would be justified in seeking out any public official for such advice and then proceeding in reliance upon the opinion received. Whether viewed in terms of the requirement that the reliance itself be reasonable or, as also provided in the Model Penal Code, that the interpretation be obtained from one "charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense,"[132] such a broad interpretation of the defense is unwarranted.[133] Thus, for example, a tavern keeper could not rely upon advice from the mayor as to the meaning of the state law concerning the closing of bars on election day,[134] nor could a policeman rely upon the court clerk who administered his oath of office for an opinion about the lawfulness of the officer carrying a concealed weap-

could not be convicted of federal firearms offense); State v. Guzman, 89 Haw. 27, 968 P.2d 194 (App.1998) (on facts similar to *Cox,* court applies an "entrapment by estoppel" defense grounded in the due process clause of the state constitution); People v. Donovan, 53 Misc.2d 687, 279 N.Y.S.2d 404 (Ct.Spec.Sess.1967) (police action in telling defendant seated in car parked on private property to leave the property created an estoppel barring conviction for driving while intoxicated); Commonwealth v. Kratsas, 564 Pa. 36, 764 A.2d 20 (2001) (where defense grounded in state or federal constitution, issue to be decided by judge pursuant to pretrial motion).

In United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), holding the defendant corporation was entitled to invoke a reasonable reliance defense, the Court cited to both *Raley* and *Cox.*

**132.** Model Penal Code § 2.04(3)(b). See, e.g., State v. Davis, 63 Wis.2d 75, 216 N.W.2d 31 (1974) (county corporation counsel may give legal opinions on both civil and criminal matters, and thus county board member appointed as airport manager by the board had a defense to a conflict-of-interest prosecution where counsel said appointment was lawful).

Some of the modern codes describe even more narrowly what officials may be relied upon. Ark.Code Ann. § 5–2–206 (person or agency responsible "for interpretation or administration"); Ill.Comp.Stat.Ann. ch. 720, § 5/4–8 ("legally authorized to interpret such statute"); Kan.Stat.Ann. § 21–3203 (same); Mo.Ann.Stat. § 562.031 (same); Tex.Penal Code Ann. § 8.02 (same); Utah Code Ann. § 76–2–304 (same).

**133.** "Although the courts generally do not state that the 'appropriateness' of the official controlled in deciding to allow the defense, most courts stress the position of

authority of the given official and implicitly support the view that this position of authority is a crucial element of the defense." Comment, 66 Cal.L.Rev. 809, 826 (1978), collecting the cases id. at n. 74. See also Notes, 15 Am.J.Crim.L. 161 (1988) (on the "real" vs. "apparent" authority dispute in later national security cases); 1993 U.Ill. L.Rev. 565 (on proper dimensions of entrapment-by-estoppel defense).

But in United States v. Barker, 546 F.2d 940 (D.C.Cir.1976), where the defendants, one-time CIA operatives, were recruited to burglarize a psychiatrist's office on the representation that what was involved was a lawful investigation to obtain national security information, the court held these defendants were entitled to a mistake-of-law defense instruction even though their advice came from a person who was not in fact authorized to interpret, administer or enforce the law in question. In other words, their conduct would be excusable if based on a reasonable, good faith reliance on the apparent authority of a government official.

There exists a strong difference of opinion on the soundness of the *Barker* rule. One view is that reliance should be limited to those who are in fact the appropriate officials because such officials "are more likely than other officials to have made a careful study of the law's scope and effect" and "are in positions of accountability and responsibility, thus significantly decreasing the opportunity for abuse of power." Comment, supra, at 830. See also Note, 77 Colum.L.Rev. 775 (1977). Another is that "if the goal is to deter reliance on careless officials, the fairer approach would seem to be to punish the officials' carelessness, not an actor's reasonable reliance upon it." 2 P. Robinson, Criminal Law Defenses § 183(e) (1984).

**134.** Jones v. State, 32 Tex.Crim. 533, 25 S.W. 124 (1894).

on.[135] On the other hand, a chemical company could reasonably rely upon a Corps of Engineers' interpretation that the River and Harbor Act only prohibits water deposits that affect navigation, as the Corps "is the responsible administrative agency under the * * * Act."[136]

**(4) Reliance Upon** situations heretofore descr mistake-of-the-criminal-law of collusion is minimal, an ableness of the belief in le ty."[137] Is this not equally upon a private attorney persuasion that the answe that he consulted a reput: legality of his conduct, a character.[138] Here as we clearly shown that his a( abidingness.

Yet, the cases unifo these circumstances,[139] a principal reason for this is greater and that tho around for bad advice.[14] ward dishonesty already, gences, for a fee, in crim of the state' for whose a

**135.** State v. Simmons, 143 N.C. 613, 56 S.E. 701 (1907). See also United States v. Ormsby, 252 F.3d 844 (6th Cir.2001) (where entrapment-by-estoppel defense "is asserted with respect to a federal offense, representations or assurances by state or local officials lack the authority to bind the federal government as to an erroneous interpretation of federal law"); United States v. Ramirez–Valencia, 202 F.3d 1106 (9th Cir.2000) (no entrapment by estoppel where defendant, charged with being a deported alien found in U.S., relied upon fact INS form said it a felony to be so found "within five years," while in fact return illegal at any time, as form "did not affirmatively misrepresent that defendant could lawfully reenter the United States without permission after five years"); United States v. Gutierrez–Gonzalez, 184 F.3d 1160 (10th Cir.1999) (court holds that, consistent with Model Penal Code approach, see text at note 128 supra, "the defense of entrapment by estoppel requires that the 'government agent' be a government official or agency responsible for interpreting, administering, or enforcing the law defining the offense"); United States v. Ramos, 179 F.3d 1333 (11th Cir.1999) (defendant could not defend illegal importing charge on ground he knew others had been allowed to bring in such articles, as "[f]or a statement to trigger an entrapment-by-estoppel defense, it must be made directly to the defendant, not to others"; as for defendant's reliance on statements of unidentified customs agent, "the exchange was too vague to allow [defendant] to reasonably rely upon it"); United States v. West Indies Transport, Inc., 127 F.3d 299 (3d Cir.1997) (defendant's "entrapment by estoppel" defense under *Raley* and *Cox* fails, as defendant relied on private entities as to legality of ocean dumping); United States v. Achter, 52 F.3d 753 (8th Cir.1995) (cannot rely on state and local police as to whether weapon possession would violate federal law); Bsharah v. United States, 646 A.2d 993 (D.C.App.1994) (cannot rely on statement of subway station manager, an employee of interstate transit authority, that defendants could lawfully carry guns in D.C.); State v. DeCastro, 81 Haw. 147, 913 P.2d 558 (App.1996) (911 telephone operator not officially authorized to determine when criminal statute re obeying official order of policeman not applicable); People v. Marrero, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068 (1987) (fed-

eral corrections officer, who relied on "fel low officers and teachers" in deciding that the peace officer exception in the state weapons possession statute applied to him had no defense, as interpretation not by an officer responsible for administering, en forcing or interpreting the statute), dis cussed in Comment, 54 Brooklyn L.Rev 229 (1988); Miller v. Commonwealth, 25 Va App. 727, 492 S.E.2d 482 (1997) (as for defendant's reliance on information that he could possess a firearm notwithstanding his felony conviction, it necessary that "the source of the information is a public officer or body charged by law with responsibility for defining permissible conduct with re spect to the offense at issue," which does not include federal ATF agent, who has no duty of law-defining with respect to Va. law, or Va. game warden, who not responsible for construing this statute).

**136.** United States v. Pennsylvania In dustrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). Consider also United States v. Clegg, 846 F.2d 1221 (9th Cir.1988) (defendant, prosecuted for exporting firearms through Pakistan to Af ghan rebels in violation of federal law, could rely on representation by high U.S. Army official in Pakistan that such transportation would be lawful; dissent notes confusion in cases elsewhere regarding whether official relied upon must have actual authority, e.g., United States v. Duggan, 743 F.2d 59 (2d Cir.1984), or "apparent authority," e.g., United States v. Barker, 546 F.2d 940 (D.C.Cir.1976)); Miller v. Commonwealth, 25 Va.App. 727, 492 S.E.2d 482 (1997) (as for defendant's reliance on information that he could possess a firearm notwithstanding his felony conviction, defendant could rely on his probation officer, who "is, *a fortiori*, charged by law with defining a probation er's permissible and impermissible con duct").

Compare the *Tallmedge* case, note 131 supra (court goes on to explain that reliance on the licensed firearm dealer was sufficient because Congress has made them "federal agents in connection with the gathering and dispersing of information on the purchase of firearms"); with United States v. Clark, 986 F.2d 65 (4th Cir.1993) (taxidermist's statements to defendant that his contem plated conduct would be lawful not rele vant, as "statements made by a person who

is not a federal government o establish the defense of entra toppel"); United States v. Aus 363 (8th Cir.1990) (firearm private individuals" and thus by-estoppel rule not applicable

**137.** Model Penal Code ment at 275 (1985).

**138.** Perkins, Ignorance a Criminal Law, 88 U.Pa.L.R (1939).

**139.** People v. McCalla, 6 220 P. 436 (1923); State v N.W.2d 509 (Iowa 1999) (wl convicted of stalking former no defense defendant's Ill. him protection order would outside the state, as stalking require specific intent to v der); State v. Huff, 89 Me. (1897); State v. Western Un N.J. 468, 97 A.2d 480 (1953) er, 932 S.W.2d 1 (Ter (where defendant convicte state security laws, trial co clined to rule "that his advice of his attorney that was not in violation of the fense to all charges").

It is sometimes asserted minority view that reliance a defense. However, the ca

**(4) Reliance Upon Advice of Private Counsel.** In each of the situations heretofore described, the general objections to recognizing a mistake-of-the-criminal-law defense are inapplicable, for "the possibility of collusion is minimal, and * * * a judicial determination of the reasonableness of the belief in legality should not present substantial difficulty."[137] Is this not equally true if the defendant has reasonably relied upon a private attorney for advice? It has been argued with some persuasion that the answer is yes, at least when the defendant can show that he consulted a reputable attorney, he had a good faith belief in the legality of his conduct, and the conduct is not obviously antisocial in character.[138] Here as well, so the argument goes, the defendant has clearly shown that his actions have been entirely consistent with law-abidingness.

Yet, the cases uniformly hold that no defense is available under these circumstances,[139] and the Model Penal Code is in accord.[140] The principal reason for this position apparently is that the risk of collusion is greater and that those desiring to circumvent the law would shop around for bad advice.[141] "Lawyers are under enough temptations toward dishonesty already, without giving them the power to grant indulgences, for a fee, in criminal cases. Nor is the private attorney an 'officer of the state' for whose advice the state is responsible, whatever may be

---

is not a federal government official cannot establish the defense of entrapment by estoppel"); United States v. Austin, 915 F.2d 363 (8th Cir.1990) (firearm dealers "are private individuals" and thus entrapment-by-estoppel rule not applicable).

**137.** Model Penal Code § 2.04, Comment at 275 (1985).

**138.** Perkins, Ignorance and Mistake in Criminal Law, 88 U.Pa.L.Rev. 35, 42–43 (1939).

**139.** People v. McCalla, 63 Cal.App. 783, 220 P. 436 (1923); State v. Bellows, 596 N.W.2d 509 (Iowa 1999) (where defendant convicted of stalking former girl friend, it no defense defendant's Ill. attorney told him protection order would have no effect outside the state, as stalking crime does not require specific intent to violate such order); State v. Huff, 89 Me. 521, 36 A. 1000 (1897); State v. Western Union Tel. Co., 12 N.J. 468, 97 A.2d 480 (1953); State v. Brewer, 932 S.W.2d 1 (Tenn.Cr.App.1996) (where defendant convicted of violating state security laws, trial court properly declined to rule "that his reliance on the advice of his attorney that his undertaking was not in violation of the law was a defense to all charges").

It is sometimes asserted that there is a minority view that reliance upon counsel is a defense. However, the cases where this is

so are of a different kind, in that the defendant's mistake of law, based upon counsel's advice, negatives a mental state required for conviction. See, e.g., United States v. Poludniak, 657 F.2d 948 (8th Cir.1981); Long v. State, 44 Del. 262, 65 A.2d 489 (1949). (Compare People v. Snyder, 32 Cal.3d 590, 186 Cal.Rptr. 485, 652 P.2d 42 (1982), holding counsel's advice defendant had been convicted only of a misdemeanor was no defense to a charge of possession of a firearm by a convicted felon, as statute is of strict liability type as to status of felon.) Even in that setting, counsel's advice the conduct is lawful is not inevitably a defense. It would not be, for example, if defendants "retained counsel to insure the success of their mendacious scheme, not to secure legal advice." United States v. Shewfelt, 455 F.2d 836 (9th Cir.1972). In connection with *Shewfelt*, consider also the cases in note 93 supra requiring full disclosure of all facts to counsel in order to justify reliance on the attorney's advise.

**140.** Model Penal Code § 2.04. The provisions in the modern codes referred to earlier, see notes 105, 109, 120, 121, 122 and 132 supra, by likewise limiting the reliance doctrine to specific situations, are also in accord. But see note 143 infra.

**141.** State v. Downs, 116 N.C. 1064, 21 S.E. 689 (1895).

his status as an 'officer of the court' for other purposes."[142] It has been forcefully argued, however, that the rule should be otherwise (as it is in one jurisdiction[143]) because (i) reliance upon one's own counsel, as compared to a government official, is not inherently more blameworthy,[144] and (ii) the potential for abuse, given the necessity for reasonable reliance, is not that great and, in any event, any problems of proof "may be reduced significantly * * * by giving the defendant the burdens of production and persuasion."[145]

### Library References

C.J.S. Criminal Law § 31–33, 35–39, 56, 93–94, 700, 1462–1463, 1472, 1477, 1492, 1494, 1521, 1530, 1534–1536, 1538; Negligence § 913.
West's Key No. Digests, Criminal Law ☞20, 32, 33, 313.

142. Hall and Seligman, supra note 78, at 652.

143. N.J.Stat.Ann. 2C:2–4 provides that belief conduct is not a crime is a defense when: "The actor otherwise diligently pursues all means available to ascertain the meaning and application of the offense to his conduct and honestly and in good faith concludes his conduct is not an offense in circumstances in which a law abiding and prudent person would also so conclude."

144. 2 P. Robinson, Criminal Law Defenses § 183(c)(1) (1984), noting it cannot

be said "that a citizen who spends a considerable sum to hire a reputable, professional tax attorney is more culpable in following that advice than a person following the advice of a seasonal I.R.S. employee hired to answer taxpayer inquiries."

145. Id. at § 183(c)(3). See also Ashworth, Excusable Mistake of Law, 1978 Crim.L.Rev. 652, 661.

## ACTS; CONCUI

Sec.
6.1 Requirement of an Ac
  (a) Meaning of "Act."
  (b) Necessity for an Ac
  (c) Voluntary Nature (
  (d) Crimes of Personal
  (e) Crimes of Possessi(
  (f) Vicarious Liability.
6.2 Omission to Act.
  (a) Duty to Act.
    (1) Duty Based U
    (2) Duty Based U
    (3) Duty Based U
    (4) Duty Based U
    (5) Duty Based U
    (6) Duty to Conti
    (7) Duty of Land(
  (b) Knowledge of Leg
  (c) Possibility of Perf
  (d) Causation.
  (e) Crimes Which Ma
  (f) A Broader Duty tc
6.3 Concurrence of Acts
  (a) Concurrence of A
  (b) Attendant Circun
  (c) What Act Must C
  (d) Concurrence of
    Harm.
  (e) Concurrence of ]
    Harm.
6.4 Causation.
  (a) The Problem.
  (b) Cause in Fact.
  (c) Legal (Proximate
  (d) Intentional Crin
  (e) Reckless and Ne
    ligence").
  (f) Intentional Crim
    (1) Direct Caus
    (2) Pre-existing
    (3) Intervening
    (4) Intervening
    (5) Intervening
    (6) Intervening
    (7) Intervening
  (g) Reckless and N(
    (1) Direct Caus
    (2) Intervening
  (h) Unintended T:
    slaughter.

# APPENDIX
# J

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)

CAUSE NUMBER 12-03-02579-CR

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 359th JUDICIAL |
| VS. | § | DISTRICT COURT |
| JAMES ALAN JENKINS | § | MONTGOMERY COUNTY, TEXAS |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

The defendant, **JAMES ALAN JENKINS**, stands charged by indictment with the offense of Illegal Voting alleged to have been committed on or about May 8th, 2010 in Montgomery County, Texas. To this charge the defendant has pleaded Not Guilty. You are instructed that the law applicable to this case is as follows:

I.

A person commits the offense of illegal voting if he votes or attempts to vote in an election in which the person knows the person is not eligible to vote.

II.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

When words are used in a sense which varies from the meaning commonly understood, you will be given a proper legal definition, which you are bound to accept in place of any other definition or meaning.

All words, phrases and terms used in this charge are to be taken and understood in their usual acceptation in common language, except where specially defined.

1

**312**

To be eligible to vote in an election in this state, a person must: be a qualified voter as defined by Section 11.002 of the Texas Election Code on the day the person offers to vote; be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and satisfy all other requirements for voting prescribed by law for the particular election.

"Residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence. Residence shall be determined in accordance with the common-law rules as enunciated by the courts of this state, except as otherwise provided by the Texas Election Code. A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only. A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

III.

Now if you find from the evidence beyond a reasonable doubt that on or about May 8, 2010 in Montgomery County, Texas, the defendant, **JAMES ALAN JENKINS**, did then and there vote in an election, the May 8 2010 Woodlands Road Utility District Board of Directors election, when the defendant knew he was not eligible to vote because he knew he did not reside in the precinct in which he voted, then you will find the defendant guilty of voting illegally as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

2

## IV.

An indictment is the means whereby a defendant is brought to trial in a criminal prosecution. It is not evidence of guilt nor can it be considered by you in passing upon the question of guilt of the defendant. The burden of proof in all criminal cases rests upon the State throughout the trial and never shifts to the defendant.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not Guilty."

3

**314**

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and the weight to be given their testimony, but the law you must be governed by you shall receive in these written instructions, and you must be governed thereby.

You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein. While you should consider only the evidence before you, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

After you retire to the jury room, you should select one of your members as your Presiding Juror. It is his or her duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify your verdict by using the appropriate form attached hereto and signing the same as Presiding Juror.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

No one has authority to communicate with you except the officer who has you in charge. After you have retired, you may communicate with the Court in writing through this officer. Any communication relative to the cause must be written, prepared and signed by the Presiding Juror and shall be submitted to the Court through this officer. Do not attempt to talk to the officer who has you in charge, or the attorneys, or the Court, or anyone else concerning any questions you may have.

4

Your sole duty at this time is to determine whether the defendant is guilty or not guilty under the indictment in this cause and restrict your deliberations solely to that issue.

Following the arguments of counsel, you will retire to consider the evidence.

SIGNED this the 27th day of June, 2013.

Judge John Stevens
359th District Court by Assignment
Montgomery County, Texas

5

**316**

CAUSE NUMBER 12-03-02579-CR

RECEIVED AND FILED
At 5:2? O'Clock P M.
FOR RECORD
JUN 27 2013
BARBARA GLADDEN ADAMICK
District Clerk
By_____ Deputy
MONTGOMERY COUNTY, TEXAS

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 359th JUDICIAL |
| VS. | § | DISTRICT COURT |
| JAMES ALAN JENKINS | § | MONTGOMERY COUNTY, TEXAS |

**VERDICT FORM** (Sign ONLY ONE line)

WE, THE JURY, find the defendant, **JAMES ALAN JENKINS**, "GUILTY" of Illegal Voting as charged in the indictment.

_____
PRESIDING JUROR

WE, THE JURY, find the defendant, **JAMES ALAN JENKINS**, "NOT GUILTY" of Illegal Voting as charged in the indictment.

_____
**PRESIDING JUROR**

6

317

# APPENDIX K

*State v. Jenkins*, PD-0832-15
(Tex. Crim. App.)



Geoffrey S. Connor
SECRETARY OF STATE
State of Texas

January 22, 2004

VIA HAND DELIVERY
The Honorable Rick Perry
Governor
State Capitol, Room 2S.1
Austin, Texas 78711

**Election Law Opinion GSC –1**

Dear Governor Perry:

This formal election law advisory opinion is in response to your letter, dated December 30, 2003, requesting this office's opinion on matters relating to residency in Texas. Specifically, you requested the opinion of this office concerning how Section 1.015 of the Texas Election Code ("Code") applies to college students currently attending Prairie View A&M University. Because you have raised issues of general importance, I shall address your question within the context of this formal election law opinion, which is rendered under my authority to obtain and maintain uniformity in the interpretation of elections laws. TEX. ELEC. CODE ANN. § 31.001(a) (Vernon 2003).

Question: What is the proper interpretation and application of Section 1.015 of the Code in the context of voter registration by and "residency" of college students, in particular, those students currently attending Prairie View A&M University?

Short Answer: The definition of residence for the purpose of voter registration is well settled in Texas. As stated in the seminal case of *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex.1964), "[n]either bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. There is no specific length of time for the bodily presence to continue." Most importantly, a college student cannot be held to stricter residency

0 1

standards than other classes of Texas voters as a precondition to submitting an application and becoming a registered voter in this state.

## I.    APPLICABLE TEXAS STATUTES

In general, a person is eligible to vote in elections in Texas if such person first meets the requirements in Section 11.001 of the Code as set forth below:

§ 11.001. Eligibility to Vote.

Except as otherwise provided by law, to be eligible to vote in an election in this state, a person must:

(1) be a qualified voter as defined by Section 11.002 on the day the person offers to vote;

(2) be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and

(3) satisfy all other requirements for voting prescribed by law for the particular election.

TEX. ELEC. CODE ANN. § 11.001 (Vernon 2003). The next step in the analysis of who is permitted to vote in Texas requires a review of the definition of "qualified voter" set forth in Section 11.002 of the Code:

§ 11.002 Qualified Voter.

In this code, "qualified voter" means a person who:

(1) is 18 years of age or older;

(2) is a United States citizen;

(3) has not been determined mentally incompetent by a final judgment of a court;

(4) has not been finally convicted of a felony or, if so convicted, has:

(A) fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or

(B) been pardoned or otherwise released from the resulting disability to vote;

(5) *is a resident of this state*; and

(6) is a registered voter.

TEX. ELEC. CODE ANN. § 11.002 (Vernon 2003) *(emphasis added)*. Clearly, if it appears that a person meets all of the aforementioned requirements, then such person shall be permitted to vote in Texas.

The definition of "residence" is as set forth below:

§ 1.015. Residence

(a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

TEX. ELEC. CODE ANN. § 1.015 (Vernon 2003). An analysis of Section 1.015 of the Code and the judicial interpretations thereof follows immediately below.

## II.     ANALYSIS

### A.     *Applicable Federal Cases*

Texas has a history of providing test cases for what were sometimes referred to in the past as transient voters, especially with respect to constitutional questions concerning presumptions against a particular class of voters (i.e., military and student voters, etc.). Some of these test cases, and their holdings are outlined below:

- The state constitutional conclusive presumption against military voters using a Texas military base as their home during their service was struck down as violating the

Equal Protection Clause of the Fourteenth Amendment. *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775 (1965).

- A previous Election Code provision which sought to create a rebuttable statutory presumption against student voters establishing their college town as home was struck down as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Whatley v. Clark*, 482 F.2d 1230 (5th Cir. 1973) (hereinafter referred to as "*Whatley*").

- The actions of a Texas county registrar that required student voters to fill out a questionnaire demonstrating an intent to remain after graduation was struck down as violating the Twenty-Sixth Amendment. *United States v. Texas*, 445 F. Supp. 1245, 1249, 1257 (S. D. Tex. 1978), *aff'd in memorandum op. sub nom. Symm v. United States*, 432 U.S. 1105 (1979) (hereinafter referred to as "*Texas*").

As noted in the *Texas* case:

> The trial court's opinion in *Ballas v. Symm*, 351 F.Supp. 876, at 877, discusses the fact that on October 2, 1972, the United States District Court for the Eastern District of Texas (Judge Wayne Justice) decided Whatley, holding at the trial court level that the statutory presumption contained in Article 5.08(k) was unconstitutional. The opinion also discusses the fact that on October 3, 1972, the Chief Election Officer of the State of Texas, Secretary of State, Robert Bullock, issued a bulletin to all voting registrars, advising that: "No county registrar may require any affidavits or questionnaire in addition to the information required on the application for a voter registration certificate."

*Texas*, at 1246. It is the opinion of this office that the decisions in *Whatley* and *Texas* are binding, definitive precedents in this state with respect to issues concerning the rights of students to register to vote.

### B. Applicable State Cases

The statutory definition of residence adopts Texas common law, reinforcing the notion that residence involves a mixed question of law and fact. See TEX. ELEC. CODE ANN. § 1.015(b) (Vernon 2003). College students, and other travelling Texans, including those in the United States military, have, on a number of occasions, expressed concerns to personnel in my office about their proper residency for voting purposes due to the fact that their lives are "split" among one or more physical locations.

There are a plethora of election cases on Texas residence regarding both voters and candidates. Because of the fact-intensive nature of the residence question, some have argued that it is possible to select one case or another as "proving" that a certain factor is dispositive with respect to the question of intent for residence purposes. However, it is the opinion of this office that such an approach can be misleading. The one constant in the common law tests that have

been approved by the Texas Supreme Court, and federal courts interpreting Texas law, is that no one factor is dispositive. As stated by the Texas Supreme Court in the leading Texas case, *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex.1964), regarding residence:

> The meaning that must be given to it [residence] depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Volition, intention and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile.
>
> ...
>
> Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. *There is no specific length of time for the bodily presence to continue.*

*Mills*, at 637 (*emphasis added*). The majority of Texas courts have consistently ruled that residency is a combination of intention and fact, and that the voter's intention must be reviewed to make a final determination of residence. *McBeth v. Streib*, 96 S.W.2d 992 (Tex. Civ. App. – San Antonio 1936, no writ). For example, the El Paso Court of Appeals held that "the voter's intention was material to a proper determination of the voter's residence requirement." *Simmons v. Jones*, 838 S.W.2d 298, 301 (Tex. App. – El Paso 1992, no writ). Coupled with the voter's intention, there must also exist a physical connection to the place in which such voter is claiming residence. *Commercial Standard Ins. Co. v. Nunn*, 464 S.W.2d 415 (Tex. Civ. App. – Texarkana 1971, writ dism'd).

As the attorney general stated in an opinion addressing "winter Texans," residence is a fact question that does not yield broad categorical answers. Op. Tex. Att'y Gen. No. JM-611 (1986); see also Op. Tex. Att'y Gen. No. JM-231 (1984). For the general principle that adults, including students, may determine their residence, see Op. Tex. Att'y Gen. No. H-301 (1974) (a person at least 18 years of age may determine his own residence in the same legal manner and with the same legal result as any other adult). See also Op. Tex. Att'y Gen. No. JC-520 (2002) (construing the Transportation Code, but noting that "if we consider the analogous question of voter registration, college students residing in dormitories routinely register to vote from such addresses.").

The high standard of proof required to contravert a voter's stated or written intent should also be examined. In any judicial proceeding against a student for alleged residence violations under the Code, the burden of proof of any challenging official will include negating the presumption that a student has the right to determine his or her own residence in the same manner and with the same effect of any other adult. See *Texas*, 445 F. Supp. at 1247 (quoting from *Whatley*, 482 F.2d at 1230, that the statutory presumption of non-residency contained in prior Article 5.08(k) of the Texas Election Code [the predecessor to current Section 1.015 of the Code] is unconstitutional).

C.   *Application to Student Voters in Texas*

While not a trier of fact, my office is statutorily authorized to give voters the definition of residence for them to use when completing the voter registration application, based wholly upon the facts known to them at the time the application is completed. We can advise prospective registrants on the common law only in the most general terms, by giving them examples of the tests announced by the courts, and the array of factors taken into consideration.

Evidence of intent to establish domicile may include, but is not limited to, such factors as where a person "exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family." *Coury v. Prot*, 85 F.3d 244, 251 (5th Cir. 1996). While an address at a college dormitory might constitute some limited probative evidence that there is no intent to remain, a conclusive presumption that there is no bona fide domicile based solely on the nature of such address is impermissible. See Op. Tex. Att'y Gen. No. JC-520 (2002).

We note in particular that the naming of the parents' home as the voting home of a young student voter is not the stronghold against challenge it is sometimes reputed to be. In *Alvarez v. Espinoza*, 844 S.W.2d 238 (Tex. App. – San Antonio 1992, writ dism'd w.o.j.), a student attended college in the same town as her husband and her family. The couple had no definite plans for their residence after the wife's graduation. They received mail and voted in a different county, using the home address of the husband's parents. This couple was ruled not to reside at the home address of the husband's parents; rather, the court found they were residents of their college town, even though their intent to remain after the wife's graduation was indefinite. *Alvarez*, at 248.

In *Guerra v. Pena*, 406 S.W.2d 769 (Tex.Civ.App. – San Antonio 1966), two single people who had jobs elsewhere were held not to be residents of their parents' home where they returned for the holidays.

As we have noted above, analysts of Texas residence cases select a single case at their peril. However, by way of further guidance, a case especially pertinent for voters who spend time in different locations is *Guerra v. Pena*. In analyzing the scenarios of a number of voters, including migrant workers who were compelled to spend months at a time at different places, the court emphasized that:

> A removal to divest one of his right to vote must be accompanied by an intent to make a new domicile and quit the old. Mere removal, coupled with an intent to retain the original domicile and return to it, will not constitute a change.

*Guerra*, at 776, and cases cited therein. This is codified in the Code at Section 1.015(c). Many voters who travel are in the position of naming the best home they can under the circumstances. If a voter who spends several months in one location and several months in another location were told that he or she could not register in either location, the voter is effectively disenfranchised.

Aside from such general advice, we caution other officials and those conducting voter registration drives against seeking to influence the voter's choice of a residence address. The

presumption is not in favor of the parents' home *or* the college home; rather, the presumption is in favor of the voter's own assessment of the facts and his or her intent. Accordingly, there is no broad answer that will fit all college students.

For instance, one student might consider a parent's home as the "home base" because he or she grew up there and returns there for extended vacations. Another student could consider the college town his or her residence, because he or she is engaged in the occupation of being a full-time student, and intends to return each semester for three-quarters of the year for four years. A third student might spend the last summer of his or her college career working at an internship at a third Texas location where he or she intends to return for a permanent job.

A voter who wishes to register at one location while temporarily spending time at another may use registration by mail and ballot by mail procedures to continue to vote in the precinct where the permanent home is located. If a voter is a student in Texas and wishes to vote using a residence location in another state, that student would of course need to consult with the election authorities concerning the laws of that state.

In sum, when a student registers to vote and describes his or her permanent residence in Texas for voting purposes, the presumption is in favor of the voter's factual statement on the face of the application.

### D.    Duration of Residence Generally

We note that a common complaint about students and other voters who travel is the concern that these voters will not consider the residence location on the application to be their home in the future (e.g., five years from the application date). No applicant is required to assert such a future durational intention when registering to vote. If a voter were held to such a standard, it is the opinion of this office that such a requirement would be contrary to the rationale in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct 995, 31 L.Ed2d 274 (1972). In *Dunn*, a durational residence requirement of time in the location before registration was struck down.

As the court in *Texas* observed:

> In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct 995, 31 L.Ed2d 274 (1972), the Supreme Court held unconstitutional Tennessee's one-year durational residency requirement because such requirements penalize persons who travel from one place to another to establish a new residence during the qualifying period, and thus deny a portion of the citizenry their rights under the Equal Protection Clause of the 14th Amendment.

*Texas*, at 1261. It is our opinion that any state requiring a voter to state that he or she will be residing in a location for a stated number of months or years in the future would face a similar challenge. An applicant filling out a Texas voter registration form is not required to state that the residence will be his or her home forever, or for the next five years, or even the next year. The applicant is only required for administrative reasons to submit the application 30 days before the

election in which the applicant wishes to vote. See TEX. ELEC. CODE ANN. § 13.143 (Vernon 2003).

## III.  CONCLUSION

No more or less can be required of college students during the voter registration process than any other Texas voter. In particular, no Texas county voter registrar may require an affidavit or questionnaire in addition to the information required on the application for a voter registration certificate. A person who has reached the age of majority is presumed able to make a factual statement about his or her voting residence. Moreover, the student is presumed to be in the best position to make such factual statements about the residence of the student. In addition, Texas law does not require a statement of durational future residence. These principles apply equally to college students as well as other voters, and no more can be required of them in order for them to register and vote in the State of Texas.

Very truly yours,

Geoffrey S. Connor

Prepared by Melanie Best
Staff Attorney
Elections Division

APPROVED:

OPINION COMMITTEE
Benjamin M. Hanson, General Counsel
Ann McGeehan, Chair
Elizabeth Hanshaw-Winn
Mark McHargue
Paul Miles



ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

February 4, 2004

| | |
|---|---|
| The Honorable Rodney Ellis<br>Chair, Government Organization Committee<br>Texas State Senate<br>P. O. Box 12068<br>Austin, Texas 78711 | Opinion No. GA-0141<br><br>Re: Residency requirements for voting in an election in Texas (RQ-0157-GA) |

Dear Senator Ellis:

You ask three questions regarding voter eligibility and residency requirements for voting in Texas, particularly with respect to students enrolled in schools of higher education.

## I. Background

In your letter requesting an official opinion from this office, you state that your request is prompted by statements made by the Criminal District Attorney of Waller County, who you say has "declared that students at Prairie View A&M University may not meet residency requirements sufficient to vote in local elections."[1] Citing *Symm v. United States*, 439 U.S. 1105 (1979), you note that the United States Supreme Court rejected an appeal by a former Waller County Tax Assessor-Collector, who was also the voter registrar, thus affirming the decision of a three-judge panel that enjoined the Tax Assessor-Collector from refusing to register college dormitory residents enrolled at Prairie View A&M University. The current Tax Assessor-Collector of Waller County, who is also the voter registrar, has publicly declared that she will seek guidance from and follow the directives of the Office of the Secretary of State, who is the state's chief election officer, on these matters, rather than rely on advice from the local prosecutor. *See* Terry Kliewer, *Prairie View Voting Issue to be Appealed*, Houston Chronicle, Dec. 24, 2003, at 19A. You ask for an opinion from this office about eligibility for voting in Texas, residency requirements for voter registration, and the authority of local prosecutors to prevent local voter registrars from registering voters.

## II. Analysis

### A. Legal Requirements for Eligibility to Vote

You first ask: "What are the legal requirements to vote in an election in Texas?" Request Letter, *supra* note 1, at 2.

The Texas Constitution provides that every person who is both a citizen of the United States and a resident of Texas shall be deemed a qualified voter, provided, however, that the person is registered to vote and does not fall within any of a specific set of disqualifications. See Tex. Const. art. VI, § 2 (a). Persons so disqualified are those under 18 years of age; those who have been determined mentally incompetent by a court, subject to such exceptions as the legislature may enact; and those convicted of any felony, again subject to such exceptions as the legislature may enact. *See Id.* art. VI, § 1(a). Additionally, the legislature is directed to "enact laws to exclude from the right of suffrage persons who have been convicted of bribery, perjury, forgery, or other high crimes," *Id.* art. VI, § 1 (b). The legislature expressly is directed to "make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box," as well as to "provide by law for the registration of all voters." *Id.* art. VI, § 4.

*D 2*

Statutory eligibility requirements have been codified in the Election Code, which provides that:

Except as otherwise provided by law, to be eligible to vote in an election in this state, a person must:

(1) be a qualified voter as defined by Section 11.002 on the day the person offers to vote;

(2) be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and

(3) satisfy all other requirements for voting prescribed by law for the particular election.

Tex. Elec. Code Ann. § 11.001 (Vernon 2003). Section 11.002 defines "qualified voter":

In this code, "qualified voter" means a person who:

(1) is 18 years of age or older;

(2) is a United States citizen;

(3) has not been determined mentally incompetent by a final judgment of a court;

(4) has not been finally convicted of a felony or, if so convicted, has:

(A) fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or

(B) been pardoned or otherwise released from the resulting disability to vote;

(5) is a resident of this state; and

(6) is a registered voter.

*Id.* § 11.002.

In order to be a resident of the state, one must satisfy the statutory definition of "residence." Section 1.015 of the Election Code defines "residence":

(a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

*Id.* § 1.015.

In order to register to vote, one must file an application with the voter registrar of the county in which the applicant desires to vote. *Id.* § 13.002. In order to file, one must satisfy the statutory eligibility requirements for registration, which track the definition of "qualified voter" found in section 11.002 with the additional requirement that the person "be a resident of the county in which application for registration is made." *Id.* § 13.001(a)(5). Thus, a person who complies with and satisfies the requirements of sections 1.015, 11.001, 11.002, 13.001, and 13.002 of the Election Code is an "eligible voter." *See id.* §§ 1.015, 11.001-.002, 13.001-.002 (Vernon 2003 & Supp. 2004).

## B. Residency Requirements for Voter Registration and *United States v. Texas*

In your second question you ask: "What is the law with regard to residency in the State of Texas as it relates to voter registration?" Request Letter, *supra* note 1, at 2.

As noted above, in order to register to vote, one must be a "resident" of the county in which one desires to vote. Residence for purposes both of registration and voting is defined to mean "domicile," *i.e.*, "one's home and fixed place of habitation to which one intends to return after any temporary absence." Tex. Elec. Code Ann. § 1.015(a) (Vernon 2003). Residence must be determined in accordance with the common-law rules, as enunciated by the courts of this state, unless the code provides otherwise. *See id.* § 1.015(b). A person does not lose residence by leaving his home to go to another place for temporary purposes only; nor does a person acquire a residence in a place to which he has come for temporary purposes only and without the intention of making that place his home. *See id.* § 1.015(c)-(d).

In the leading Texas Supreme Court case of *Mills v. Bartlett*, 377 S.W.2d 636 (Tex. 1964), the court declared that the meaning of the term "residence" for voting purposes

depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Volition, intention and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile. . . . Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. There is no specific length of time for the bodily presence to continue.

*Id.* at 637 (citations omitted). *See Slusher v. Streater*, 896 S.W.2d 239, 243 (Tex. App.-Houston [1st Dist.] 1995, no writ); *Alvarez v. Espinoza*, 844 S.W.2d 238, 247 (Tex. App.-San Antonio 1992, writ dism'd w.o.j.); *Guerra v. Pena*, 406 S.W.2d 769, 776 (Tex. Civ. App.-San Antonio 1966, no writ); *McBeth v. Streib*, 96 S.W.2d 992 (Tex. Civ. App.-San Antonio 1936, no writ); *see also* Tex. Att'y Gen. Op. Nos. JC-0520 (2002), JM-611 (1986), JM-231 (1984).

Prior to *Whatley v. Clark*, 482 F.2d 1230 (5th Cir. 1973), students in Texas were presumed by statute to have a domicile at the residence of their parents, not where they were enrolled at institutions of higher education. *Whatley* struck down the statutory presumption in former article 5.08 (k) of the Election Code providing that "'a student in a school, college, or university' shall not be considered to have acquired a voting residence at the place where he lives while attending school 'unless he intends to remain there and to make that place his home indefinitely after he ceases to be a student.'" *Whatley*, 482 F.2d at 1231 (quoting former article 5.08(k) of the Election Code, *see* Act of May 19, 1967, 60th Leg., R. S., ch. 723, § 21, sec. 40 (art. 5.08), 1967 Tex. Gen. Laws 1858, 1879-80, *repealed by* Act of May 13, 1985, 69th Leg., R. S., ch. 211, § 1, sec. 1.015, 1985 Tex. Gen. Laws 802, 807) (substantive recodification of Texas Election Code, repealing former article 5.08 and enacting section 1.015). The court noted that the statutory presumption illegally treated student voters differently than non-student voters:

By its terms it creates a presumption that students are not domiciliaries of the places they live while attending school. Of course, the presumption is rebuttable; but unless a student carries the burden of persuading the voter registrar that he is in fact a domiciliary of the place where he resides for the better part of each year, he is not permitted to vote there and is consequently denied an opportunity to participate in elections which may have considerably more impact on his life than do those in the area where he resided before becoming a student. Other prospective voters, on the other hand, are

not subject to this presumption of nonresidency or to the attendant burden of overcoming it.

*Whatley*, 482 F.2d at 1233 (footnotes omitted). The court declared that the presumption violated the Equal Protection Clause of the 14th Amendment and struck down the provision.

Under current law, the determination regarding "residence" thus involves both physical presence and current intention of the applicant; if a student, like any other applicant, satisfies the requirements of section 1.015, that student is a "resident" of the county in which he seeks to register. The intention of the voter registration applicant is crucial to a proper determination of residence, and every person is strongly presumed to have "the right and privilege of fixing his residence according to his own desires." *McBeth*, 96 S.W.2d at 995. For example, let us assume that two students, Student A and Student B, live in the same college dormitory. Student A, who is living in the dormitory and is therefore physically present for purposes of voter registration yet intends his residence to remain the same as that of his parents, can permissibly register to vote in the county of his parent's residence. *See, e.g., Alvarez*, 844 S.W.2d at 247 (by temporarily moving to Austin to attend school at the University of Texas at Austin, challenged voter did not lose his Frio County residence or acquire residence for voting purposes in Travis County). On the other hand, Student B, who is living in the same dormitory as Student A yet who intends that the dormitory be his residence for purposes of voter registration, can permissibly register to vote in the county where his dormitory is located. *See, e.g., Whatley*, 482 F.2d 1230 (student who was physically present in Denton County and intended to claim Denton County as his residence for purposes of voter registration lost residence in the county where his parents resided and acquired residence in Denton County). And the mere fact that an applicant claims a post office box as an address or that many applicants claim the same post office box as an address is not dispositive regarding the determination of residence. Indeed, depending upon the facts in each case, it might not even be relevant. *See, e.g., Speights v. Willis*, 88 S.W.3d 817 (Tex. App.-Beaumont 2002, no pet.) (voters who were physically present and intended county to be residence for purposes of voter registration, yet who claimed post office box numbers as addresses, satisfied statutory voter registration application requirements and, thereby, residence requirement).

Without outlining all of the various fact situations that the courts have addressed in determining whether a voter is a "resident," we can say that all applicants for registration, including students, must be subject equally to whatever presumptions or restrictions are imposed by law. *See Dunn v. Blumstein*, 405 U.S. 330 (1972). To illustrate the sorts of factors and practices that cannot be employed to determine "residence," we examine the federal three-judge panel's injunction in *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd, Symm v. United States*, 439 U.S. 1105 (1979) (hereinafter *Texas*), a case involving the very county that is the focus of your concern - Waller County. Though in a brief submitted to this office the Criminal District Attorney of Waller County seems to assert that the case only prohibited the use of a certain questionnaire in determining "residence" for purposes of voter registration,[2] the injunction issued in the case makes it clear beyond cavil that the court concluded that a variety of practices undertaken by the voter registrar violated the United States Constitution.

In *Texas*, a federal three-judge panel enjoined the Waller County Tax Assessor-Collector, who was the voter registrar, from refusing to register to vote students enrolled at Prairie View A&M University. Specifically, the panel enjoined the registrar from engaging in a variety of practices that the panel deemed violated the 26th Amendment to the United States Constitution, which provides that no right of citizens who are 18 years old or older to vote shall be denied or abridged on account of age.[3] *See* U.S. Const. amend. XXVI, § 1.

The panel ordered that, *inter alia*, college students of Waller County must be registered and allowed to vote on the same basis and by application of the same standards and procedures as non-students, without reference to whether such students had dormitory addresses, whether or not they resided in Waller County prior to attending school, and whether or not they planned to leave Waller County upon graduation. *See United States v. Texas*, Civil Action No. 76-H-1681, Injunction Decree, 1 (S.D. Tex. 1978) (on file with Opinion Committee). The panel acknowledged that the registrar had the authority under the Election Code to make a factual determination as to whether each applicant to vote was a bona fide resident of Waller County; however, in making this factual determination, the panel declared that the registrar could not find that a person was a non-resident of Waller County for

any of the following reasons:

A. That such person resides in a dormitory at Prairie View A&M University;

B. That such person owns no property in Waller County;

C. That such person is a student at Prairie View University;

D. That such applicant has no employment or promise of employment in Waller County;

E. That such applicant previously lived outside Waller County, or may live outside Waller County after his graduation;

F. That such person visits the home of his parents, or some other place during holidays and school vacations.

*Id.* at 2.

The panel required that, if the registrar made a finding that a person was not a bona fide resident of Waller County, the determination must be made on the basis of tangible evidence, consisting of facts or factors other than the six factors listed above. *See id.* In addition, in the event that the registrar made a determination that any person who claims to be a resident of Waller County, and who had a Prairie View A&M University address, was not a bona fide resident of Waller County, the registrar must make a written record of the precise, exact tangible evidence upon which he relied in making his determination of non-residency. *See id.* All records of the type described in the previous sentence were required to be kept in legible form and in a single file in the Waller County Registrar's office, where such records could be inspected by the plaintiff in the cause or any other person having a legitimate interest in the examination of such records. Such records were required to be maintained for a period of five years after originally made. *See id.*

Additionally, students of Waller County were not to be subjected to the presumption contained in former article 5.08(k) of the Election Code or to any other presumption with regard to their voting residence. *See id.* 3. The registrar was ordered immediately to cease using the residence standard for students, which had been implemented by means of a questionnaire, to terminate the use of the questionnaire, and to henceforth register students on the basis of the information contained in the state-approved registration form, as was done elsewhere in Texas, unless the registrar had tangible, recordable evidence (consistent with Paragraph 2 of the decree) that such applicant was not a bona fide resident of Waller County. *See id.* 4. And the registrar was enjoined from subjecting Prairie View A&M students to any particular or discriminatory procedure not applied to non-students on a regular basis, such as, for example, causing students to visit his office and submitting students orally to the questioning previously contained in the questionnaire discussed in the court's Memorandum Opinion. *See id.*

We stress that the United States Supreme Court affirmed the three-judge panel's judgment in *Symm v. United States*, 439 U.S. 1105 (1979). Thus, clearly, in light of *Whatley* and *Texas*, students in Texas may no longer be subjected, whether by statute or by practice, to any presumption with respect to "residence" not also applied to all other voters in Texas.

**C. Administrative Procedure Governing Applications for Registration to Vote and the Authority of the District Attorney**

With your third question, you ask about the authority of the local prosecutor to prevent someone from registering to vote or to prevent the voter registrar from acting on that application:

Does the [Criminal] District Attorney have the jurisdiction or authority to prevent local election officials from refusing to allow a person to register to vote in the county? In other words, can the [Criminal] District Attorney preemptively prevent someone from registering to vote in an election or

must the [Criminal] District Attorney bring an action against the individual after an election has taken place contesting unlawful voter registration?

Request Letter, *supra* note 1, at 2.

1. *Local Prosecutor's Authority Regarding Voter Registration Decisions*

The voter registrar is authorized by the Election Code to conduct an administrative procedure to determine and possibly challenge the eligibility of an applicant for registration to vote, subject to judicial review. *See* Tex. Elec. Code Ann. §§ 13.001-.146 (Vernon 2003 & Supp. 2004), 17.001-.008 (Vernon 2003). The Election Code also establishes an administrative procedure cancelling, by the registrar's initiative or that of another registered voter, a voter registration application that already has been approved, if the voter is no longer eligible. *Id.* §§ 16.001-.095 (Vernon 2003 & Supp. 2004). Adverse decisions rendered under chapter 16 are also subject to judicial review. *Id.* §§ 17.001-.008 (Vernon 2003). These provisions grant no role to a local prosecutor. Thus, we have found no statute granting local prosecutors the preemptive authority to prevent a person from filing an application to register to vote or the voter registrar from acting on that application. Local prosecutors do, however, have express authority to prosecute a person who knowingly makes a false statement on an application for voter registration.

2. *Local Prosecutor's Authority to Prosecute Certain Criminal Offenses Involving Voter Fraud*

Section 13.007 of the Election Code provides:

(a) A person commits an offense if the person knowingly makes a false statement or requests, commands, or attempts to induce another person to make a false statement on a registration application.

(b) An offense under this section is a Class B misdemeanor.

(c) For purposes of this code, an offense under this section is considered to be perjury, but may be prosecuted only under this section.

*Id.* § 13.007.[4] An application for voter registration must contain substantially more than just a declaration of residence. Subsection (c) of section 13.002 sets forth the information that must be included on an application for voter registration:

(c) A registration application must include:

(1) the applicant's first name, middle name, if any, last name, and former name, if any;

(2) the month, day, and year of the applicant's birth;

(3) a statement that the applicant is a United States citizen;

(4) a statement that the applicant is a resident of the county;

(5) a statement that the applicant has not been determined mentally incompetent by a final judgment of a court;

(6) a statement that the applicant has not been finally convicted of a felony or that the applicant is a felon eligible for registration under Section 13.001;

(7) the applicant's residence address or, if the residence has no address, the address at which the applicant receives mail and a concise description of the location of the applicant's residence;

(8) the following information:

(A) the applicant's Texas driver's license number or the number of a personal identification card issued by the Department of Public Safety;

(B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or

(C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B);

(9) if the application is made by an agent, a statement of the agent's relationship to the applicant; and

(10) the city and county in which the applicant formerly resided.

*Id.* § 13.002(c) (Vernon Supp. 2004). Thus, knowingly providing any false information in answer to the above ten items of information violates section 13.007 of the Election Code.

Prosecution under section 13.007, by its terms, is not limited only to those instances in which a person already has cast a vote. Rather, the section creates an offense that may be prosecuted at any time its elements are met, whether before or after an election, subject of course to applicable statutes of limitations. We emphasize that it is not a criminal offense in this state if an applicant for voter registration believes, however mistakenly, that the applicant is a resident of the county in which the applicant seeks to vote. *But see id.* § 64.012 (voting or attempting to vote in an election when voter knows that the voter is ineligible to vote is criminal offense). However, knowingly making a false statement on an application for voter registration is a criminal offense.

Additionally, we note that chapter 273 of the Election Code confers general authority on both local prosecutors and the attorney general to investigate alleged criminal conduct "in connection with" an election. Section 273.001 provides in pertinent part that:

If two or more registered voters of the territory covered by an election present affidavits alleging criminal conduct in connection with the election to the county or district attorney having jurisdiction in that territory, the county or district attorney shall investigate the allegations. If the election covers territory in more than one county, the voters may present the affidavits to the attorney general, and the attorney general shall investigate the allegations.

*Id.* § 273.001(a). Moreover, the local prosecutor and the attorney general have authority to conduct such an investigation in the absence of affidavits:

A district or county attorney having jurisdiction or the attorney general may conduct an investigation on the officer's own initiative to determine if criminal conduct occurred in connection with an election.

*Id.* § 273.001(b). In this specific instance, the Criminal District Attorney of Waller County "has all the powers, duties, and privileges in Waller County that are conferred by law on county and district attorneys in the various counties and districts." Tex. Gov't Code Ann. § 44.337 (Vernon Supp. 2004). Thus, the Criminal District Attorney of Waller County is conferred authority by Election Code chapter 273 to investigate, on his own initiative, whether criminal conduct occurred "in connection with an election." Tex. Elec. Code Ann. § 273.001(b) (Vernon Supp. 2004).

Therefore, in answer to your third question, we conclude that local prosecutors are conferred no authority to prevent someone from registering to vote or to prevent voter registrars from acting on voter registration applications. We further conclude that local prosecutors may seek to investigate and prosecute possible offenses under section 13.007 of the Election Code any time that credible evidence of such fraud is brought to their attention or complaints are filed with their offices; local prosecutors are conferred general authority to investigate whether criminal conduct has occurred "in

connection with an election" under chapter 273 of the Election Code. *Id.*

## SUMMARY

A person who complies with and satisfies the requirements of sections 1.015, 11.001, 11.002, 13.001, and 13.002 of the Texas Election Code is an "eligible voter". *See* Tex. Elec. Code Ann. §§ 1.015, 11.001-.002, 13.001-.002 (Vernon 2003 & Supp. 2004).

The meaning of "residence" for purposes of voting and voter registration is governed by section 1.015 of the Texas Election Code. "Residence" is defined to mean "domicile," *i.e.*, one's home and fixed place of habitation to which one intends to return after any temporary absence. *Id.* § 1.015(a) (Vernon 2003). Residence must be determined in accordance with the common-law rules, as enunciated by the courts of this state, unless the code provides otherwise. *See id.* § 1.015(b). A person does not lose his residence by leaving his home to go to another place for temporary purposes only; nor does a person acquire a residence in a place to which he has come for temporary purposes only and without the intention of making that place his home. *See id.* § 1.015(c). Both bodily presence and current intention on the part of the applicant or voter are necessary to establish residence.

The intention of the voter registration applicant is crucial to a proper determination of residence, and every person is strongly presumed to have "the right and privilege of fixing his residence according to his own desires." *McBeth v. Streib*, 96 S.W.2d 992, 995 (Tex. Civ. App.-San Antonio 1936, no writ). For example, one student who is living in a dormitory, and is therefore physically present for purposes of voter registration, yet who intends his residence to remain the same as that of his parents, can permissibly register to vote in the county of his parent's residence. On the other hand, another student living in the same dormitory who intends that the dormitory be his residence for purposes of voter registration, can permissibly register to vote in the county where the dormitory is located. And the mere fact that an applicant claims a post office box as an address or that many applicants claim the same post office box as an address is not dispositive regarding the determination of residence.

Chapter 13 of the Texas Election Code sets forth a detailed administrative procedure to be conducted by the voter registrar governing the submission and approval of voter registration applications. Chapter 16 of the Texas Election Code sets forth a detailed administrative procedure to be conducted by the voter registrar governing the cancellation, whether through the initiative of the registrar or any registered voter, of voter registration applications already approved. Chapter 17 of the Texas Election Code provides for judicial review of any administrative decision made under those chapters. No section of any of these chapters affords an official role to local prosecutors. Therefore, local prosecutors have no authority to prevent any voter registrar from performing the registrar's duties as provided by law. However, local prosecutors are authorized to investigate and prosecute whenever credible evidence is brought to their attention, or a complaint is filed regarding alleged violations of section 13.07 of the Texas Election Code, which makes it a criminal offense to submit false or fraudulent information on a voter registration application.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY MCBEE
First Assistant Attorney General

DON R. WILLETT

Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Jim Moellinger
Assistant Attorney General, Opinion Committee

---

**Appendix A**

The injunction decree issued in *United States v. State of Texas* ordered the following:

1. College students of Waller County shall be registered and allowed to vote on the same basis and by application of the same standards and procedures as non-students, without reference to whether such students have dormitory addresses, whether or not they resided in Waller County prior to attending school, and whether or not they plan to leave Waller County upon graduation.

2. The Court recognizes that LeRoy Symm has the right under the Texas Election Code to make a factual determination as to whether or not each applicant to vote is a bona fide resident of Waller County; however, in making this factual determination, LeRoy Simm shall not find that a person is a non-resident of Waller County for any of the following reasons:

A. That such person resides in a dormitory at Prairie View A&M University;

B. That such person owns no property in Waller County;

C. That such person is a student at Prairie View University;

D. That such applicant has no employment or promise of employment in Waller County;

E. That such applicant previously lived outside Waller County, or may live outside Waller County after his graduation.

F. That such person visits the home of his parents, or some other place during holidays and school vacations.

In this connection, if LeRoy Symm, in the performance of his duties, determines that he is to make a finding that a person is a non-resident, or not a bona fide resident of Waller County, such determination shall be made on the basis of tangible evidence, consisting of facts or factors other than the six factors listed above. In addition, in the event LeRoy Symm makes a determination that any person who claims to be a resident of Waller County, and who has a Prairie View University address, is not a bona fide resident of Waller County, Mr. Symm shall make a written record of the precise, exact tangible evidence upon which he relied in making his determination of non-residency. All records of the type described in the previous sentence shall be kept in legible form and in a single file in the Waller County Registrar's office where such records can be inspected by the plaintiff in this cause or any other person having a legitimate interest in the examination of such records. Such records shall be maintained for a period of five (5) years after originally made.

No additional inquiry or information shall be required solely because the application form promulgated by the Secretary of State of Texas contains different permanent and mailing addresses or states that the applicant is registered in another Texas county.

3. Students of Waller County shall not be subjected to the presumption contained in [art.] 5.08(k) of the Texas Election Code, or to any other presumption with regard to their voting residence.

4. The Tax Assessor, LeRoy Symm, shall immediately cease the utilization of the residence standard for students which has been implemented by means of a questionnaire, shall terminate the use of the questionnaire, and shall henceforth register students on the basis of the information contained in the state-approved registration form, as is done elsewhere in Texas, unless LeRoy Symm has tangible, recordable evidence (consistent with Paragraph 2 above of this injunctive decree) that such applicant is not a bona fide resident of Waller County. Defendant is enjoined from subjecting Prairie View students to any particular or discriminatory procedure not applied to non-students on a regular basis, such as for example, causing students to visit his office and submit students orally to the questioning previously contained in the questionnaire discussed in this Court's Memorandum Opinion.

5. The defendant Tax Assessor of Waller County shall schedule registration and other election procedures pursuant to a time table which will allow students who are bona fide residents of Waller County to register and vote in the elections scheduled for May 6, 1978, and in subsequent elections. Adequate resources and personnel shall be employed by the defendant Tax Assessor, so as to avoid causing student applicants any significant or unusual inconvenience.

6. Defendant Symm may require that all applicable information requested on the application form promulgated by the Secretary of State of Texas be supplied by the applicant, and may refuse registration unless and until all such information is provided. In the event the application form is incomplete and registration is denied on such basis, defendant Symm shall promptly return such incomplete application to the applicant with notice of the reason registration is denied.

7. The entry of this order shall not preclude the State of Texas from altering its voter registration standards so long as said standards are applied on a uniform basis and do not discriminate on the basis of race or age. Any such alteration of uniform standards shall be applied in Waller County and elsewhere without further order of this Court.

8. No relief will be granted with respect to defendants, Mark White, and his successor, Steven C. Oaks, John L. Hill, the State of Texas, and Waller County. It is further ORDERED, ADJUDGED, and DECREED that LeRoy Symm recover nothing of or from Steven C. Oaks, Secretary of State of the State of Texas, on his cross-claim, and that the State of Texas, acting by and through John L. Hill, its Attorney General, have judgment against LeRoy Symm on its cross-claim ordering that LeRoy Symm obey Rule 004.30.05.313 of the Rules of the Secretary of State, and that he cease using the written questionnaire with reference to the registration of voters in Waller County.

# Footnotes

1. Letter from Honorable Rodney Ellis, Chair, Government Organization Committee, Texas State Senate, to Honorable Greg Abbott, Texas Attorney General at 1 (Dec. 30, 2003) (on file with Opinion Committee) [hereinafter Request Letter].

2. Brief from Honorable Oliver S. Kitzman, Criminal District Attorney, Waller County, to Nancy Fuller, Chair, Opinion Committee, Office of the Attorney General at 2-6 (Jan. 23, 2004) (on file with the Opinion Committee).

3. The complete text of the injunctive order of the panel is set forth in Appendix A of this opinion.

4. The offense of perjury is set forth in chapter 37 of the Penal Code. See Tex. Pen. Code Ann. §§ 37.01-.13 (Vernon 2003 & Supp. 2004).

POST OFFICE BOX 12548, AUSTIN, TEXAS 78711-2548 TEL: (512) 463-2100 WWW.OAG.STATE.TX.US
*An Equal Employment Opportunity Employer*

https://www.oag.state.tx.us/opinions/opinions/50abbott/op/2004/htm/ga0141.htm

6/20/2013

Home | Opinions